# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| *In Re*: BioLab Class Actions | Civ. A. No. 1:24-CV-4407-SEG |
|  | Jury Trial Demanded |

## CONSOLIDATED CLASS ACTION COMPLAINT

Jason J. Carter
BONDURANT MIXSON & ELMORE
1201 West Peachtree Street, Suite 3900
Atlanta, Georgia 30309

L. Chris Stewart
STEWART MILLER SIMMONS
55 Ivan Allen Jr. Boulevard, Suite 700
Atlanta, Georgia 30308

Daniel R. Flynn
DICELLO LEVITT
10 North Dearborn Street, Sixth Floor
Chicago, Illinois 60602

Jean Sutton Martin
MORGAN & MORGAN
201 N. Franklin St., Seventh Floor
Tampa, Florida 33602

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

PARTIES .......................................................................................................4

    I.     Individual Plaintiffs .......................................................................4

    II.    Business Plaintiffs ........................................................................6

    III.   Defendants ....................................................................................8

          A. BioLab .................................................................................8

          B. KIK Defendants...................................................................10

          C. Centerbridge Defendants....................................................12

JURISDICTION & VENUE ...........................................................................13

COMMON FACTUAL ALLEGATIONS ........................................................18

    I.     Corporate Interrelatedness.........................................................18

          A. BioLab & KIK....................................................................19

          B. KIK & Centerbridge...........................................................25

          C. Joint and Concerted Action of Defendants.......................... 34

    II.    Defendants Failed to Make Critical Safety Improvements at the Conyers Plant Despite Previous Fires at Biolab Facilities......................35

          A. BioLab's History of Fires at the Conyers Plant ..................35

          B. BioLab's History of Regulatory Violations at the Conyers Plant .......37

          C. BioLab's History of Fires at its Lake Charles Plant...........40

III.   Building 12 of the Conyers Plant was filled with TCCA
       and other dangerous chemicals.................................................42

IV.    The September 29, 2024 Conyers Plant Fire............................................49

       A. The Evacuation and Shelter-in-Place Orders and
          Additional Closures..........................................................54

       B. The Regulatory Response to the Fire.................................61

       C. Impacts on the Community ...............................................68

CLASS ALLEGATIONS ........................................................................80

CLASS INJUNCTIVE RELIEF PURSUANT TO RULE 23(b)(2).......................87

CAUSES OF ACTION .........................................................................93

Plaintiffs Fannie Tartt, Albert Tartt, Teresa Boyd, Vanessa Underwood, Rafael Smith, Shanketa Barr, Pittman Construction Company, TT of Conyers, Inc., Wiggle Butts Enterprises, Inc. d/b/a Hounds Town – Atlanta-Conyers, Levett  Funeral Home, Inc., ADE 960, LLC, and ADE 1020, LLC, individually and on behalf of all others similarly situated ("class members"), bring this class action complaint against Defendants Biolab, Inc., KIK Custom Products, Inc., KIK International, LLC, KIK US Holdings, LLC, Centerbridge Partners, LP, and Centerbridge Capital Partners III, LP for damages resulting from a fire and explosion at their Conyers, Georgia chemical plant on September 29, 2024.

## INTRODUCTION

1.    On September 29, 2024, a fire ignited at the BioLab chemical plant at 1700 Covington Hwy., Conyers, Georgia 30012 ("Conyers Plant") ("BioLab fire").[1] The fire created a toxic chemical plume that was visible as far as 30 miles away,[2] and state emergency authorities issued a public safety alert to all residents within 50 miles of the Conyers Plant.[3] The fire and resulting cloud of

---

[1] Although its formal name is Bio-Lab, Inc., the consumer facing brand is BioLab, so the complaint will use BioLab.

[2] David Aaro & Rosana Hughes, *Chemical Fire at Conyers, GA, Plant Forces Evacuations, Closures*, FIREHOUSE (Sept. 29, 2024), https://www.firehouse.com/operations-training/video/55143420/evacuations-ordered-after-chemical-plant-fire-in-conyers-ga.

[3] Rosana Hughes, *Conyers BioLab plant fire: What to know*, THE ATLANTA JOURNAL-

toxic chemicals closed an 8-mile stretch of Interstate 20, required widespread evacuation and shelter-in-place orders, and caused needless and preventable property damage and personal injury. The photos below show the fire and plume at various points after the explosion:





CONSTITUTION (Oct. 4, 2024), https://www.ajc.com/news/crime/conyers-chemical-plant-fire-what-to-know/ZECJVWIRDNCR5P2DZJFSAXUQ2A/;    https://x.com/AFCEMA/status/1840819308697387256.



2.  BioLab manufactures and supplies chemicals, including specifically trichloroisocyanuric acid, or "TCCA." Consumers use TCCA-based formulations to kill algae and bacteria in swimming pools and hot tubs.

3.  When TCCA comes into contact with water, it causes an exothermic reaction that gives off a significant amount of heat and decomposes the TCCA into chlorine gas and nitrogen trichloride. In large bodies of water like a swimming pool, the heat is dissipated and the water dissolves both the chlorine and the nitrogen trichloride. When, however, TCCA comes in contact with small amounts of water, a runaway reaction can occur. This runaway reaction can release toxic and combustible gases into the air. The heat can initiate a fire and cause explosions.

4.  The 2024 BioLab fire was the fourth known fire at the Conyers Plant since 2004 and the third since 2016.

5.   In 2020 a similar fire occurred at BioLab's Westlake, Louisiana facility (the "Lake Charles Plant") requiring residents to shelter in place and shutting down a portion of Interstate 10 for more than 28 hours.

6.   The September 2024 fire in Conyers, and those that came before it, were the predictable result of years of reckless asset-stripping by KIK and Centerbridge, the entities that control BioLab, that eliminated or prevented the implementation of necessary safety measures.

7.   In 2015, Centerbridge forced KIK to take out roughly $1.2 billion in loans to finance its own acquisition by Centerbridge in a leveraged buyout.

8.   Under Centerbridge's control, KIK has diverted virtually all of its free cash flow to make payments on its leveraged buyout loans and distribute approximately $1 billion in dividends to Centerbridge. Those dividends have come at the expense of the communities that host unsafe KIK and BioLab facilities.

## PARTIES

### I.   Individual Plaintiffs

9.   Plaintiff Fannie Tartt has been a resident of Rockdale County, Georgia since approximately August 2007, and a citizen of the state of Georgia since approximately 1996.

10. Plaintiff Albert Tartt has been a resident of Rockdale County, Georgia since approximately August 2007, and a citizen of Georgia since approximately 1996.

11. On September 29, 2024, Plaintiffs Fannie and Albert Tartt resided at 1849 Kings Row, Conyers, Georgia 30012, approximately 1.3 miles from the Conyers Plant.

12. Plaintiffs Fannie and Albert Tartt lived in the area covered by the Evacuation Alert at the time of the fire and resulting toxic chemical plume at the Conyers Plant. Plaintiffs were not able to evacuate.

13. Plaintiff Teresa Boyd is a resident of Rockdale County, Georgia.

14. On September 29, 2024, Plaintiff Teresa Boyd resided at 2202 Bear Mountain Drive, Conyers, Georgia 30013, approximately 4.3 miles from the Conyers Plant.

15. Plaintiff Teresa Boyd lived within the area covered by the Shelter-in-Place Order and was forced to shelter in place after the fire and resulting toxic chemical plume at the Conyers Plant.

16. Plaintiff Vanessa Underwood is a resident of Rockdale County, Georgia.

17. On September 29, 2024, Plaintiff Vanessa Underwood resided at 1065A Eastview Road NE, Conyers, Georgia 30012, approximately 1.7 miles from the Conyers Plant.

18. Plaintiff Vanessa Underwood lived in the area covered by the Evacuation Alert at the time of the fire and resulting toxic chemical plume at the Conyers Plant. She was forced to evacuate her home for three days.

19. Plaintiff Rafael Smith is a resident of Rockdale County, Georgia.

20. On September 29, 2024, Plaintiff Rafael Smith resided at 1309 S. Hicks Circle, Conyers, Georgia 30012, approximately 1.6 miles from the Conyers Plant.

21. Plaintiff Rafael Smith lived in the area covered by the Evacuation Alert at the time of the fire and resulting toxic chemical plume at the Conyers Plant. Plaintiff was not able to evacuate.

22. Plaintiff Shanketa Barr is a resident of Rockdale County, Georgia.

23. On September 29, 2024, Plaintiff Shanketa Barr resided at 207 Odyssey Turn NW, Conyers, Georgia 30012, approximately 2.7 miles from the Conyers Plant.

24. Plaintiff Shanketa Barr lived in the area covered by the Shelter-in-Place Order at the time of the fire and resulting toxic chemical plume at the Conyers Plant. Plaintiff evacuated her home, along with her husband, elderly parents, and children.

## II.  Business Plaintiffs

25. Plaintiff Pittman Construction Company ("Pittman Construction") is a Georgia corporation that operates a paving and road construction business in Rockdale County, Georgia.

26. On September 29, 2024, Plaintiff Pittman Construction operated its business at 1487 Farmer Road NW, Conyers, Georgia 30012, approximately 0.7 miles from the Conyers Plant.

27. Plaintiff Pittman Construction operated its business within the area covered by the Evacuation Alert.

28. Plaintiff TT of Conyers, Inc. ("Conyers Nissan"), is a Georgia corporation that operates a car dealership in Rockdale County, Georgia.

29. On September 29, 2024, Plaintiff Conyers Nissan operated its business at 1420 Iris Dr. SW, Conyers, Georgia 30094, approximately 2.2 miles from the Conyers Plant.

30. Plaintiff Conyers Nissan operated its business within the area covered by the Evacuation Alert.

31. Plaintiff Wiggle Butts Enterprises, Inc. d/b/a Hounds Town – Atlanta-Conyers ("Hounds Town") operates a dog daycare business in Rockdale County, Georgia.

32. On September 29, 2024, Plaintiff Hounds Town operated its business at 1381 Iris Drive SE Conyers, Georgia 30013, approximately 4 miles from the Conyers Plant.

33. Plaintiff Hounds Town operated its business within the area covered by the Shelter-in-Place Order.

34. Plaintiff Levett Funeral Home, Inc. ("Levett Funeral Home") operates a funeral home business in Rockdale County, Georgia.

35. On September 29, 2024, Plaintiff Levett Funeral Home operated its business at 1299 Milstead Avenue, Conyers, Georgia 30012, approximately 2 miles from the Conyers Plant.

36. Plaintiff Levett Funeral Home operated its business within the area covered by the Evacuation Alert.

37. Plaintiffs ADE 960, LLC, and ADE 1020, LLC (collective, "ADE Entities"), own and operate a storage facility in Rockdale County, Georgia.

38. On September 29, 2024, Plaintiffs ADE Entities operated their business at 1363 Dogwood Drive SW, Conyers, Georgia 30012, approximately 0.8 miles from the Conyers Plant.

39. Plaintiffs ADE Entities operated its business within the area covered by the Evacuation Alert.

## III. Defendants

### A. BioLab

40. Defendant Bio-Lab, Inc. is engaged in the business of manufacturing and distributing swimming pool and spa water care chemicals under product names that include BioGuard, SpaGuard, Natural Chemistry, SeaKlear, AquaPill, Coral Seas, ProGuard, and Pro Series.

41. BioLab markets itself as "an industry leader in the development and marketing of innovative products that provide clear water for pools and spas and for keeping homes fresh and clean."[4]

42. At all relevant times, BioLab owned and operated the Conyers Plant.

43. "Among other operations, the [Conyers Plant] received, blended, and packaged [trichloroisocyanuric acid ("TCCA")] material into finished consumer products."[5]

44. According to Defendants' Corporate Disclosure Statement, BioLab is a Delaware corporation with its principal place of business in the State of Georgia. Doc. 44.

45. BioLab is licensed to do business in the State of Georgia and conducts business in several counties in the State of Georgia, including in Gwinnett and Rockdale Counties. BioLab is a wholly owned subsidiary of KIK International, LLC, a Delaware limited liability company.

---

[4] *BioLab, Inc.*, POOL SUPPLY WAREHOUSE, https://www.thepoolsupplywarehouse. com/collections/biolabinc#:~:text=BioLab%2C%20Inc.%20is%20proud%20to,kee ping%20homes%20fresh%20and%20clean. (last visited Jan. 5, 2025).

[5] U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD, *Trichloroisocyanuric Acid Reaction, Decomposition, and Toxic Gas Release at BioLab, Inc*. (1st ed. 2023), https://www.csb.gov/assets/1/6/BioLab_investigation_report_2023-4-24.pdf.

46. BioLab was previously served through its registered agent for service of process, CT Corporation System, 289 S. Culver St., Lawrenceville, Georgia 30046.

### B. KIK Defendants

47. Defendant KIK International, LLC is a Delaware limited liability company with its principal place of business in Ontario, Canada. Doc. 44; Doc. 58.

48. KIK International, LLC was previously served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

49. Defendant KIK Custom Products, Inc. ("KIK") is a Delaware corporation with its principal place of business in Ontario, Canada. Doc. 44; Doc. 58.

50. KIK Custom Products, Inc. uses the registered trade name KIK Consumer Products, Inc.

51. KIK Custom Products, Inc., d/b/a KIK Consumer Products, Inc., ("KIK") is duly authorized to conduct business in the State of Georgia.

52. KIK Custom Products Inc. was previously served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801.

53. Defendant KIK US Holdings, LLC is a Delaware limited liability company with its principal place of business in Illinois. *See Rodriguez v. KIK Int'l, LLC,*

*et. al.*, Civ. A. No 5:23-cv-01598 (C.D. Cal. 2023), Doc. 1-2, Iheaka Aff. ¶ 4 ("KIK U.S. Holdings LLC, a Delaware limited liability company, and citizen of the state of Delaware and Illinois.").

54. KIK US Holdings, LLC may be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

55. KIK International, LLC, KIK Custom Products, Inc., and KIK US Holdings, LLC are collectively referred to as "KIK Defendants."

56. KIK is one of North America's largest independent manufacturers of consumer products. KIK acquired BioLab in 2013 in order to expand its pool and spa treatment business.

57. KIK, at all relevant times, owned and operated the Conyers Plant.

58. Upon information and belief, BioLab has consistently held itself out as conducting business affairs as a conduit for KIK in connection with the ownership and operation of their chemical enterprise, including promoting itself as "the swimming pool and spa water care division of KIK Consumer [Custom] Products, based in Lawrenceville, Georgia."[6]

---

[6] BioLab, Inc., *Who We Are*, https://www.biolabinc.com/ (last visited Jan. 10, 2025).

59. Additionally, BioLab and KIK constituted a joint venture in connection with the Conyers Plant in as much as they agreed to undertake ownership and operation of the Conyers Plant jointly for the purpose of sharing associated profits and losses, and each contributed their respective skills, property, or resources in exercising control or a right of control over the Conyers Plant.

### C. Centerbridge Defendants

60.  Defendant Centerbridge Partners, LP ("CB Partners") is a Delaware limited partnership. Upon information and belief, CB Partners' primary place of business is in New York.

61. Centerbridge Partners, LP may be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

62. Defendant Centerbridge Capital Partners III, LP ("Centerbridge Fund") is a Delaware limited partnership private equity investment fund established in 2014. Upon information and belief, Centerbridge's primary place of business is in New York.

63. Centerbridge Capital Partners III, LP. may be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

64. Centerbridge Partners, LP and Centerbridge Capital Partners III, LP are collectively referred to as "Centerbridge."

65. Upon information and belief, CB Partners created, promoted, and controls Centerbridge Fund.

66. Centerbridge acquired KIK in June 2015.

## JURISDICTION & VENUE

67.  This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).

68. The amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs.

69. There are more than one hundred Class members.

70. Plaintiffs and many members of the putative Class are citizens of states that are different from the states of which at least one Defendant is a citizen.

71. Defendants are citizens of foreign states. KIK Custom Products, Inc. is a citizen of Delaware and Ontario, Canada; KIK International, LLC is a citizen of Delaware and Ontario, Canada; and KIK US Holdings, LLC is a citizen of Delaware and Illinois. Centerbridge Partners, LP is a citizen of Delaware and New York and Centerbridge Capital Partners III, LP is a citizen of Delaware and New York.

72. No exception to CAFA jurisdiction under 28 U.S.C. § 1332(d)(4) exists in this case.

73. The local controversy exception, 28 U.S.C. § 1332(d)(4)(A), does not apply because at least two state court class actions were filed before the first case was filed in this Court.

74. On September 30, 2024, two plaintiffs, individually and on behalf of all others similarly situated, filed a class action complaint against BioLab in the State Court of Gwinnett County. *See Dobbins, et al. v. Bio-Lab, Inc., et al*., Case No. 24-C-9053-S5. The *Dobbins* complaint bears an e-filed stamped time of 5:14 am.

75. On September 30, 2024, several other plaintiffs, individually and on behalf of all others similarly situated, filed another class action complaint against BioLab in the State Court of Gwinnett County. *See Lynch, et al. v. Bio-Lab, Inc., et al.*, Case No. 24-C-09082-S5. The *Lynch* complaint bears an e-file stamped time of 1:26 p.m.

76. The plaintiffs in *Dobbins* and *Lynch* filed their original complaints shortly before any plaintiffs filed a class action complaint in federal court regarding the fire. The complaints in *Dobbins* and *Lynch* assert the same or similar claims on behalf of the same or other persons as the federal class action complaints which have been consolidated into the above-captioned case.

77.   The home state exception, 28 U.S.C. § 1332(d)(4)(B), does not apply because KIK Defendants and Centerbridge Defendants are "primary defendants," and none are citizens of Georgia for diversity jurisdiction purposes under CAFA.

78.   The KIK Defendants are primary defendants because they are directly liable to the proposed class as joint tortfeasors and they have "potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants if found liable." *Hunter v. City of Montgomery*, 859 F.3d 1329, 1336 (11th Cir. 2017).

79.   This Court has jurisdiction over the KIK Defendants because they each operate their chemical enterprise in this District. *See Rodriguez v. KIK Int'l, LLC, et. al.*, Civ. A. No 5:23-cv-01598 (C.D. Cal. 2023), Doc. 1-2, Iheaka Aff. ¶ 4 ("KIK International controls, directs, and coordinates the company's business activities primarily from three locations, in Ontario Canada, Georgia, and Illinois."). *Aguiar v. KIK Int'l. LLC, et al*, Civ. A. No. 5:19-cv-1596 (C.D. Cal. 2019), Doc. 3, Padilla Dec. ¶ 7 ("KIK Custom Products Inc. … maintains its principal places of business in the States of Georgia and Illinois, and in the country of Canada.").

80.   This Court has jurisdiction over the Centerbridge Defendants because each of the Centerbridge Defendants have taken actions, either alone or in concert with

other Centerbridge entities, to influence, control and direct the operations of KIK.

81. The Centerbridge Defendants' diversion of KIK's assets, revenue, and free cash flow was a material factor in KIK's inability to invest in adequate safety measures at KIK and BioLab facilities.

82. KIK's inability to invest in adequate safety measures at the Conyers Plant was a foreseeable consequence of the Centerbridge Defendants' diversion of KIK's assets, revenue, and free cash flow.

83. At all relevant times, each of the Centerbridge entities were aware that BioLab was a major component of KIK's business structure.

84. At all relevant times, each of the Centerbridge Defendants were aware that the Conyers Plant was a major part of BioLab's business operations.

85. At all relevant times, each of the Centerbridge Defendants were aware that their influence, control, and direction of KIK could affect the implementation of adequate safety measures by KIK and Biolab.

86. At all relevant times, each of the Centerbridge Defendants intended for the effects of their influence, control, and direction of KIK and BioLab to be felt in Georgia.

87. At all relevant times, each of the Centerbridge Defendants were aware that if KIK and BioLab failed to implement adequate safety measures, KIK and BioLab could suffer an industrial incident at the Conyers Plant.

88. At all relevant times, each of the Centerbridge Defendants were aware that an industrial incident at the Conyers Plant would disproportionately affect the citizens of Georgia.

89. Through their diversion of cash flow from the KIK entities, the Centerbridge Defendants have derived substantial revenue from products that are shipped out of the Conyers Plant.

90. The Centerbridge Defendants are primary defendants because they acted in concert with the KIK Defendants and are therefore directly liable to the proposed class as joint tortfeasors and they have "potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants if found liable." *Hunter v. City of Montgomery*, 859 F.3d 1329, 1336 (11th Cir. 2017).

91. Through their regular business operations in this District, Defendants intentionally and regularly availed themselves of the markets and jurisdiction in this District, conferring this Court with personal jurisdiction over each Defendant.

92. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Conyers Plant and Defendants' operations are located in this District. Defendants' negligence resulted in a fire in this District that caused harm to Plaintiffs and class members in this District. Defendants are subject to personal jurisdiction in this District.

## COMMON FACTUAL ALLEGATIONS

### I.    Corporate Interrelatedness

93. BioLab is wholly owned by KIK International LLC.

94. The sole member of KIK International LLC is KIK U.S. Holding LLC.

95. The sole member of KIK U.S. Holding LLC is KIK Custom Products Inc.

96. KIK Custom Products Inc. uses "KIK Consumer Products Inc." as a registered trade name.

97. KIK Custom Products Inc. is wholly owned by KCP Holdings, Inc.

98. KCP Holdings, Inc. is owned by KCP Investment Holdings, LP.

99. The controlling shareholder of KCP Investment Holdings, LP, is Centerbridge Capital Partners III, LP.

100. Centerbridge Capital Partners III, LP is controlled and promoted by Centerbridge Partners, LP.

101. A chart depicting the corporate structure is attached as Exhibit A.

## A. BioLab & KIK

*BioLab and KIK share officers and directors*

102. Michael Sload currently serves as the CEO of KIK Custom Products Inc., KIK International LLC, and BioLab.

103. Mr. Sload is also a director of BioLab.

104. Currently, Isabelle Pierre simultaneously serves as Executive Vice President, General Counsel, and Secretary for all of the following entities: KIK Custom Products Inc., KIK International, LLC, and BioLab.

105. From 2014 to 2017, Mark Halperin simultaneously served as Executive Vice President, General Counsel, and Secretary for all of the following entities: KIK Custom Products Inc., KIK International, LLC, and BioLab.

106. Steven P. Jackson currently serves as Chief Financial Officer and Treasurer of KIK Custom Products Inc., KCP Holdings, Inc., KIK International, LLC, and BioLab.

107. Ari Sahakian currently serves as a director of KIK Custom Products Inc. and BioLab.

108. From 2019 to 2023, Jared Knudson served as a director of KIK Custom Products Inc., KCP Holdings, Inc., and BioLab.

109. From 2015 to 2017, Jeffrey Nodland served as a director of KIK Custom Products Inc., KCP Holdings, Inc., and BioLab.

110. Numerous copyrights, trademarks, patents, patent applications, and industrial design registrations owned by BioLab were pledged as collateral for loans taken out by KIK.

111. In an August 2015 agreement executing this assignment, Mark Halperin signed on behalf of BioLab, KIK Custom Products Inc., and KIK International, LLC.

112. No other officers or directors of BioLab, KIK Custom Products Inc., or KIK International, LLC signed the agreement.

113. As recently as July 2024, Stephen Jackson signed an agreement assigning intellectual property rights of BioLab, KIK Custom Products Inc., and KIK International Inc. as security interests for a loan taken out by KIK Custom Products, Inc.

114. Stephen Jackson signed on behalf of BioLab, KIK Custom Products Inc., KIK International Inc., and eight other corporate entities.

115. No other officers or directors of BioLab, KIK Custom Products Inc., or KIK International, LLC signed the agreement.

116. Similar assignments of rights occurred in 2021, 2020, 2019, and 2016.

*KIK personnel are directly responsible for aspects of BioLab's regulatory and safety operations concerning the Conyers Plant.*

117. Travis Gladish, a KIK Custom Products Director of Process Safety, has served as BioLab's liaison to the Georgia Environment Protection Department on

matters relating to BioLab's violation of pollution discharge limits and subsequent remedial measures. *See, e.g.*, Exhibit B.

118. Michael Smith, a KIK Vice President, has served as the Emergency Contact and Tier II information contact for BioLab's submissions to the Environmental Protection Agency under Section 312 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA). *See, e.g.*, Exhibit C.

119. KIK employees have also been listed as the corporate point of contact for county government inspections of the Conyers Plant and applications for repairs of the Conyers Plant after the fires in September 2020. These repairs included replacement of the Conyers Plant sprinkler system.

120. KIK is actively engaged in and responsible for the operations at the Conyers Plant. KIK employees are present on-site and responsible for core functions at the Conyers plant. Off-site KIK management and executives participate in operations and management of the Conyers Plant.

121. KIK's reliance on and intervention in the corporate affairs of BioLab has been enhanced since KIK's sale of its auto products division (Prestone Products Corp.) in June 2024.

122. A June 2024 report issued by the credit rating agency Standard & Poors ("S&P") noted that after the sale of Prestone Products, KIK's business was

"less diverse" because it was now concentrated in the market segments where BioLab operates.

123. When discussing its financial forecast for KIK, the June 2024 S&P report referenced the projected business impact of "the ramp-up and full utilization of its Lake Charles Plant, a reduction in the expenses associated with its purchases of Trichloroisocyanuric acid [TCCA] from third parties, [and] management's cost-reduction initiatives."

124. The hazardous decomposition of TCCA formulations was a contributing factor to the August 2020 destruction of the Lake Charles Plant.

125. The hazardous decomposition of TCCA formulations was a contributing factor to the hazardous release at the Conyers Plant in September 2020.

126. The hazardous decomposition of TCCA formulations was a contributing factor to the September 2024 fire at the Conyers Plant that is the subject of this litigation.

*BioLab is KIK's core business*

127. BioLab's centrality to the operation of KIK was so obvious that S&P, an outside bond agency, made multiple references to TCCA and the Lake Charles Plant when discussing KIK's financial outlook.

128. The importance of the Lake Charles Plant and expenses relating to BioLab's use of TCCA was also noted in a December 2021 report from the bond rating agency Moody's.

*KIK's 2015 purchase of BioLab was a "tuck-in acquisition"*

129. The June 2024 S&P report indicated that KIK has a history of making "tuck-in acquisitions."

130. A "tuck-in acquisition" occurs when a larger business entity completely absorbs a smaller entity.

131. In a tuck-in acquisition, the acquisition target does not maintain any of its own original systems, structure, or independence after the acquisition.

132. By contrast, in a "bolt-on acquisition," the acquisition target can be allowed to operate independently within its own department of the acquiring company.

133. In a tuck-in acquisition, both entities usually exist within the same industry or occupy similar spaces in the market.

134. At the time of KIK's acquisition of BioLab in 2013, KIK was already a competitor in the pool care business.

135. At the time of KIK's acquisition of BioLab in 2013, KIK had recently announced an agreement to license the brand Clorox for pool care products.

136. Since acquiring BioLab, KIK has acquired the German pool chemical brands SYNaqua and PoolsBest.

137. Since acquiring BioLab, KIK has acquired North American specialty pool chemical provider NC Brands L.P.

138. Since acquiring BioLab, KIK has acquired pool chemical manufacturer and distributor Sunbelt Pool Chemicals.

139. All of these acquired entities exist within the same industry of specialty pool chemicals.

140. Thus, the circumstances of KIK's acquisition of BioLab, the pattern of KIK's subsequent acquisitions within the specialty pool chemical industry, and the S&P's comments about KIK's history of tuck-in acquisitions indicate that BioLab was a tuck-in acquisition of KIK.

*KIK's co-branding and control of BioLab*

141. At all relevant times, KIK has maintained and exercised the right to control BioLab's work, including (but not limited to) BioLab's development and implementation of safety policies and procedures, BioLab's handling, transport, and storage of chemicals, BioLab's emergency response policies and procedures, and BioLab's maintenance of its safety infrastructure.

142. KIK has been directly involved in assisting, directing, and controlling BioLab's response to the 2024 Conyers Plant incident. *See* Exhibit D.

143. KIK maintains an Environmental, Health and Safety Policy for BioLab and all its other subsidiaries. The policy specifies: "[a]ll KIK employees have a

responsibility for individual and collective actions to improve our environment, health, safety, security, and sustainability performance. We are committed to continuous improvement in these areas by working together with government representatives, customers, consumers, and the communities in which we live and work."

144. KIK directly provided employee benefits to all employees of KIK subsidiaries, including BioLab.

145. Signage bearing the name and branding of KIK were pervasive at the Conyers Plant. *See* Exhibit E.

146. Safety-related signage at the Conyers Plant bore the name and branding of KIK. *See* Exhibit F.

147. KIK branding was used for customer labels and inventory control records placed on product held at the Conyers Plant. *See* Exhibit G.

148. Some products held at the Conyers Plant were addressed to "KIK Consumer Products," while also noting BioLab and NC Brands, another pool chemical company acquired by KIK. *See* Exhibit H.

### B. KIK & Centerbridge

149.  Centerbridge Partners, LP ("CB Partners") is a Delaware limited partnership.

150. Upon information and belief, CB Partners' primary place of business is in New York.

151. CB Partners operates through a number of subsidiary entities.

152. CB Partners is a multi-strategy private investment firm focused on private equity and credit investment opportunities.

153. CB Partners has over $25 billion of assets under management.

154. CB Partners was founded in 2005 by Jeffrey Aronson and Mark Gallogly.

155. Centerbridge Capital Partners III, LP. ("Centerbridge Fund") is a limited partnership private equity investment fund established by Jeffrey Aronson and Mark Gallogly in 2014.

156. Jeffrey Aronson and Mark Gallogly are Executive Officers of Centerbridge Fund and CB Partners.

157.  Centerbridge Fund has at least $5.7 billion in committed capital to invest in portfolio companies.

158. Centerbridge acquired KIK in June 2015.

159. Centerbridge is not a passive investor in KIK.

160. Centerbridge claims that it "consistently looks to … effectuate operational improvements and other value-creating strategies that grow their businesses in responsible ways."

161. Centerbridge claims that it uses an "integrated approach" that "Unifies Perspectives Across Private Equity, Credit and Real Estate and Applies Them Across Sectors and Geographies."

*Centerbridge and KIK share multiple officers and directors*

162. Elliott Weinstein is a Managing Director at CB Partners.

163. Mr. Weinstein is also a Vice President and Secretary of KIK Custom Products, as well as a Director for KIK Custom Products and KCP Holdings.

164. Steven Silver is a Senior Managing Director at CB Partners.

165. Mr. Silver is also a Director of KIK Custom Products and KCP Holdings.

166. Susanne V. Clark is a Senior Managing Director, General Counsel, Chief Sustainability Officer, and Secretary at CB Partners.

167. Ms. Clark is also a Director of KIK Custom Products and KCP Holdings.

168. S&P has rated KIK's governance structure as a negative consideration in its credit rating analysis.

*Centerbridge's tortious undercapitalization of KIK*

169. In October 2022 S&P stated that "[KIK's] highly leveraged financial risk profile points to corporate decision-making that prioritizes the interests of the controlling owners."

170. The authors of a June 2024 S&P report "believe[d] [KIK's] financial sponsors will continue to undertake tuck-in acquisitions or debt-funded dividend recapitalizations."

171. The June 2024 S&P report's reference to corporate decisions being driven by KIK's financial sponsors (i.e., Centerbridge) demonstrates that Centerbridge's dominance of KIK was public knowledge.

172. The June 2024 S&P report's reference to corporate decisions being driven by KIK's financial sponsors (i.e., Centerbridge) demonstrates that Centerbridge's dominance of KIK went beyond what is considered typical among majority owners of a corporation.

173. In 2015, Centerbridge acquired KIK for approximately $1.653 billion.

174. However, Centerbridge contributed only 25% of the acquisition price, or roughly $413 million.

175. The remaining 75% of the acquisition price, or roughly $1.24 billion, was funded through secured and unsecured loans that were assigned to KIK.

176. Effectively, KIK paid Centerbridge $1.24 billion to fund its own acquisition.

177. While Centerbridge contributed only 25% of the acquisition price, it received 100% control and 100% of the rewards.

178. Meanwhile, KIK and its creditors were forced to shoulder the risk that KIK would default on the loans it took out to pay Centerbridge.

179. These loans were viewed by outside observers as low quality.

180.  The credit rating agency Moody's gave the 2015 secured loans a rating of B2, reflecting a judgment that the loans were "speculative and … subject to high credit risk."

181. Moody's gave the $390 million in unsecured loans a rating of Caa2, reflecting a judgment that the loans were "speculative of poor standing and … subject to very high credit risk."

182. Moody's gave the KIK "corporate family" an overall default rating of B3-PD, reflecting a judgment that KIK's corporate family was "speculative and … subject to high default risk."

183. Both Moody's and S&P noted that KIK retained a "highly leveraged financial risk profile" with Debt-to-EBITDA ratio of 8.

184. For comparison, Clorox Company (a large competitor) had a Debt-to-EBITDA ratio of 1.9.

185. Consequently, S&P's August 2015 report stated "we based our assessment on a 'weak' business risk profile … and a highly leveraged financial risk profile that reflects financial sponsor ownership."

186. In the years that followed, Centerbridge continued to burden KIK with debt-financed acquisitions.

187. In 2016, Centerbridge acquired Prestone Products Corp. for approximately $235 million.

188. Upon information and belief, Centerbridge financed the entire acquisition by loading debt onto KIK.

189. In December 2018, Centerbridge burdened KIK with an additional $175 million in debt to fund the acquisition of NC Brands, LP & NCI Holdings, Inc.

190. A December 2018 S&P report noted that the December 2018 acquisition was "fully debt funded"; S&P "expect[ed KIK's] credit measures to deteriorate following the acquisition" and found "the company's capital structure/debt burden to be unsustainable in the long term."

191. In the months of August and September 2020, KIK facilities at Lake Charles and Conyers both experienced fires and hazardous chlorine releases caused by a failure to protect TCCA materials from water while in storage.

192. Subsequent reconstruction of the Lake Charles Plant cost $250 million, while the Conyers Plant sustained over $1 million in damage.

193. The close temporal proximity of these hazardous releases, each involving the same material, was a clear indicator that KIK's industrial safety measures and processes were seriously deficient.

194. Any genuinely independent corporate entity in KIK's situation would have recognized the risk that additional incidents would pose to both the sustainability of KIK's business operations and the communities that host KIK facilities.

195. However, Centerbridge's first major financial move after the destruction of the Lake Charles Plant was to force KIK to distribute roughly $484 million in dividends.

196. The amount of this dividend exceeded the amount of equity that Centerbridge had contributed to acquire KIK in 2015.

197. Upon information and belief, Centerbridge never demanded that KIK issue a significant dividend prior to the 2020 incidents which damaged the Lake Charles and Conyers facilities.

198. The timing of this shift shows that Centerbridge was aware of KIK's precarious position in 2020 and wanted to secure a profit through asset stripping before any other major incidents could occur.

199. This dividend was financed by burdening KIK with $1.9 billion in new and refinanced debt, including about $500 million in unsecured notes that were below investment grade.

200. According to a December 2020 S&P report on a new loan that was being arranged as part of the restructuring, Kronos Acquisition Holdings Inc. was the borrower and KIK Custom Products Inc. was the co-borrower.

201. The S&P report also specifically described KIK Custom Products as being "backed by Centerbridge Partners."

202. In rating KIK's December 2020 loan deal, Moody's reaffirmed a previous B3 rating for KIK's corporate family.

203. Moody's stated that this rating was constrained by KIK's "ownership by a private equity firm, which could lead to financial policies that are more favorable to shareholders."

204. In August 2021, Moody's again stated that its rating of KIK was "constrained by high leverage [and] private equity ownership."

205. The improvident and forced nature of KIK's 2020 dividend was further revealed in December 2021, when KIK required another $170 million in loans to fund working capital and capital expenditure requirements relating to reconstruction of the Lake Charles Plant.

206. If Centerbridge had limited the size of its forced dividend in the aftermath of the Lake Charles and Conyers incidents to a "mere" $300 million, KIK would not have required any additional debt funding in 2021.

207. In rating the new $170 million loan, Moody's again stated that KIK was constrained by "high pro forma leverage" and "ownership by a private equity firm, which could lead to financial policies that are more favorable to shareholders."

208. In June 2024, KIK underwent another round of debt refinancing and restructuring in connection with the sale of Prestone Products.

209.  KIK received roughly $850 million for the sale of Prestone Products.

210. That revenue was immediately diverted to pay off roughly $2.1 million in preexisting debt, obtain $1.9 billion in new debt, and pay another forced dividend of between $450 million and $550 million to Centerbridge.

211. In the nine years from 2015 to 2024, Centerbridge took out more than $1 billion in dividends from KIK based on an initial equity investment of $413 million.

212. This $1 billion in dividends has come at the expense of burdening KIK with roughly $1 billion more debt than KIK held prior to its acquisition by Centerbridge.

213. By themselves, the two forced dividends in 2020 and 2024 have given Centerbridge a profit of 142% on its initial equity investment.

214. This profit has been augmented by an unknown amount of management and transactional fees levied by Centerbridge against KIK.

215. As indicated by the repeated public statements of credit rating agencies S&P and Moody's, Centerbridge's influence over KIK in matters of debt, dividends, and cash flow is pronounced and widely known.

216. Centerbridge has repeatedly "bled" KIK of assets and cash flow in order to deliver promised returns to Centerbridge investors.

217. The conduct by Centerbridge and others detailed herein caused or contributed to undercapitalization of the KIK entities with the intent to improperly avoid future debts of the entities.

218. At all relevant times, Centerbridge has maintained and exercised the right to control KIK's level of investment in safety infrastructure.

219. Centerbridge has effectively barred KIK from making necessary investments and improvements in safety infrastructure because Centerbridge has committed KIK to debt-financed dividends that divert all of KIK's free cash flow.

220. Centerbridge has been directly involved in assisting, directing, and controlling KIK's response to the 2024 Conyers Plant fire.

221. A timeline identifying some key events is attached as Exhibit I.

### C. Joint and Concerted Action of Defendants

222. Defendants either positively or tacitly arrived at a mutual understanding as to how they would accomplish an unlawful design to commit the acts which are detailed herein, such that the act of one is the act of all defendants.

223. There was either an express agreement or compact among the Defendants or alternatively, between each individual Defendant and Defendant BioLab, or their common design can be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances.

224. Defendants' agreement, mutual understanding, and common design is established and/or may be inferred from the facts detailed herein.

225. As a direct and proximate cause of Defendants' actions, Plaintiffs and class members have incurred, and will continue to incur, monetary and other damages, including those arising from property damage and loss of use of their property.

226. Because the Defendants acted in concert, the fault of Defendants cannot be readily apportioned among them.

227. Defendants collectively are joint wrongdoers such that they are all jointly and severally liable for the damages suffered by Plaintiffs and class members.

## II.    Defendants failed to make critical safety improvements at the Conyers Plant despite previous fires at BioLab facilities.

228. Centerbridge's financial manipulation and siphoning of assets from KIK and BioLab resulted in massive safety failures at the Conyers Plant and BioLab facilities across the country.

### A. BioLab's History of Fires at the Conyers Plant

229. In 2004, the warehouse of the Conyers Plant caught fire, injuring 28 people.[7]

---

[7] Jonathan Raymond, *BioLab in Conyers had similar chemical fire, smoke plume situation in 2004 | Here's what happened,* 11 ALIVE (Sep 29, 2024), https://www.11alive.com/article/news/local/BioLab-chemical-fire-conyers-georgia-2004-similar-incident/85-d71cc6d6-78cf-4283-9510-03c93b2ee71c.

230. The fire was caused by an explosion at the Conyers Plant fueled by 250,000 pounds of dry chlorine pellets.

231. The fire produced a toxic chlorine plume that affected residents within 50 miles of the Conyers Plant and authorities closed Interstate 20.

232. Residents within a 1.5-mile radius of the  were evacuated.

233. In 2016, a fire ignited in a storage shed at the Conyers Plant.[8]

234. Upon information and belief, the fire protection system did not properly activate, and no fire was reported by BioLab.

235. The fire was only noticed and reported because a nearby resident smelled smoke and chemicals and called the authorities.

236. The fire was fueled by reactions from chlorine pellets contained in the storage shed.

237. Residents within a 1-mile radius of the  were evacuated.

238. On September 14, 2020, a TCCA reaction and subsequent chemical fire and toxic chemical plume occurred at the Conyers Plant.[9]

239. The fire ignited when water reacted with unpackaged TCCA on the floor.

---

[8] Adrianne Haney, *Chemical fire breaks out Conyers warehouse*, 11 ALIVE (June 4, 2016, 10:29 AM), https://www.11alive.com/article/news/local/conyers/chemical-fire-breaks-out-conyers-warehouse/85-231326577.

[9] U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD, *Trichloroisocyanuric Acid Reaction, Decomposition, and Toxic Gas Release at BioLab, Inc.* (1st ed. 2023), https://www.csb.gov/assets/1/6/BioLab_investigation_report_2023-4-24.pdf.

240. As a result of the fire, sections of the interstate were shut down and surrounding businesses were evacuated.

241. Following the incident, chlorine levels in the air at a nearby business property measured 12 times the permissible exposure limit set by the federal government.

242. The leak and resulting fumes cost an estimated $1,007,000 in property damage.

243. Nine responding firefighters were hospitalized as a result of their exposure to the fumes.

244. Four days later, on September 18, 2020, a trailer containing TCCA caught on fire at the Conyers Plant, further releasing toxic materials into surrounding communities.

### B. BioLab's History of Regulatory Violations at the Conyers Plant

245. The Conyers Plant has been inspected for Clean Air Act compliance three times in the past five years.[10]

246. These three inspections resulted in two informal enforcement actions and one formal enforcement action.[11]

---

[10] *Detailed Facility Report: BioLab, Inc.*, U.S. EPA, https://echo.epa.gov/detailed-facility-report?fid=110007087213 (last visited Oct. 30, 2024).

[11] *Id.*

247. The Conyers Plant was also inspected in 2023 for compliance with the Clean Water Act ("CWA").[12]

248. The inspection detected significant noncompliance, and BioLab received an informal enforcement action.[13]

249. The Conyers Plant has spent eight of the last twelve quarters in CWA noncompliance, and five of the last twelve quarters with a significant violation of the CWA.[14]

250. The Conyers Plant was inspected in January 2024 for compliance with the Resource Conservation and Recovery Act ("RCRA").[15]

251. BioLab received two informal enforcement actions and spent two quarters in noncompliance with RCRA.[16]

252. "In February of [2024], BioLab received a notice of violation from Georgia environmental regulators after inspectors uncovered several [RCRA] violations during an inspection the month prior. During the January inspection, the report said regulators found multiple improperly sealed and unlabeled hazardous waste containers on site. Used oil tanks and buckets were left uncovered, and

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

inspectors noted that the company had not been performing its required weekly self-inspections. 'Multiple areas in the . . . showed a neglect of maintenance to the point of creating potential safety hazards. It is advised that the take some action to address this issue,' inspectors wrote."[17]

253. BioLab shipped over 323,000 pounds of hazardous waste to and from the Conyers Plant during the first three quarters of 2024.[18] This number was consistent with numbers from previous years.

254. BioLab knew the amount of dangerous and toxic chemicals at the Conyers Plant and failed to take adequate precautions to ensure these chemicals were handled safely and to prevent dangerous chemical reactions, as evidenced by the prior violations detailed above.

255. BioLab has also been cited for "dozens of OSHA violations" over the past 30 years, including violations for not properly training employees on hazardous chemicals.[19]

---

[17] Charles P. Pierce, *A Cloud of Noxious Chemicals and Lawsuits Is Descending Outside Atlanta,* ESQUIRE (Oct. 15, 2024, 8:29 AM), https://www.esquire.com/news-politics/politics/a62600626/biolab-fire-chemicals-leak-georgia/ (last visited Jan. 10, 2025).

[18] *Detailed Facility Report: BioLab, Inc.*, U.S. EPA, https://echo.epa.gov/detailed-facility-report?fid=110007087213 (last visited Jan. 10, 2025).

[19] Pamela Kirkland, *Conyers residents demand accountability after latest BioLab fire leaves lingering concerns*, GPB NEWS (Oct. 28, 2024, 3:46 PM), https://www.gpb.org/news/2024/10/28/conyers-residents-demand-accountability-after-latest-biolab-fire-leaves-lingering (last visited Jan. 10, 2025).

256. Chemtura, the former parent company of BioLab, settled with the EPA and the Department of Justice in 2010 for a total of $26 million, and $785,000 of that amount was payment for penalties incurred by the Conyers Plant for violations of environmental law and regulations.[20]

### C. BioLab's History of Fires at its Lake Charles Plant

257. On August 27, 2020, there was a chemical fire at the Biolab's Lake Charles Plant following Hurricane Laura.[21]

258. The fire caused a plume of toxic chemicals to spread through surrounding areas.

259. A federal investigation revealed that the cause of the Lake Charles Plant fire and chemical cloud was rainwater which came into contact with stored TCCA, which initiated a chemical reaction, decomposition, and fire.[22]

260. The federal investigation found that BioLab:

    (a)  failed to "learn the importance of preparing for extreme weather;"

    (b)  failed to implement recommendations from BioLab's Process Hazard Analyses under their Process Safety Management program;

---

[20] *Id.*

[21] U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD, *Chemical Reaction, Decomposition and Toxic Gas Release at BioLab, Inc.* (1st ed. 2023), https://www.csb.gov/BioLab-lake-charles-chemical-fire-and-release-/ (last visited Jan. 10, 2025).

[22] *Id.*

    (c)   failed to "adequately maintain its fire protection system to protect against fire hazards and ensure its functionality during an emergency," which caused "serious delays in responding to the TCCA-based formulation decomposition;" and

    (d)   failed failure to "conform to the safeguards identified in the National Fire Protection Association (NFPA) 101 *Life Safety Code* for high-hazard industrial occupancies." [23]

261. In November 2022, Biolab celebrated the reopening of the Lake Charles Plant, touting it as stronger and safer than ever.

262. In March 2023, there was a chlorine leak at the Lake Charles Plant that caused a shelter-in-place order for the area surrounding the .[24]

263. On July 2, 2024, the Lake Charles Plant again caught fire prompting freeway closures and shelter-in-place orders.[25]

264. This intentional, willful, and wanton conduct creates a presumption of conscious indifference to the consequences of its actions that warrant the imposition of punitive damages.

---

[23] *Id.*

[24] KPLC Digital Team, Devon Distefano*, Chlorine Lead from BioLab Causes Shelter In Place*, 7KPLC (Mar. 22, 2023, 10:09AM), https://www.kplctv.com/2023/03/22/i-10-shut-down-westlake-due-possible-hazardous-chemical-cloud/ (last visited Jan. 10, 2025).

[25] Natalie Mclendon, *Chlorine warehouse fire forces Calcasieu residents to Shelter in Place, I-10 Closure*, Louisiana Illuminator, (July 2, 2024, 1:27 PM), https://lailluminator.com/2024/07/02/chlorine-fire/ (last visited Jan. 10, 2025).

### III. Building 12 of the Conyers Plant was filled with TCCA and other dangerous chemicals.

265. Inspections by the Rockdale County Fire Rescue in 2022 revealed at least 69 chemicals stored at the Conyers Plant, 48 of which posed health hazards. Several of these chemicals were also known to be explosive or combustible.

266. Defendants regularly stored and used dozens of hazardous chemicals that are harmful to human health and the surrounding environment at the Conyers Plant—many of which evolve to release additional hazardous chemicals after combustion or decomposition, *e.g.*, when exposed to heat, fire or water.

267. The CSB's November 2024 Investigation Report ("CSB November Report") following the September 29, 2024 fire states that the primary bulk chemicals at Plant 12 were TCCA and DCCA. The report further stated that "[t]hey can release toxic and corrosive products such as chlorine gas and hydrogen chloride upon decomposition."[26] These chemicals were stored in super sacks prior to their distribution to other parts of the Conyers Plant.

268. A publicly available safety data sheet ("SDS") for DCCA states it is a corrosive chemical, exposure to which can cause irritation to the respiratory system, redness of upper and lower airways, coughing, laryngeospasm, edema, shortness of breath, bronchoconstriction, pulmonary edema, skin corrosion,

---

[26] *Id.*

serious eye damage, eye irritation, burns to eye lids, conjunctivitis, corneal edema, corneal burn and damage to internal contents of the eye.

269. According to its SDS, DCCA should be stored in a tightly closed container and be kept away from heat, clothing, and combustible materials. DCCA's safety data sheet instructs handlers to never add water to DCCA and to keep it away from acids, ammonia, bases, floor sweeping compounds, calcium hypochlorite, reducing agents, and organic solvents and compounds. Exposure to these materials can cause DCCA to decompose and release noxious gases. Wet DCCA can generate nitrogen trichloride, an explosion hazard. DCCA produces numerous hazardous products upon combustion including chlorine, nitrogen, nitrogen trichoride, cyanogen chloride, oxides of carbon and phosgene.

270. A publicly available SDS for TCCA states it is an algaecide, bactericide, and swimming pool disinfectant that is also an active ingredient in household bleaches. Exposure to TCCA is severely irritating to eyes and can cause serious and irreversible eye damage and burns. TCCA is also irritating to skin and can cause burns. Exposure to TCCA in its solid form or to free chlorine evolving and released from TCCA can cause irritation, redness of upper and lower airways, coughing, laryngospasm, edema, shortness of breath, labored breathing, bronchoconstriction and pulmonary edema.

271. According to its SDS, users of TCCA should store it in a tightly closed container in a dry, cool, well-ventilated place. TCCA should be protected from moisture, direct sunlight, and extreme temperatures and should not be mixed with other chemicals, including other swimming pool chemicals in their concentrated forms. TCCA is a strong oxidizer and can intensify existing fires. In responding to a TCCA-involved fire, firefighting personnel are instructed to avoid contacting TCCA with water. They are further instructed not to let the fire burn because thermal decomposition of TCCA can release toxic, corrosive and noxious gases/vaper, including chlorine gas, and wet TCCA can generate nitrogen trichloride, which creates an explosion hazard. Firefighting personnel are further instructed to wear self-contained breathing apparatus when responding. To safely handle TCAA, safety data sheets instruct users to never add water to TCCA.

272. Chemistry professor Dr. Joseph Sadighee explained to the public in an interview that the safety data sheet for TCCA instructs companies to "never allow a small amount of water to go into a large amount of [TCCA] material."[27]

Dr. Sadighee also explained that, "when you have something that can't contact

---

[27] Melissa Nord, *Breaking down what chemicals are in the air over Conyers BioLab plant*, 11 ALIVE (Oct. 1, 2024, 9:44 PM), https://www.11alive.com/article/news/local/conyers/explaining-what-exactly-is-in-air-over-conyers-biolab-plant/85-541f7251-4365-48f3-aec7-4c5d0b9acdc3 (last visited Jan. 10, 2025).

water, if a fire were to happen, it's important to design your lab so that it won't contact water."[28] BioLab did not design the Conyers Plant in such a manner.

273. The CSB November Report also stated that Plant 12 stored super sacks of bromochloro-5,5-dimethylimidazolidine-2,4-dione (BCDMH).[29]

274. A publicly available SDS for BCDMH states exposure to it is corrosive to eyes and can cause eye irritation, corneal damage and blindness. BCDMH is also corrosive to skin and can cause skin inflammation, blistering, burns and ulcerations. Inhaling BCDMH dust will produce irritation to gastrointestinal or respiratory tract, including burning, sneezing, coughing and wheezing. BCDMH can be fatal if inhaled.

275. According to its SDS, BCDMH should be stored in a tightly closed container, away from water, moisture, sources of ignition, direct sunlight, heat, sparks, open flame, combustible materials, wooden floors, and incompatible materials including strong oxidizing agents, strong acids, strong bases, alcohols, strong reducing agents, and organic materials. BCDMH can produce irritating and toxic fumes and gases upon decomposition that contain, *e.g.*, nitrogen oxides,

---

[28] *Id.*

[29] CSB, *U.S Chemical Safety Board Releases Investigation Update into September 2024 Massive Fire and Toxic Plume at BioLab Facility in Georgia*, CSB News Release (Nov. 22, 2024), https://www.csb.gov/us-chemical-safety-board-releases-investigation-update-into-september-2024-massive-fire-and-toxic-plume-at-BioLab-facility-in-georgia/ (last visited Jan. 10, 2025).

carbon monoxide, carbon dioxide, hydrogen bromide, hydrogen chlorine, bromine, and chlorine.

276. Defendants also used and stored myriad other chemicals at the Conyers Plant that pose serious risks to human health and the ability to safely use and enjoy property.

277. At all relevant times, the risk of a chemical fire caused by and/or involving these chemicals and the release of a toxic chemical plume was reasonably foreseeable to Defendants.

278. At all relevant times, it was reasonably foreseeable to Defendants that the risk of a chemical fire and the release of a toxic chemical plume could impact nearby properties and present a hazard to the residents located near the Conyers Plant.

279. Prior fires at the Conyers Plant and BioLab's Lake Charles Plant were facts known to the Defendants.

280. Defendants knew or should have known, from, *inter alia*, a March 2001 EPA Safe Storage and Handling of Swimming Pool Chemicals Alert, that at least eleven fires involving swimming pool chemicals occurred between 1996 and 2000—the vast majority of which were specifically caused by pool chemicals becoming wetted by a small quantity of water, including water leaked from a

fire suppression sprinkler system, or when mixed with other chemicals and/or reactive materials.[30]

281. This March 2001 EPA Alert cautioned that "[f]acility management is responsible for knowing and understanding the hazards associated with these chemicals and ensuring that pool chemicals are safely stored and handled. Hazardous substances are capable of being safely handled day-after-day through a management system that ensures that good, written procedures are prepared, posted, and followed by trained employees. Also, the  needs to be properly designed and maintained. Finally,  management should very carefully plan for emergencies and work with first responders to mitigate incidents that occur."

282. In this Alert, EPA also provided swimming pool chemical  management with recommendations and standards for addressing major hazards posed by swimming pool chemicals including that they should:

    (a)  design and maintain designated areas for pool chemical storage so that water does not come in contact with containers or packaging;[31]

---

[30] U.S. ENVIRONMENTAL PROTECTION AGENCY, *Safe Storage and Handling of Swimming Pool Chemicals,* (1st ed. 2001), https://www.epa.gov/sites/default/files/2013-11/documents/spalert.pdf (last visited Jan. 10, 2025).

[31] *Id.* at 2.

(b)   give prompt and corrective attention to any evidence of potential water entry from the roof, windows, doors, water pipes, hoses, sprinkler systems and drains;[32]

(c)   look for ways to prevent water contact with stored pool chemicals such as close containers properly, cover opened or damaged packaging, ensure that there are no roof leaks or leaks from water pipes, hoses or the sprinkler system, and store chemicals on shelves of pallets to keep containers off the floor;[33]

(d)   avoid chemical mixing by conducting a review of chemical storage arrangements and chemical handling tasks to identify situations where chemicals could be intentionally or accidentally mixed such as by: separating incompatible substances; avoiding storing containers of liquids above containers of other incompatible substances; not mixing old chemicals with fresh chemicals, even if they are the same type; using separate, designated containers for cleanup of spilled materials; making chemical storage area housekeeping a priority, and keeping combustible and flammable substances away from chemicals.[34]

(e)   prevent a chemical reaction ignition by avoiding wetting or mixing chemicals;[35]

(f)   review bulk storage, including packaging and storage locations, relative to potential for accidental contact with water, including sprinkler systems, rainwater, etc.[36]

283. In January 2024, a Georgia environmental agency inspected the Conyers Plant.

The regulators reported that "[m]ultiple areas in the [Conyers Plant] … showed

---

[32] *Id*. at 2–3.

[33] *Id*. at 3.

[34] *Id.*

[35] *Id.*

[36] *Id.*

a neglect of maintenance to the point of creating potential safety hazards," including improperly sealed and unlabeled hazardous waste containers on site and uncovered used oil tanks and buckets. The regulators further noted that BioLab had not been performing its required weekly self-inspections. BioLab was told by the regulators to "take some action to address this issue."[37]

## IV.    The September 29, 2024 Conyers Plant Fire

284. Defendants operated their Conyers Plant with an egregious indifference to safety. Instead, their main objective was to extract as much profit as possible while ignoring, deferring, and avoiding necessary expenditures that would have been incurred by reasonably prudent chemical companies.

285. For example, safety sprinklers at the Conyers Plant were in a constant state of repair, but Defendants refused to implement necessary system upgrades that were suggested by several employees, managers, and/or external contractors.

286. Despite a clear and obvious need for proper policies and procedures relating to the safe management and handling of toxic and reaction chemicals, Defendants failed to design or implement these.

287. As a result, toxic and reactive chemicals were stored and handled in a dangerous, haphazard, and reckless manner at the Conyers Plant.

---

[37]   https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/#

288. Defendants also failed to adequately staff the Conyers Plant or adequately train and equip the employees on-site.

289. Similarly, Defendants refused to spend necessary moneys to design and implement adequate Emergency Response Plans that could guide actions in the result of chemical decomposition events, set forth actions that could mitigate emergencies and prevent runaway reactions, or respond to a runaway reaction, fire, and explosion if one occurred.

290. Instead, Defendants consistently favored production over safety. Defendants and their internal auditors actively intimidated their employees from calling attention to critical safety failures that would result in additional expenditures.

291. This culture of fear and failure was driven primarily by Centerbridge Defendants' unwillingness to adequately capitalize the KIK and BioLabs Defendants. Upon information and belief, the Centerbridge Defendants controlled operations at the Conyers Plant, and affirmatively prevented KIK and BioLabs from undertaking necessary safety expenditures.

292. On September 29, 2024 these multiple failures culminated in a disaster that would engulf all of Rockdale County.

293. At around 5:00 a.m. that morning, a fire ignited at Plant 12 at the Conyers Plant, resulting in a chemical reaction that caused an enormous toxic chemical plume

that could be "seen for miles."[38] The plume was visible from at least 30 miles away.[39]

294. The fire apparently then triggered a sprinkler head at the Plant,[40] which sprayed water onto water-reactive chemicals. According to the CSB, tasked with investigating the fire, the "reaction involved materials stored in a warehouse that generated heat, which led to the decomposition of the product, the release of toxic vapors, and fires."[41] This reaction sent "a colossal wall of smoke into the sky" which contained toxic chemicals,[42] depicted above.

---

[38] Cindy Von Quednow & Lauren Mascarenhas, *Thousands told to stay home a day after chemical plant fire sent a plume containing chlorine high into the air*, CNN (Sept. 30, 2024, 12:58 PM), https://www.cnn.com/2024/09/29/us/rockdale-county-BioLab-fire-georgia/index.html (last visited Jan. 10, 2025).

[39] David Aaro & Rosana Hughes, *Chemical Fire at Conyers, GA, Plant Forces Evacuations, Closures*, FIREHOUSE (Sept. 29, 2024), https://www.firehouse.com/operations-training/video/55143420/evacuations-ordered-after-chemical-plant-fire-in-conyers-ga (last visited Jan. 10, 2025).

[40] Hank Sanders & Remy Tumin, *Plume From Chemical Plant Fire Reaches Atlanta*, N.Y. TIMES (Sept. 30, 2024, 2:18 PM), https://www.nytimes.com/2024/09/29/us/chemical-BioLab-fire-georgia.html (last visited Jan. 10, 2025).

[41] CSB, *U.S Chemical Safety Board Releases Investigation Update into September 2024 Massive Fire and Toxic Plume at BioLab Facility in Georgia*, CSB News Release (Nov. 22, 2024), https://www.csb.gov/us-chemical-safety-board-releases-investigation-update-into-september-2024-massive-fire-and-toxic-plume-at-BioLab-facility-in-georgia/.

[42] Rosana Hughes, *Conyers BioLab plant fire; What to know*, THE ATLANTA JOURNAL-CONSTITUTION (Oct. 4, 2024), https://www.ajc.com/news/crime/conyers-chemical-plant-fire-what-to-know/ZECJVWIRDNCR5P2DZJFSAXUQ2A/.

295. Rockdale County Fire Rescue, the local fire department, was dispatched to respond to the fire at the Conyers Plant.

296. Atlanta Fire Rescue was dispatched to respond to the fire at the Conyers Plant.

297. DeKalb County Fire Rescue dispatched to respond to the fire at the Conyers Plant.

298. Henry County Fire Rescue was dispatched to respond to the fire at the Conyers Plant.

299. The fire was initially contained but reignited around 12:00 p.m., sending a second large plume of black and multi-colored chemical smoke into the air.

300. The fire was not contained again until approximately 4:00 p.m.

301. After the fire was contained, smoldering and off-gassing continued to produce a toxic chemical plume.[43]

302. The fire caused a "complete collapse" of the Conyers Plant building, as the roof caved in and multiple walls fell as a result of the fire.[44]

---

[43] Associated Press, *Chemical smoke spewing from a Georgia factory is projected to spread toward Atlanta as winds shift*, GPB NEWS (Oct. 2, 2024, 5:01 PM), https://www.gpb.org/news/2024/10/02/chemical-smoke-spewing-georgia-factory-projected-spread-toward-atlanta-winds-shift (last visited Jan. 10, 2025).

[44] Cindy Von Quednow & Lauren Mascarenhas, *Thousands told to stay home a day after chemical plant fire sent a plume containing chlorine high into the air*, CNN (Sept. 30, 2024, 12:58 PM), https://www.cnn.com/2024/09/29/us/rockdale-county-BioLab-fire-georgia/index.html (last visited Jan. 10, 2025).

303. According to the CSB the area around the Plant remained "an active emergency response scene for nearly four weeks under Unified Incident Command."[45]

304. As the toxic chemical plume expanded across the sky above Rockdale County and into other counties, one resident described the scene as "apocalyptic."[46]

305. U.S. Chemical Safety Board Chairperson Steve Owens stated "[t]his incident and the substantial potential risk that it posed to the surrounding community was completely unacceptable. Reactive chemical incidents can have severe environmental and public safety impacts due to the combination of fire, toxic gas emissions, and hazardous materials involved, and BioLab and any other facility that has reactive chemicals onsite must manage those materials safely."[47]

---

[45] U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD, *Chemical Decomposition, Fire, and Toxic Gas Release at BioLab, Inc., Investigation Update*, (1st ed. 2024), investigation_update_BioLab_final_nov2024_ (005).pdf (last visited Jan. 10, 2025).

[46] Sydney Sims, *I've Lived Through Three BioLab Fires in 20 Years. I Fear the Impact.*, CAPITAL B ATLANTA ( Oct. 2, 2024), https://atlanta.capitalbnews.org/biolab-fire-black-residents-conyers-georgia/ (last visited Jan. 10, 2025).

[47] CSB, *U.S Chemical Safety Board Releases Investigation Update into September 2024 Massive Fire and Toxic Plume at BioLab Facility in Georgia*, CSB News Release (Nov. 22, 2024), https://www.csb.gov/us-chemical-safety-board-releases-investigation-update-into-september-2024-massive-fire-and-toxic-plume-at-BioLab-facility-in-georgia/ (last visited Jan. 10, 2025).

306. Defendants did not have an adequate fire protection system in order to quickly and effectively extinguish fires at the Conyers Plant while also avoiding causing dangerous chemical reactions with water-reactive chemicals.

307. Defendants did not have an adequate Emergency Response Plan to guide their response to decomposition events.

308. Defendants' failure to possess and utilize an effective fire protection system or Emergency Response Plan exacerbated the harm caused by the decomposition event at the Conyers Plant, allowing for a runaway reaction, fire and explosions, and delayed emergency response.

### A. The Evacuation and Shelter-in-Place Orders and Additional Closures

309. At approximately 1:10 p.m., authorities in Rockdale County issued an alert directing residents living between Sigman Road and Interstate 20 near the Conyers Plant to evacuate immediately ("Evacuation Order") and residents north of Sigman Road to shelter in place with the windows closed.

310. The Evacuation Order displaced more than 17,000 residents.

311. At the same time, Rockdale County authorities announced the closing of Interstate 20 in both directions between Salem Road and Turner Hill Road, an eight-mile stretch of the highway, causing significant traffic disruptions. All southbound traffic on Hi-Roc Road between Irwin Bridge and Highway 138

was shut down, and all traffic from Highway 138 to Interstate 20 from Turner Hill Road to Salem Road was shut down.

312. Interstate 20 remained closed until the morning of September 30, 2024, causing additional traffic disruptions. Other roads, including Old Covington Highway, Kysor Crossing, Dogwood Drive, and Veterans Drive, remained closed through at least October 1, 2024.[48]

313. Residents subject to the evacuation order that were not at home at the time of the order were unable to return to their homes to obtain personal items and necessities, including medication, technology, and communication devices to inform loved ones of their wellbeing.

314. At approximately 7:45 p.m. on September 29, 2024, Rockdale County, Georgia authorities issued a shelter-in-place order for all residents of Rockdale County ("Shelter-in-Place Order") between 7:45 p.m. and midnight.[49] More than 90,000 residents were affected and could not leave their homes.

---

[48] Makayla Richards, 11Alive Staff, *Rockdale County recommends nightly shelter-in-place for residents | Live updates, Tuesday, Oct. 1*, 11 ALIVE ( Oct. 1, 2024, 11:54 PM), https://www.11alive.com/article/news/local/conyers/biolab-chemical-plume-conyers-rockdale-county-updates-tuesday-oct-1/85-e90ee497-a0d4-4a01-922b-7fd3cd740315 (last visited Jan. 10, 2025).

[49] *Updates on Bio Fire (9/29/24- 9/30/2024)*, ROCKDALE COUNTY (Sept. 30, 2024, 2:14 PM), https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/ (last visited Jan. 10, 2025).

315. Those sheltering in place were asked by County officials "to turn the air conditioning off and keep windows and doors shut."[50]

316. The Shelter-in-Place order was extended on September 30, 2024.[51]

317. All businesses in Rockdale County were asked to close operations while the Shelter-in-Place Order was in effect.

318. The Shelter-in-Place Order affected approximately 2,200 businesses.[52]

319. On September 30, 2024, at approximately 2:20 p.m., the Georgia Emergency Management and Homeland Security Agency ("GEMA/HS") issued a public safety alert to all residents within 50 miles of the Conyers Plant.[53]

320. On October 1, 2024, the Rockdale Emergency Management Agency and Rockdale County again extended the Shelter-in-Place Order, directing residents to remain indoors from 7 p.m. until 7 a.m. every day through October 4, 2024

---

[50] *Rockdale County Remains Closed with Shelter in Place Continuing*, ROCKDALE COUNTY (Sept. 30, 2024), https://www.rockdalecountyga.gov/rockdale-county-remains-closed-with-shelter-in-place-continuing/ (last visited Jan. 10, 2025).

[51] *Id.*

[52] *Rockdale County, Georgia*, UNITED STATES CENSUS BUREAU https://data.census.gov/profile/Rockdale_County,_Georgia?g=050XX00US13247 (last visited Jan. 10, 2025).

[53] Rosana Hughes, *Conyers BioLab plant fire: What to know*, THE ATLANTA JOURNAL-CONSTITUTION (Oct. 4, 2024), https://www.ajc.com/news/crime/conyers-chemical-plant-fire-what-to-know/ZECJVWIRDNCR5P2DZJFSAXUQ2A/; https://x.com/AFCEMA/status/1840819308697387256 (last visited Jan. 10, 2025).

because the "plume has consistently shifted throughout the night."[54] All businesses in Rockdale County were advised to remain closed.

321. On October 4, 2024, Rockdale County extended the Shelter-in-Place Order until 7 a.m. on October 7, 2024.[55]

322. On October 7, 2024, eight days after the fire started, the Rockdale County Emergency Management Agency extended the Shelter-in-Place Order for residents within two miles of the Conyers Plant while lifting the Order for other residents in the County farther from the Conyers Plant.[56]

323. Piedmont Rockdale Hospital evacuated patients and announced that the hospital was on diversion, delaying care for those in need of emergency medical treatment.[57]

---

[54] Updates on Bio Fire (9/29/24- 10/9/2024), ROCKDALE COUNTY (Oct. 9, 2024), https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/ (last visited Jan. 10, 2025).

[55] *BIOLAB FIRE: Rockdale County Extends Nightly Shelter-In-Place Order Through the Weekend*, WSBTV NEWS (Oct. 4, 2024), https://www.wsbtv.com/news/local/ rockdale-county/biolab-fire-rockdale-county-extends-nightly-shelter-in-place-order-through-weekend/IJTQ3CK3OJHXLDLMHVQWZZGT54/ (last visited Jan. 10, 2025).

[56] Rockdale County, Georgia, *Rockdale County Lifts Shelter in Place Except for the 2-Mile Radius Around Biolab* (Oct. 7, 2024), https://www.rockdalecountyga.gov/ rockdale-county-lifts-shelter-in-place-except-for-the-2-mile-radius-around-biolab/ ?fbclid=IwZXh0bgNhZW0CMTAAAR2p50qo4es0I3F4VJpAs4Z0pnnt5rPIOFPd OFgyh9bKlOoasc4YnqBDT8_aem_lP5ar-sVonmC0GoC3_xgIQ (last visited Jan. 10, 2025).

[57] Jonathan Raymond, *Conyers chemical plume after BioLab fire updates | Gwinnett*

324. Rockdale County Schools were closed for fall break during the week following the fire at the Conyers Plant, but the students did not return to the schools, instead attending virtually for 14 days from October 7 until October 21, 2024, while they "continuously monitored the environmental impact of the BioLab incident and cleanup efforts."[58] More than 15,000 students were affected by the cancellation of in-person classes.[59]

325. Newton County Schools closed on September 30 and October 1, 2024, due to the fire and toxic chemical plume from the Conyers Plant.[60]

---

*says nothing hazardous detected, Atlanta mayor says smell is dissipating*, 11 ALIVE (Sept. 30, 2024, 1:30 PM), https://www.11alive.com/article/news/local/conyers-chemical-plume-BioLab-fire-latest-updates-monday-september-30/85-2a4ac3d6-4263-4b25-aec8-5d0865c7c960 (last visited Jan. 10, 2025).

[58] Rockdale County Public Schools, *UPDATE October 17, 2024: RCPS schools will return to in-person learning and school buildings reopen starting Monday, October 21, 2024.* (Oct. 17, 2024), https://www.rockdaleschools.org/about/news_and_announcements/news/independent_learning_virtual_october_2024 (last visited Jan. 10, 2025).

[59] Holly Yan*, 'We want them gone': Georgia county plans to sue BioLab after its chemical plant fire upended life for thousands of residents*, CNN (Oct. 22, 2024, 8:18 PM), https://www.cnn.com/2024/10/22/us/biolab-fire-lawsuit-rockdale-county/index.html (last visited Jan. 10, 2025).

[60] Newton County Schools, *Schools Closed Monday, September 30* (Sept. 29, 2024), https://www.newtoncountyschools.org/departments/public_relations/news/schools_closed_monday__september_30?fbclid=IwY2xjawFm09ZleHRuA2FlbQIxMAABHQ-KlsTtwU5LXzxpISGupG0F0A2fijFc32ZrSQSNx2GxNd1uQSyYwVLQug_aem_7E6-2smPIyp0ljqw_kYpxg (last visited Jan. 10, 2025).

326. The Newton County Emergency Management Agency advised Newton County residents to "stay indoors."[61]

327. Newton County residents experienced strong odors and symptoms such as burning eyes. One resident stated that "when I walk outside it smells like I'm standing next to a freshly chlorinated indoor pool."[62]

328. Fayette County Public Schools canceled all outdoor activities following the fire at the Conyers Plant.[63]

329. Georgia Piedmont Technical College closed both their Newton and Rockdale campuses because of the fire and toxic chemical plume.

330. Numerous government buildings, including the County Courthouse, Administration Building, Water Resources, Elections Office, Animal Services, Tax Commissioner, and Board of Commissioner's Office, were closed on September 30, 2024, due to the fire and toxic chemical plume.[64]

---

[61] Evan Newton, *FEMA says Newton County has not experienced 'significant impacts' from BioLab fire, despite citizen concerns*, THE COVINGTON NEWS (Sept. 30, 2024, 2:34 PM), https://www.covnews.com/news/county/fema-says-newton-county-has-not-experienced-significant-impacts-from-biolab-fire-despite-citizen-concerns/ (last visited Jan. 10, 2025).

[62] *Id.*

[63] Fox 5 Atlanta Digital Team, *BioLab fire: School and government office closures over air quality concerns*, FOX5 ATLANTA (Sept. 30, 2024, 10:52 AM), https://www.fox5atlanta.com/news/biolab-fire-school-government-closures-air-quality-chlorine (last visited Jan. 10, 2025).

[64] Scott Flynn, *Rockdale County chemical fire: County and School closings for*

331. The City of Conyers closed City Hall, municipal court, and Conyers University through October 2, 2024, and cancelled a Conyers Downtown Development Authority meeting scheduled for October 1, 2024.[65]

332. Government offices in nearby Newton County closed on September 30, 2024, due to health concerns.

333. Churches in Rockdale County, and from Rockbridge to Northside County, were all asked to cancel or immediately end services on Sunday, September 29, 2024.[66]

334. The EPA continued to detect chlorine gas in the air near the Conyers Plant at levels above the action level for chlorine through October 11, 2024, twelve days after the fire at the Conyers Plant started.[67]

---

*Monday*, WSB-TV ATLANTA (Sept. 29, 2024, 10:32 PM), https://www.wsbtv.com/news/local/rockdale-county/rockdale-county-chemical-fire-county-school-closings-monday/CP52YJPW7FAGTNPVK6MF5P53VM/ (last visited Jan. 10, 2025).

[65] Jonathan Raymond, *Conyers chemical plume after BioLab fire updates | Gwinnett says nothing hazardous detected, Atlanta mayor says smell is dissipating*, 11 ALIVE (Sept. 30, 2024, 1:30 PM), https://www.11alive.com/article/news/local/conyers-chemical-plume-BioLab-fire-latest-updates-monday-september-30/85-2a4ac3d6-4263-4b25-aec8-5d0865c7c960 (last visited Jan. 10, 2025).

[66] David Aaro & Rosana Hughes, *Conyers chemical plant fire: Air quality monitored across metro Atlanta*, THE ATLANTA JOURNAL-CONSTITUTION (Sept. 30, 2024, 1:19 PM), https://www.ajc.com/news/atlanta-news/metro-atlanta-chemical-plant-fire-leads-to-evacuation-of-17000/NLTZ6RLMIZCERF76B7FHUQFRYE/ (last visited Jan. 10, 2025).

[67] *Air Monitoring Summary Table October 11, 2024 (5 a.m. to 5 p.m.)*, U.S. EPA (Oct. 11, 2024), https://www.epa.gov/system/files/documents/2024-10/biolab

335. Chlorine gas remained in the air above or near EPA action levels through at least October 17, 2024, when the EPA stopped releasing its air monitoring data.[68]

### B. The Regulatory Response to the Fire.

336. The Rockdale County Emergency Management Agency mobilized in response to the fire. The state also sent officials from the Georgia Environmental Protection Division ("EPD") to respond and assess the air quality after the fire, and the Georgia Department of Public Health ("DPH") was engaged in monitoring the public health impacts of the fire and the resulting toxic chemical plume.[69]

337. The Georgia Department of Transportation managed road closures and accompanying transportation delays in response to the fire.

---

chlorine_datasummaryreport_20241011_5pm.pdf (last visited Jan. 10, 2025).

[68] *Air Monitoring Summary Table October 17, 2024 (5 a.m. to 5 p.m.)*, U.S. EPA (Oct. 17, 2024), https://www.epa.gov/system/files/documents/2024-10/biolab chlorine_datasummaryreport_20241017_5pm.pdf (last visited Jan. 10, 2025).

[69] *State and Federal Agencies Continue Monitoring Rockdale County Biolab Fire Incident*, GEORGIA EMERGENCY MANAGEMENT AND HOMELAND SECURITY AGENCY (Oct. 2, 2024), https://gema.georgia.gov/press-releases/2024-10-02/state-and-federal-agencies-continue-monitoring-rockdale-county-biolab (last visited Jan. 10, 2025).

338. The U.S. Environmental Protection Agency ("EPA") also responded, assisting in air quality monitoring and assessment,[70] and the Federal Emergency Management Agency ("FEMA") was called to respond and assist in emergency management.[71]

339. Shelter locations and evacuation sites were established for affected residents, including sites in Lithonia, Covington, and Stockbridge, with assistance from the American Red Cross and DeKalb County Emergency Management.

340. On October 2, 2024, GEMA/HS announced it was monitoring the toxic chemical plume affecting residents from the fire at the Conyers Plant, informing residents about potential health impacts and recommending nearby residents stay indoors and turn off HVAC machines.[72] Levels of chlorine

---

[70] The Associated Press, *Residents in Conyers, Ga., told to shelter in place following chemical plant fire*, ABC NEWS CHANNEL 6 WJBF.COM (Sept. 29, 2024, 2:11 PM), https://www.wjbf.com/news/georgia-news/residents-in-conyers-ga-told-to-shelter-in-place-following-chemical-plant-fire/ (last visited Jan. 10, 2025).

[71] Cindy Von Quednow & Lauren Mascarenhas, *Thousands told to stay home a day after chemical plant fire sent a plume containing chlorine high into the air*, CNN (Sept. 30, 2024, 12:58 PM), https://www.cnn.com/2024/09/29/us/rockdale-county-BioLab-fire-georgia/index.html (last visited Jan. 10, 2025).

[72] Georgia Emergency Management and Homeland Security Agency, *Rockdale County Biolab Fire* (Oct. 2, 2024), https://gema.georgia.gov/rockdale-county-biolab-fire-1 (last visited Jan. 10, 2025).

detected in the air were more than double the action levels set by the EPA for the chemical.[73]

341. The Georgia DPH issued a warning across the state given that the toxic chemical plume had traveled to "areas beyond the immediate area of the fire."[74] The Georgia DPH told residents to "[l]imit your activities outdoors and stay inside and away from the smoke" and to "[k]eep windows and doors closed."[75]

342. As winds shifted, the toxic chemical plume traveled between multiple cities and counties throughout the metropolitan Atlanta area.

343. On October 2, 2024, the City of Atlanta announced that a haze would appear in the City and residents would smell chlorine. The City altered operational plans

---

[73] 11 Alive Staff, *Shelter-in-place order extended through weekend, Rockdale County officials say | Conyers chemical plume Friday latest updates*, 11 ALIVE (Oct. 4, 2024, 5:19 PM), https://www.11alive.com/article/news/local/conyers/chemical-plume-updates-friday-oct-4-biolab/85-89bc98d1-7731-4876-9db5-e1a813afe3fd (last visited Jan. 10, 2025); Action levels are set by the EPA "based on the most protective AEGLs (Acute Exposure Guideline Levels) which are used by emergency responders when dealing with chemical spills or other exposures and describe the human health effects from once-in-a-lifetime, or rare, exposure to airborne chemicals." *Air Monitoring Summary Table October 3, 2024 (5 a.m. to 5 p.m.)*, U.S. EPA https://www.epa.gov/system/files/documents/2024-10/biolabchlorine_data summaryreport_20241003_ 5pm.pdf (last visited Jan. 10, 2025).

[74] Georgia Department of Public Health, *Smoke From BioLab Chemical Fire Health Precautions* (Oct. 2, 2024) https://web.archive.org/web/20241004003959/https:/dph.georgia.gov/smoke-biolab-chemical-fire-health-precautions (last visited Jan. 10, 2025).

[75] *Id.*

by delaying work start times in the City. The toxic chemical plume reached Atlanta on October 3, 2024.

344. The Atlanta-Fulton County Emergency Management Agency ("EMA") issued regular public updates from September 30, 2024, through October 13, 2024, on the toxic chemical plume created by the fire at the Conyers Plant.

345. These updates noted that "off-gassing" and "smoldering" continued to occur at the Conyers Plant through October 6, 2024, adding toxic chemicals to the air.[76] Off-gassing reportedly continued into October 7, 2024.[77]

346. The U.S. Chemical Safety Board found in its investigation that the off-gassing "occurred because residual TCCA product remained onsite, including beneath the collapsed walls and structure debris, requiring the use of heavy equipment to access and remove the material for treatment."[78]

---

[76] Atlanta-Fulton County EMA (@AFCEMA), X, https://x.com/AFCEMA (last visited Jan. 5, 2025).

[77] Akilah Winters, *Conyers chemical plume | Shelter-in-place lifted for most of county except for those within 2-mile radius of facility*, 11 ALIVE (Oct. 7, 2024, 11:27 PM), https://www.11alive.com/article/news/local/conyers/conyers-chemical-plume-biolab-fire-officials-update/85-e1b1b8cc-7f27-45b5-adb3-8d57eb7f7e1b (last visited Jan. 10, 2025).

[78] U.S. CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD, *Chemical Decomposition, Fire, and Toxic Gas Release at BioLab, Inc., Investigation Update*, (1st ed. 2024), investigation_update_BioLab_final_nov2024_(005).pdf (last visited Jan. 10, 2025).

347. The Atlanta-Fulton County EMA advised residents to stay inside and informed residents of the myriad negative health impacts the toxic chemicals emitted from the Conyers Plant can have, including "irritation of the eyes and airways, coughing, shortness of breath, difficulty breathing, chest tightness, a scratchy throat, irritated sinuses, headaches, stinging eyes, or a runny nose." Residents were further warned that "People with lung disease may not be able to breathe as deeply or as vigorously as usual, and they may experience symptoms such as coughing, phlegm, chest discomfort, wheezing, and shortness of breath."[79]

348. According to Center for Disease Control's Medical Management Guidelines (MMG) for Chlorine, "chlorine gas is irritating and corrosive to the eyes skin and respiratory tract" [and] that exposure to chlorine "may cause burning of the eyes, nose, and throat; cough as well as constriction and edema of the airway and lungs can occur."[80]

---

[79] Georgia Emergency Management and Homeland Security Agency, *State and Federal Agencies Continue Monitoring Rockdale County Biolab Fire Incident,*(Oct. 2, 2024), https://gema.georgia.gov/press-releases/2024-10-02/state-and-federal-agencies-continue-monitoring-rockdale-county-biolab (last visited Jan. 10, 2025).

[80] *Medical Management Guidelines for Chlorine*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=198&toxid=36 (last visited Jan. 10, 2025).

349. The Fulton County Board of Health also advised residents to stay inside and to close windows and doors,[81] and they expanded the hours during which County clinics were open in response to the fire and toxic chemical plume.[82]

350. DeKalb County similarly warned residents about high chlorine levels in the air and a likelihood of "seeing haze and smelling chlorine" in DeKalb County on October 2, 2024. DeKalb County advised residents to stay inside.[83]

351. Walton County dispatched the Walton County Emergency Management Agency and the Walton County Fire Rescue to aid in the response to the fire and toxic chemical plume. Walton County also advised residents to "turn off your air conditioners, turn on your ceiling fans, and if possible bring your outside animals indoors."[84]

---

[81] Fulton County Board of Health, *Smoke From BioLab Chemical Fire* https://fultoncountyboh.com/smoke-from-biolab-chemical-fire/ (last visited Jan. 10, 2025).

[82] Fulton County Board of Health (@FultonHealth), X, https://x.com/fultonhealth ?prefetchTimestamp=1729861589581 (last visited Jan. 10, 2025).

[83] DeKalb County Georgia, *State and Federal Agencies Continue Monitoring Rockdale County Biolab Fire Incident (Oct. 2)* (Oct. 2, 2024, 5:54 PM), https://www.dekalbcountyga.gov/news/state-and-federal-agencies-continue-monitoring-rockdale-county-biolab-fire-incident-oct-2 (last visited Jan. 10, 2025).

[84] Sharon Swanepoel, *Update Sept. 30 from Walton County EMA: Air is safe to breath, but recommends to stay indoors*, MONROE LOCAL (Sept. 30, 2024), https://news.monroelocal.org/update-walton-ema-director-chlorine-smell-in-air-is-sufficiently-dissipated-but-stay-indoors/ (last visited Jan. 10, 2025).

352. The EPA and the Georgia EPD conducted air quality surveys on September 29 and 30, 2024, and the results indicated "the harmful irritant chlorine" emitting from the Conyers Plant.[85] The chlorine was present in the plume of smoke coming from the Plant, and wind patterns made the toxic chlorine pollution follow an "unpredictable path."

353. On October 3, 2024, Rockdale County announced that the EPA had detected and was monitoring chlorine and chlorine compounds, chloramine, carbon monoxide, hydrogen chloride, and phosgene in the air.[86] Rockdale County also explained why the Shelter-in-Place Order affected evening hours: "In the evening atmospheric inversion is occurring trapping air and pollution, and the harmful chemicals closer to the ground. This causes unhealthy spikes in air quality for people not sheltering in place in the evening."[87]

354. In addition to chlorine and other chemicals mentioned, air monitoring revealed the presence of bromine. "Georgia Tech professor Sally Ng said a system known as the Atmospheric Science and Chemistry Measurement Network detected a 1,400-times increase in the amount of chlorine-containing particles

---

[85] Rockdale County, Georgia, *Rockdale County Remains Closed with Shelter in Place Continuing* (Sept. 30, 2024), https://www.rockdalecountyga.gov/rockdale-county-remains-closed-with-shelter-in-place-continuing/ (last visited Jan. 10, 2025).

[86] Rockdale County, Georgia, *FAQ Biolab* https://www.rockdalecountyga.gov/faq-biolab/ (last visited Jan. 5, 2025) (last visited Jan. 10, 2025).

[87] *Id.*

in the air, and a 170-times increase in the amount of bromine-containing particles in the air over Decatur on Monday morning [September 30, 2024]. Typically, there is little of either element in the air, Ng said."[88]

### C. Impacts on the Community

355. Hundreds of residents near the Conyers Plant have visited "emergency rooms and clinics complaining of symptoms associated with an exposure to the BioLab smoke," and more than 700 residents made poison control calls to the Georgia Poison Center.[89]

356. Beginning on September 29, 2024, and continuing through the date of this Complaint, residents in Rockdale County and surrounding communities have been unable to fully use and enjoy their indoor and outdoor property as a result

---

[88] Charles P. Pierce, *A Cloud of Noxious Chemicals and Lawsuits Is Descending Outside Atlanta*, ESQUIRE (Oct. 15, 2024, 8:29 AM), https://www.esquire.com/news-politics/politics/a62600626/biolab-fire-chemicals-leak-georgia/ (last visited Jan. 10, 2025) (last visited Jan. 10, 2025).

[89] David Aaro, Alexis Stevens & Helena Oliviero, *Conyers Chemical Plant Fire: Winds to Shift Toward Atlanta Through Sunday*, THE ATLANTA JOURNAL-CONSTITUTION (Oct. 4, 2024), https://www.ajc.com/news/crime/conyers-plant-fire-atlanta-mayor-advises-staying-indoors-if-haze-reaches-city/CMXIGCNJXNEJBO K2YPRXOYCF6I/ (last visited Jan. 10, 2025).; Candace McCowan, *BIOLAB FIRE: Georgia Poison Center Has Taken Nearly 700 Calls About Exposure to Chlorine Symptoms*, WSBTV.COM NEWS (Oct. 3, 2024), https://www.wsbtv.com/news/local/atlanta/biolab-fire-haze-chemical-fire-set-move-into-metro-atlanta-thursday/Y3JQB2QUVFAHRPFW6VE FQR7DLY/ (last visited Jan. 10, 2025).

of the debris and poor air quality caused by the fire and resulting toxic chemical plume.

357. At the time of the fire, Plaintiffs Fannie and Albert Tartt were in their residence at 1849 Kings Row, Conyers, Georgia 30012, which is approximately 1.3 miles from the Conyers Plant.

358. As a result of the fire and resulting toxic chemical plume, Plaintiffs Fannie and Albert Tartt had concerns about their health and well-being and the health and well-being of their family because their residence is in the area directly impacted by the plume.

359. Plaintiffs Fannie and Albert Tartt lived in the area covered by the Evacuation Alert at the time of the fire and resulting toxic chemical plume at the Conyers Plant. Plaintiffs were not able to evacuate. They closed their home, turned off the heating, ventilation, and air conditioning system, and sheltered in place. They were not able to leave their home for any reason, including to attend a scheduled physical therapy session.

360. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on, and around Plaintiffs Fannie and Albert Tartt's property. As a result, the Tartts have not been able to fully use and enjoy their home.

69

361. Plaintiff Teresa Boyd lived within the area covered by the Shelter-in-Place Order and was forced to shelter in place after the fire and resulting toxic chemical plume at the Conyers Plant.

362. At the time of the fire, Plaintiff Teresa Boyd was attending church near the Conyers Plant. She began to suffer medical symptoms, including skin irritation, a headache, coughing, shortness of breath, and aching of the eyes, nose, throat, and ears.

363. Plaintiff Teresa Boyd was told to shut off the air conditioning in her home and to close and lock all doors and windows. Once she returned home, Ms. Boyd discovered that her dog had gotten sick several times inside of her house. Ms. Boyd, her husband, and her son all felt ill, which was worsened by the heat inside of their home without any air conditioning. To avoid any worsening health conditions for herself, her family, and her dog, Plaintiff Teresa Boyd made the decision to evacuate her home. Ms. Boyd evacuated her home for four days before returning.

364. Upon returning to her home, Plaintiff Teresa Boyd was still forced to shelter in place without any air conditioning. The health of her and her family deteriorated, and each member of her family sought and received medical treatment. Ms. Boyd suffered from burning in her eyes and nose, a sore throat, difficulty breathing, skin irritation, headaches, an upset stomach, coughing,

earaches, and sleep disturbances. She also suffered from feelings of anxiety and depression immediately following the fire at the Conyers Plant.

365. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on, and around Plaintiff Teresa Boyd's property. As a result, Ms. Boyd has not been able to fully use and enjoy her home.

366. Plaintiff Teresa Boyd is a teacher in Rockdale County. As a result of the fire and resulting toxic chemical plume at the Conyers Plant, Ms. Boyd was forced to miss work due to school cancellations and to conduct virtual learning for weeks after the fire until October 18, 2024.

367. Plaintiff Vanessa Underwood lived in the area covered by the Evacuation Alert at the time of the fire and resulting toxic chemical plume at the Conyers Plant. She was forced to evacuate her home for three days.

368. Plaintiff Vanessa Underwood was told to shut off the air conditioning in her home for nearly one week. As a result, and to avoid excessive heat, Ms. Underwood purchased indoor fans. Ms. Underwood also had to have her car's air conditioning system cleaned to avoid breathing contaminated air when she was inside of her car. Ms. Underwood also had to spend money ordering meals due to her inability to obtain groceries as a result of the fire at the Conyers Plant.

369. Plaintiff Vanessa Underwood suffered medical symptoms as a result of the fire at the Conyers Plant, including burning eyes and nose, dizziness, headaches, a sore throat, and anxiety.

370. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on, and around Plaintiff Vanessa Underwood's property. As a result, Ms. Underwood has not been able to fully use and enjoy her home.

371. As a result of the fire and resulting toxic chemical plume, Plaintiff Rafael Smith had concerns about his health and well-being and the health and well-being of his family because their residence was in the area directly impacted by the plume.

372. Plaintiff Rafael Smith lived in the area covered by the Evacuation Alert at the time of the fire and resulting toxic chemical plume at the Conyers Plant. Plaintiff Rafael Smith was not able to evacuate. He closed his home, turned off the heating, ventilation, and air conditioning system, and sheltered in place. Plaintiff Rafael Smith was forced to disobey the Shelter-in-Place Order from Rockdale County to obtain medical care for himself and his elderly parents, who were experiencing burning eyes and difficulty breathing, among other symptoms.

373. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on, and around Plaintiff Rafael Smith's property. As a result, Mr. Smith has not been able to fully use and enjoy his home, and his vehicle sustained damage.

374. As a result of the fire and resulting toxic chemical plume, Plaintiff Shanketa Barr had concerns about her health and well-being and the health and well-being of her family because their residence is in the area subject to the Shelter-in-Place Order.

375. Plaintiff Shanketa Barr was forced to evacuate with her family, including her husband, elderly parents, and other household members, to 9128 Sterling Lakes Circle, Covington, Georgia 30012.

376. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on, and around Plaintiff Shanketa Barr's property. As a result, Ms. Barr has not been able to fully use and enjoy her home. Ms. Barr's husband endured a prolonged hospital stay required to treat his medical symptoms, including a seizure. Other members of Ms. Barr's family experienced difficulty breathing, burning eyes, and headaches, which required medical treatment. As a result of the evacuation, her children missed scheduled

school days, and other family members were forced to miss scheduled shifts at their places of employment.

377. Plaintiff Pittman Construction has operated its business in Georgia for over a century and in Conyers for over 50 years. Plaintiff Pittman Construction operated its business within the area covered by the Evacuation Alert. As a result of the fire and resulting toxic chemical plume at the Conyers Plant, Plaintiff Pittman Construction was forced to send at least 125 employees home for approximately three days. Plaintiff Pittman Construction's business was completely unable to operate for those three days, losing out on revenue.

378. Plaintiff Pittman Construction also stores all of its equipment and machinery at its facility in Conyers, Georgia—equipment needed by its independent contractors for construction jobs across the Southeast region of the United States. As a result of the fire and resulting toxic chemical plume at the Conyers Plant, these independent contractors could not access any equipment and machinery in Conyers, Georgia, for at least three days. Plaintiff Pittman Construction lost out on additional revenue as a result.

379. Plaintiff Conyers Nissan employs 75 people in Conyers, Georgia, and offers new and pre-owned car sales and car servicing. Plaintiff Conyers Nissan operated its business within the area covered by the Evacuation Alert. As a result of the fire and resulting toxic chemical plume at the Conyers Plant,

Plaintiff Conyers Nissan was forced to send 75 employees home for three days. Plaintiff Conyers Nissan's business was unable to operate for those three days, losing out on revenue from both sales and service fees.

380. As a result of the fire and resulting toxic chemical plume at the Conyers Plant, Plaintiff Conyers Nissan was also forced to close its business early while it was under the Shelter-in-Place Order, resulting in lost revenue. Demand for car sales and servicing also decreased substantially as a result of the fire and resulting toxic chemical plume at the Conyers Plant, further reducing Plaintiff Conyers Nissan's revenue.

381. At all relevant times, Plaintiff Hounds Town is a business located at 1381 Iris Drive SE, Conyers, Georgia 30013, within four miles of the Conyers Plant. Plaintiff Hounds Town is owned and operated by Susan Vander Meer, an adult citizen of Georgia. The business is a provider of interactive dog daycare, overnight boarding, and grooming services.

382. As a result of the fire and resulting toxic chemical plume, Plaintiff Hounds Town has suffered damages, including lost revenue. Plaintiff Hounds Town, which operated in the area covered by the Shelter-in-Place Order, lost approximately one-quarter of its revenues over multiple days following the fire and resulting toxic plume.

383. At all relevant times, Plaintiff Levett Funeral Home is a business located at 1299 Milstead Avenue, Conyers, Georgia 30012, within two miles of the Conyers Plant. Levett Funeral Home is owned and operated by George Levett, Jr., an adult citizen of Georgia. The business is a provider of funeral services.

384. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on and around Plaintiff Levett Funeral Home's property, and Plaintiff Levett Funeral Home has suffered damages, including loss of use and enjoyment of property, and lost revenue. Plaintiff Levett Funeral Home, which operated in the area covered by the Evacuation Alert, was forced to send employees home, and could not operate for five working days.

385. Plaintiffs ADE Entities operated their storage facility business within the area covered by the Evacuation Alert. As a result of the fire and resulting toxic chemical plume, the main roads providing access to the storage facility operated by ADE Entities were closed. Customers were prevented from accessing the storage facility or seeking to do business with ADE Entities, resulting in lost revenue.

386. Plaintiffs ADE Entities were also unable to operate the storage facility at full capacity after the fire, as employees of the property manager for ADE Entities,

who worked at the storage facility, had to be sent home for at least three days, and were sent home off and on for fifteen days following the fire.

387. As a result of the fire and resulting toxic chemical plume, Plaintiffs ADE Entities face legal claims from customers, which are likely to cause ADE Entities to incur costs.

388. As a result of the fire and resulting toxic chemical plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on and around Plaintiffs ADE Entities' property, and ADE Entities have suffered damages, including loss of use and enjoyment of property, and lost revenue. This property damage includes damage to metal locks and doors at the storage facility, and damage to the HVAC System used at the storage facility.

389. Throughout the first week after the fire began and the toxic chemical plume was created, numerous residents reported "black and burned debris falling all over [their] property."[90]

---

[90] Asia Wilson & Blake DeVine, *One Week Since Fire Broke out at Rockdale County Chemical Plant, Changing Thousands of Lives*, ATLANTA NEWS FIRST (Oct. 6, 2024), https://www.atlantanewsfirst.com/2024/10/06/1-week-since-fire-broke-out-rockdale-county-chemical-plant-changing-thousands-lives/.

390. Many residents have shared stories on social media about how the fire, ash, and toxic chemicals have affected the use and enjoyment of their property, as well personal injury and injury to property:

(a) "Bio lab on fire very close to my house debris is flying all in my yard lungs are on fire eyes burning and can't stop coughing and I'm in my house now."

(b) "Conyers GA Bio lab fire debris in my front yard."

(c) "We got the tests back of the debris all over the property, and it has tested positive for hydrogen cyanide. Conducted by Dekalb Co. Fire Hazmat team. We've been told don't touch it. Keep all animals away from it. It needs to be remediated."

(d) "What about my truck that has black debris on it that has went through my paint on my vehicle?"

(e) "[M]y car is a very rare pink and I now have black spots over the top. Wasn't there before this. My car also smells like I'm storing chemicals."

(f) "My mother's house has ash, cars covered in this mess, house covered [in] it also."

(g) "A friend had some of the debris that came into her yard tested. It was some kind of chemical black ash stuff with arsenic and other things in it. She was advised to get her horses and everything out of the field as it was highly poisonous."

(h) "I stopped taking pics after taking 21 pics, ashes had to be cleaned off my car and truck at car wash, they would not blow off, in fact. … I'm 12 miles away!"

(i) "I'm 19 miles away and have a collection of debris. We've had headaches since the fire and my daughter has missed a week of school."

391. The severity and frequency of fires at the Conyers Plant over the last 20 years has affected the property value of residents living near the Conyers Plant.

392. Multiple business owners have shared stories of how the fire and toxic chemical plume negatively impacted their business. These stories included the following:

(a) Melvin Little, who owns an auto repair and paint shop near the Conyers Plant, said that the chains he had added to car tires in his shop looked like they had aged 30–40 years in several days due to the toxic chemical plume over his shop. He told state legislators that he likely lost at least $80,000 in business due to the toxic chemical plume from the Conyers Plant.

(b) Larry Cox, who owns a business near the Conyers Plant, said that several business owners in his area could not access their business facilities because the locks on their doors or entrances had corroded due to the toxic chemical plume. He also told state legislators that, after he entered his business in the days after the fire at the Conyers Plant started, representatives from BioLab entered his business and instructed him to leave.

(c) Torrie Crawford, who owns a transportation company located near the Conyers Plant, could not access his warehouse for days due to the fire and toxic chemical plume at the Conyers Plant.

393. On October 3, 2024, state lawmakers in Georgia called for "the immediate and permanent closure of the BioLab facility in Rockdale County" and asked the Governor to declare a state of emergency.[91]

---

[91] Brianna Leonard, *State Lawmakers Call for Permanent Closure of Conyers Biolab After Chemical Fire*, ATLANTA NEWS FIRST (Oct. 3, 2024), https://www.atlanta newsfirst.com/2024/10/03/state-representatives-call-permanent-closure-conyers-biolab-after-chemical-fire/ (last visited Jan. 10, 2025).

394. On October 23, 2024, Senator Raphael Warnock and Representative Hank Johnson wrote an oversight letter to BioLab and KIK expressing "grave concern" about the Conyers Plant fire and the resulting toxic chemical plume.[92] The elected officials stressed the costs to the community from the fire and toxic chemical plume: "[T]his is the third incident that Rockdale County has had to front the costs for cleaning up, and the third time that first responders have put their lives at risk. Working families may have also had to front out-of-pocket costs on childcare from closed schools, medical bills for chemical plume exposure, property damage, temporary housing, and lost wages from closed job sites."[93] The officials then posed detailed questions to Defendants about the fire, the history of safety failures and workplace violations at the Conyers Plant, and Defendants' planned response efforts.

## CLASS ALLEGATIONS

395.  Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1)(b), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of themselves and a class of all other similarly situated for direct, proximate, and foreseeable

---

[92] Letter to KIK Consumer Products from Sen. Raphael Warnock & Rep. Henry C. "Hank" Johnson, Jr. (Oct. 23, 2024), *accessible at* https://www.warnock. senate.gov/wp-content/uploads/2024/10/10.23.2024-Warnock-Oversight-Letter-to-BioLab-Regarding-September-2024-Fire.pdf. (last visited Jan. 10, 2025).

[93] *Id.*

losses caused by the September 29, 2024 Conyers Plant fire and toxic chemical plume. The Class is hereby defined as follows:

> All persons who resided, owned property, worked or operated businesses within a 25-mile radius of the Conyers Plant on September 29, 2024 (the "Class Area").

396. "Person" means an individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other private entity

397.  Excluded from the Class are: Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class; government entities; the judges assigned to this case, their immediate families, and court staff; and insurers and insurance syndicates whose claims for damages regarding the September 29, 2024 Conyers Plant fire and toxic release, arise out of a right of subrogation, whether equitable, contractual or otherwise.

398. Also excluded from the Class are any personal injury claims.

399. Plaintiffs hereby reserve the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

400. The proposed Class meets the criteria for certification under 23(a) and 23(b)(3).

401. **Numerosity.** The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number

of class members is currently unknown to Plaintiffs, it is ascertainable; the proposed Class includes tens of thousands of residents and businesses who were unlawfully exposed to chlorine gas and other toxic chemicals or who had property contaminated by unlawful exposure to chlorine gas and other toxic chemicals and suffered damages. Class members may be identified through objective means, including objective data available to the Parties regarding the persons and property present in the affected areas following the fire. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

402. **Commonality and Predominance.** Common questions of law and fact predominate in this matter. Defendants' conduct towards Plaintiffs and class members is uniform. Common questions of law and fact predominate over any questions affecting only individual class members.

403. Common questions include, but are not limited to the following:

    (a)  Whether Defendants engaged in the wrongful conduct alleged herein;

    (b)  Whether Defendants caused the Conyers Plant fire in violation of rules, regulations, and customs;

    (j)  Whether Defendants caused the release of toxic chemicals and particulate matter into the Class Area;

    (k)  Whether Defendants failed to exercise reasonable care in allowing the Conyers Plant fire to occur;

(l)  Whether Defendants failed to exercise reasonable care in causing the release of toxic chemicals and particulate matter into the Class Area;

(m)  Whether Defendants failed to follow required, reasonable, or minimal safety measures resulting in the Conyers Plant fire and toxic release;

(n)  Whether Defendants failed to follow required, reasonable, or minimal safety measures that would have mitigated the Conyers Plant fire and toxic release;

(o)  Whether Defendants engaged in ultrahazardous activities;

(p)  Whether Defendants were negligent;

(q)  Whether Defendants created a nuisance;

(r)  Whether Defendants engaged in trespass to class members' properties;

(s)  Whether a medical monitoring fund is an appropriate remedy to provide Plaintiffs and class members with the resources needed to cover the costs of diagnostic tests or examinations that are medically necessary for them to obtain early detection and treatment of latent injuries arising from their exposure to toxic chemicals, fumes, smoke, and debris from the September 29, 2024 fire at the Conyers Plant;

(t)  Whether Defendants knew or should have known that exposure to the chemicals at the Conyers Plant, and contamination resulting from their release, would pose significant health risks to Plaintiffs and class members;

(u)  Whether Plaintiffs and the other class members suffered injury and damages as a result of Defendants' conduct; and

(v)  Whether Plaintiffs and the other class members are entitled to damages, equitable relief, and other remedies.

404. **Typicality.** Plaintiffs' claims are typical of class members' claims and arise from the same course of conduct by Defendants.

405. Plaintiffs and the other class members' claims arise from the same single event, namely, the Conyers Plant fire, followed by the creation of a large plume of toxic chemicals that emitted from the Plant and spread throughout the Class Area. The material facts underlying each class member's claim are the same material facts as those supporting Plaintiffs' claims alleged herein and require proof of the same material facts.

406. Plaintiffs and the other class members sustained damages as a direct and proximate result of the same wrongful acts and/or omissions by Defendants.

407. Plaintiffs' damages and injuries are akin to those of class members, and Plaintiffs seek relief consistent with the relief of class members.

408. **Adequacy**. Plaintiffs can and will adequately represent the other class members and their interests are common to and coincident with them. By proving their individual claims, Plaintiffs will necessarily prove the other class members' claims and prove Defendants' class-wide liability. Plaintiffs have no known conflicts of interest with any of the other class members, their interests and claims are not antagonistic to those of any other Class member, nor are their claims subject to unique defenses.

409. Plaintiffs can and will fairly and adequately protect and represent the other class members' interests.

410. Plaintiffs' counsel have extensive experience in environmental and toxic tort litigation and class actions and have adequate financial resources to ensure that the interests of the Class will be adequately represented.

411. If appointed class representatives, Plaintiffs are aware of, and are committed to, faithfully upholding their fiduciary duties to absent class members.

412. Plaintiffs and their counsel are committed to the vigorous prosecution of this action and will allocate the appropriate time and resources to ensure that the Class is fairly represented.

413. Plaintiffs and their counsel will, therefore, fairly and adequately assert and protect the interests of the Class.

414. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Resolution of the common issues of fact and law affecting Plaintiffs' and class members' claims, including, but not limited to the common issues discussed above, in a single action will eliminate the chance of inconsistent and/or varying adjudications. Such resolution will further allow Class members to present their claims efficiently; share the costs of litigation, experts, and discovery; and preserve judicial time and resources.

415. The expense and burden of individual litigation would make it very difficult for all individual class members to seek redress individually, such that many class

members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative.

416. The prosecution of this case as a class action presents fewer management difficulties, better conserves judicial resources and the parties' resources, and more effectively protects the rights of each class member than would piecemeal litigation. Any challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public.

417. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

418. This action may also be maintained as a class action under Rule 23(b)(1)(b). The prosecution of individual actions could also result in adjudications with respect to individual class members which would as a practical matter be dispositive of the interests of non-party class members or substantially impair or impede non-party class members' ability to protect their interests.

419. The Court may, on motion or on its own determination, certify multiple subclasses for claims sharing common legal questions, and/or utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication.

**CLASS INJUNCTIVE RELIEF
PURSUANT TO RULE 23(b)(2)**

420. This action may also be maintained as a class action under Rule 23(b)(2), including for medical monitoring and other injunctive relief as set forth below, including in the Prayer for Relief. Defendants have acted and failed to act on grounds generally applicable to the class, and that require court imposition of uniform relief, thereby making appropriate equitable relief to the class as a whole within the meaning of Rule 23(b)(2).

421. As set forth above, damages claims for any current physical manifestation of personal or bodily injury are excluded from the class, and thus class members have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

422. Plaintiffs seek equitable relief in the form of a medical monitoring program, and establishment of a medical monitoring fund, to compensate them for ongoing screening for early detection and treatment of illnesses, diseases, or disease processes necessitated by their exposure to toxic chemicals, fumes, smoke, and debris arising from Defendant's wrongful conduct. Plaintiffs and

class members further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

423. As a direct and proximate result of Defendants' wrongful conduct associated with the September 29, 2024 fire as alleged above, fumes, debris, and massive walls of smoke containing toxic chemicals billowed throughout the area surrounding the Conyers Plant.

424. As explained above, the Conyers Plant contained massive quantities of TCCA, among other chemicals. When TCCA comes in contact with a small amount of water, it causes a chemical reaction which generates heat, decomposes the TCCA, and produces chlorine gas, explosive nitrogen trichloride, and other toxic chemicals. Indeed, water-reactive materials such as TCCA are known to violently produce toxic and hazardous gases, produce enough heat to cause self-ignition, and ignite other nearby combustibles.

425. A prior explosion at the Conyers Plant in 2004 released massive amounts of chlorine and hydrochloric acid into the air, as well as hydrogen cyanide, hydrogen bromide, and phosgene.

426. Upon information and belief, the plume from the September 29, 2024 fire at the Conyers Plant contained chlorine, hydrochloric acid, hydrogen cyanide,

hydrogen bromide, and phosgene, among other chemicals known only to Defendants.

427. Although Defendants have not yet identified all chemicals in the plume, the chemicals identified thus far are incredibly caustic, and even short-term exposures can cause severe, life-changing injuries. For instance, chlorine is toxic and immediately dangerous to life or health if inhaled. Furthermore, exposure to airborne toxicants are associated with risks of serious diseases.

428. Plaintiffs and class members faced significant exposure to hazardous substances, which are known to cause serious illnesses, diseases, and disease processes. Because of this exposure, Plaintiffs and class members presently suffer increased risks of serious illnesses, diseases, and disease processes. These increased risks are such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic testing and necessary examinations for early detection and treatment of these illnesses, diseases, and disease processes. Medical monitoring is reasonably and medically necessary for those exposed to ensure that latent disease processes can be identified and aggressively treated as early as possible.

429. Early detection and treatment is associated with more favorable outcomes. Finding serious diseases early, before they spread or worsen, allows for more treatment options. If the disease progresses until it becomes obvious, the

injured person loses valuable treatment time. Timely-instituted medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to toxic substances released from the Conyers Plant, and to provide early medical intervention that can prevent or reduce the deterioration and risks to long-term health and well-being of Plaintiffs and class members.

430. Medical monitoring and testing procedures, including clinical examinations, exist that make the early detection of respiratory diseases, cardiovascular diseases, and other illnesses, diseases, and disease processes caused by exposure to the toxic chemicals, fumes, smoke, and debris that were released from the Conyers Plant, both feasible and beneficial, and such procedures differ from those that would be prescribed in the absence of exposure.

431. Plaintiffs and class members have been injured by the present need to incur the costs of diagnostic testing for the early detection and treatment of illness, diseases, and disease processes, which is reasonably medically necessary as a direct and proximate result of their exposure to the toxic chemicals, fumes, smoke, and debris that were released from the Conyers Plant.

432. Plaintiffs and class members have a legally protected interest in not being exposed to toxic chemicals, such as those released from the Conyers Plant, and at levels that can result in increased risks of illness, disease, or disease process.

Plaintiffs and class members also have a legally protected interest in avoiding the present and future medical need for expensive diagnostic testing.

433. The exposure to toxic chemicals, fumes, smoke, and debris that were released from the Conyers Plant, and resulting increased risk of illness, disease or disease process, and the present and future need to incur the cost of medically necessary diagnostic testing for the early detection of such illness, disease or disease process, constitutes an injury to Plaintiffs and class members and an invasion of their legally protected interests. But for Defendants' tortious conduct, Plaintiffs and class members would not have the present and future need to incur the cost of diagnostic testing for early detection of illness, disease, or disease process arising from exposure to the toxic chemicals, fumes, smoke, and debris that were released from the Conyers Plant.

434. The increased susceptibility to injuries and irreparable threat to the health of Plaintiffs and class members, resulting from their exposure to the toxic chemicals, fumes, smoke, and debris that were released from the Conyers Plant, can be appropriately mitigated and addressed by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendants, that:

> (a) notifies individuals who have been exposed to the toxic chemicals, fumes, smoke, and debris that were released from the Conyers Plant of the potential harm from such exposure and the need for periodic testing and examination;

91

(b) provides early detection and treatment of illnesses, diseases, and disease processes caused by such exposure; and

(c) gathers and forwards to treating physicians information related to the diagnosis and treatment of illnesses, diseases, and disease processes which may result from such exposure.

435. Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

436. The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

437. The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees; (b) involve the monitoring of all Plaintiffs and class members by designated physicians under a Court-approved medical treatment and research regiment; and (c) involve the collection of medical data utilized

for group studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

438. Medical monitoring can also be ordered by the Court and/or jury as a remedy for relevant cause(s) of action certified under Fed. Rule 23(b)(3).

439. This case is also properly prosecuted as a class action under Rule 23(b)(2) for injunctive claims and remedies set forth below, including in the Prayer for Relief.

## CAUSES OF ACTION

### COUNT 1
### Negligence

440. As manufacturers, distributors, and/or suppliers of swimming pool and spa water care chemicals, Defendants have superior knowledge of these chemicals and their dangers.

441. Defendants knew or should have known of the risk of fire and chemical reaction created by the improper handling and storage of TCCA and other combustible materials.

442. Defendants knew or should have known of the risk that a fire at the Conyers Plant would result in the release of toxic smoke and debris into the surrounding neighborhood and communities.

93

443. Defendants owed Plaintiffs and class members a duty to operate the Conyers Plant in a manner that would not cause Plaintiffs and class members injury or harm.

444. Defendants breached the duties that they owe to Plaintiffs and class members, to exercise reasonable care, which has interfered with class members' property and caused property damage, lost profits, loss of use, and expected diminution of property value.

445. Defendants breached their duties by, among other things:

(a) Failing to ensure that chemicals were stored in a manner that would prevent them from coming into contact with water;

(w) Failing to take sufficient precautions to prevent a fire, including but not limited to, failing to ensure the adequacy and operation of sprinklers at the Conyers Plant;

(x) Failing to create and/or implement corporate policies and procedures that would prevent ignitions, explosions, and runaway chemical reactions from happening;

(y) Otherwise failing to take sufficient precautions to control the emissions of toxic and harmful substances, smoke, debris, particulate matter, dust, and/or other pollutants from Plaintiffs' and class members' property;

(z) Failing to create and/or implement corporate policies and procedures that would mitigate impacts from ignitions, explosions, and runaway chemical reactions if they occurred.

446. In addition, Defendants' negligence may be inferred from the nature of the September 29, 2024 Conyers Plant fire and toxic chemical plume. This type of fire, explosion, and toxic chemical plume does not occur without Defendants'

negligence. At all relevant times, the Defendants and their agents maintained exclusive control over the Conyers Plant and all materials therein that caused the fire and toxic chemical plume. Plaintiffs and class members did not contribute in any way to the cause of the fire and toxic chemical plume. Defendants are therefore liable under the doctrine of *res ipsa loquitur*.

447. As a direct and proximate cause of Defendants' negligent conduct, Plaintiffs and class members have incurred, and will continue to incur, damages, including but not limited to, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

448. The wrongful actions of Defendants constitute bad faith which entitles Plaintiffs and class members to their attorneys' fees and costs of litigation pursuant to O.C.G.A. § 13-6-11.

449. The wrongful actions of Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them

liable to Plaintiffs and class member for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

450. Because Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT 2
## Trespass to Land

451. Defendants' intentional, reckless, and negligent conduct caused the uncontrolled discharge of toxic chemicals and debris into the surrounding areas.

452. Plaintiffs and class members have legitimate possessory rights in property affected by the Conyers Plant fire and toxic chemical plume.

453. Defendants' discharge of toxic chemicals and debris invaded the Plaintiffs' and class members' properties.

454. Plaintiffs and class members did not consent to the entry of such materials onto their properties.

455. This intrusion and interference with Plaintiffs' and class members' enjoyment of land is ongoing and represents an unreasonable and unlawful trespass, which has interfered with their possessory right and which Plaintiffs seek to enjoin.

456. Defendants' trespass has substantially impaired Plaintiffs' and class members' rights to use and enjoy their property as well as economic and property damages as alleged herein.

457. As a direct and proximate cause of Defendants' trespass, Plaintiffs and class members have incurred, and will continue to incur, damages, including but not limited to, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

458. The wrongful actions of Defendants constitute bad faith which entitles Plaintiffs and class members to their attorneys' fees and costs of litigation pursuant to O.C.G.A. § 13-6-11.

459. The wrongful actions of Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs and class member for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

460. Because Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT 3
## Public Nuisance

461. As manufacturers, distributors, and/or suppliers of swimming pool and spa water care chemicals, Defendants have superior knowledge of these chemicals and their dangers.

462. Defendants knew or should have known of the risk of fire and chemical reaction created by the improper handling and storage of TCCA and other combustible materials.

463. Defendants knew or should have known of the risk that a fire at the Conyers Plant would result in the release of toxic smoke and debris into the surrounding neighborhood and communities.

464. Defendants owed Plaintiffs and class members a duty to operate the Conyers Plant in a manner that would not cause Plaintiffs and class members injury or harm.

465. In allowing toxic chemicals and debris to escape into the Class Area through their reckless and negligent conduct or omissions, Defendants interfered with public health, safety, peace, comfort, and convenience.

466. The public has not participated in the creation of Defendants' public nuisance.

467. Defendants' intentional, reckless, and negligent conduct caused, and continues to cause, harm, mental distress, and financial loss to Plaintiffs and class members, which disrupt Plaintiffs' and class members' daily lives.

468. Defendants' intentional, reckless, and negligent conduct caused, and continues to cause, substantial interference with Plaintiffs' and class members' ability to enjoy and use their properties and neighborhoods, and to carry on their businesses.

469. As a direct and proximate cause of the nuisance created by Defendants' conduct, Plaintiffs and class members have incurred, and will continue to incur, monetary damages arising from property damage and loss of use of their property.

470. The damages suffered by Plaintiffs and class members who were forced to evacuate or shelter-in-place are special damages that create a private right of action.

471. The damages suffered by Plaintiffs and class members arising from property damage and loss of use of their property are special damages that create a private right of action.

472. The fact that Plaintiffs and class members have suffered similar special damages does not convert their special damages into the nature of public damages.

473. Defendants have failed to remove the toxic chemicals and debris from the property of Plaintiffs and class members.

474. The wrongful actions of Defendants and ongoing consequences of the Conyers Plant fire warrant injunctive relief to abate the nuisance.

475. The notorious history of fires and toxic releases at the Conyers Plant demonstrate that the Conyers Plant fire is not a one-time occurrence.

476. The notorious history of fires and toxic releases at the Lake Charles Plant demonstrates that the Conyers Plant fire is not a one-time occurrence.

477. The notorious history of fires and toxic releases at the Conyers Plant demonstrate that the Conyers Plant is an ongoing nuisance that requires abatement.

478. As a direct and proximate cause of the nuisance caused by Defendants' conduct, Plaintiffs and class members have incurred, and will continue to incur, damages, including but not limited to, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

479. The wrongful actions of Defendants constitute bad faith which entitles Plaintiffs and class members to their attorneys' fees and costs of litigation pursuant to O.C.G.A. § 13-6-11.

480. The wrongful actions of Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs and class member for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

481. Because Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT 4**
**Ultrahazardous Activity/Strict Liability**

482. Defendants are engaged in an ultrahazardous activity in the manufacture, processing, and storage of chlorine and other hazardous chemicals.

483. The manufacture, processing, and storage of highly toxic and combustible chemicals is abnormally dangerous and cannot be made safe by the exercise of the utmost care.

484. Defendants' manufacture, processing, and storage of these toxic and hazardous chemicals was the direct and proximate cause of the chemical fire and toxic chemical plume.

485. Defendants are strictly liable for any and all damages which may occur or arise out of manufacture, processing, and storage of chlorine and other hazardous chemicals regardless of their standard of care.

486. The ultrahazardous nature of Defendants' conduct is evident in the history of repeated chemical fires at the Conyers Plant, and other BioLab facilities around the country, caused when water-reactive chemicals came into contact with water.

487. The harm to Plaintiffs and the class members was and is the kind of harm that would be reasonably anticipated based on the normal risks created by manufacturing, processing, and storing hazardous chemicals in close proximity to residential, commercial, and agricultural areas.

488. As a direct and proximate cause of Defendants' manufacturing and storage of ultrahazardous materials, Plaintiffs and class members have incurred, and will continue to incur, damages, including but not limited to, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

489. The wrongful actions of Defendants constitute bad faith which entitles Plaintiffs and class members to their attorneys' fees and costs of litigation pursuant to O.C.G.A. § 13-6-11.

490. The wrongful actions of Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs and class member for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

491. Because Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other class members, respectfully request that this Court:

1. Issue an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure in the manner described above;

2. Issue a class wide judgment holding Defendants liable for the reasons described above for their unlawful conduct causing Plaintiffs and class members to sustain damages resulting therefrom;

3. Award Plaintiffs and class members compensatory damages in an amount that is fair, just, and reasonable, to be determined at trial;

4. Award Plaintiffs and class members punitive damages in an amount that is fair, just, and reasonable, to be determined at trial;

5. Establish a medical monitoring fund;

6. Award interest to Plaintiffs and class members as permitted by law;

7. Award reasonable attorneys' fees and costs of suit;

8. Order equitable, injunctive, and declaratory relief to enjoin the trespass and/or abate the nuisance by requiring Defendants to, among other things:

(a)  Install effective automated fire suppression systems throughout the Conyers Plant;

(b)  Provide all Rockdale County residents with particulate masks;

(c)  Provide all Rockdale County residents with high-efficiency particulate air filters for their homes;

(d)  Conduct immediate testing and sampling of the air and groundwater to detect the presence of toxins and other chemicals potentially hazardous to human health;

(e)  Immediately and publicly disclose all information regarding the toxins and other compounds that comprised the plume;

(f)  Institute perimeter particulate matter monitoring at the fence line of the Conyers Plant; and

(g)  Install area air quality monitors in all affected areas inside and outside the Conyers Plant;

(h)  Provide a full cleanup of all affected residences, businesses, and common areas;

(i)  Wash the exterior of buildings in all affected areas; and

(j)  Wash the streets and sidewalks in all affected areas;

9.  Order equitable, injunctive, and declaratory relief requiring Defendants to provide alternative housing for residents in Rockdale County, Georgia and affected surrounding communities for the duration of the cleanup process.

10. Order equitable, injunctive, and declaratory relief requiring Defendants to conduct a Process Hazard Analysis of all aspects of the handling and storage of the chemicals present at the Conyers Plant and make the results of the analysis (including recommendations for action) available to the public.

11. Any and all additional relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiffs, individually and on behalf of the other proposed class members,

demand a trial by jury on all issues herein so triable pursuant to Fed. R. Civ. P. 38.

Respectfully submitted this 10th day of January, 2025.[94]

| | |
|---|---|
| | */s/ Jason J. Carter* |
| Daniel R. Flynn | Jason J. Carter |
| Admitted *Pro Hac Vice* | Ga. Bar No. 141669 |
| DICELLO LEVITT LLP | BONDURANT MIXSON & ELMORE, LLP |
| Ten North Dearborn Street, Sixth Floor | 1201 West Peachtree Street, Suite 3900 |
| Chicago, Illinois 60602 | Atlanta, Georgia 30309 |
| (312) 214-7900 | (404) 881-4100 |
| dflynn@dicellolevitt.com | carter@bmelaw.com |
| | |
| | L. Chris Stewart |
| Jean Sutton Martin | Ga. Bar No. 142289 |
| Admitted *Pro Hac Vice* | STEWART MILLER SIMMONS TRIAL ATTORNEYS |
| MORGAN & MORGAN | 55 Ivan Allen Jr. Boulevard, Suite 700 |
| 201 N. Franklin St., 7th Floor | Atlanta, Georgia 30308 |
| Tampa, Florida 33602 | (404) 529-3476 |
| (813) 559-4908 | cstewart@smstrial.com |
| jeanmartin@ForThePeople.com | |

*Interim Co-Lead Class Counsel*

| | |
|---|---|
| J. Cameron Tribble | Michael J. Blakely |
| Georgia Bar No. 754759 | Georgia Bar No. 708906 |
| BARNES LAW GROUP, LLC | THE BLAKELY FIRM, LLC |
| 31 Atlanta Street | 309 Sycamore Street |
| Marietta, Georgia 30060 | Decatur, Georgia 30030 |
| ctribble@barneslawgroup.com | mjblakely@blakelyfirm.com |

---

[94] Pursuant to Local Rule 7.1D, Plaintiffs' counsel certifies that this brief was prepared in 14 pt Times New Roman as approved in Local Rule 5.1C.

James Bilsborrow
*Admitted Pro Hac Vice*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York 10003
jbilsborrow@weitzlux.com

Gary M. Klinger
*Admitted Pro Hac Vice*
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
gklinger@milberg.com

Edward J. Manzke
*Admitted Pro Hac Vice*
THE COLLINS LAW FIRM, P.C.
1770 Park Street
Suite 200
Naperville, Illinois 60563
ejmanzke@collinslaw.com

J. Gerard Stranch, IV
*Admitted Pro Hac Vice*
STRANCH, JENNINGS &
GARVEY PLLC
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, Tennessee 37203
gstranch@stranchlaw.com

Christopher L. Coffin
Georgia Bar No. 173079
COFFIN LAW, LLC
1311 Ave. Ponce de Leon, Suite 504
San Juan, Puerto Rico 00907
ccoffin@coffinlawllc.com

Mark P. Chalos
*Admitted Pro Hac Vice*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 2nd Avenue South
Suite 1640
Nashville, Tennessee 37201
mchalos@lchb.com

Robert S. Libman
*Admitted Pro Hac Vice*
MINER, BARNHILL &
GALLAND, P.C.
325 North LaSalle Street
Suite 350
Chicago, Illinois 60654
rlibman@lawmbg.com

Roger w. Orlando
Georgia Bar No. 554295
THE ORLANDO FIRM, P.C.
Decatur Court, Suite 400
315 W. Ponce de Leon Avenue
Decatur, Georgia 30030
roger@OrlandoFirm.com

Lynn A. Toops
*Admitted Pro Hac Vice*
COHEN & MALAD LLP
One Indiana Square
Suite 1400
Indianapolis, Indiana 46204
ltoops@cohenandmalad.com

MaryBeth V. Gibson
Georgia Bar No. 725843
GIBSON CONSUMER LAW
GROUP, LLC
4279 Roswell Road

106

Suite 208-108
Atlanta, Georgia 30342
marybeth@gibsonconsumerlawgroup.com

*Plaintiffs' Executive Committee*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 10, 2025 the foregoing CONSOLIDATED CLASS ACTION COMPLAINT was filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

*/s/ Jason J. Carter*

Jason J. Carter
Ga. Bar No. 141669
BONDURANT MIXSON & ELMORE, LLP
1201 West Peachtree Street
Suite 3900
Atlanta, Georgia 30309
(404) 881-4100
carter@bmelaw.com
