# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| *In Re*: BioLab Class Actions | Civ. A. No. 1:24-CV-4407-SEG<br><br>Jury Trial Demanded |

## RESPONSE TO CENTERBRIDGE'S
## MOTION TO DISMISS

Jason J. Carter
BONDURANT MIXSON & ELMORE
1201 West Peachtree Street, Suite 3900
Atlanta, Georgia 30309

L. Chris Stewart
STEWART MILLER SIMMONS
55 Ivan Allen Jr. Boulevard, Suite 700
Atlanta, Georgia 30308

Daniel R. Flynn
DiCELLO LEVITT
10 North Dearborn Street, Sixth Floor
Chicago, Illinois 60602

Jean Sutton Martin
MORGAN & MORGAN
201 N. Franklin St., Seventh Floor
Tampa, Florida 33602

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................2

ARGUMENT AND CITATION TO AUTHORITY ...............................5

I.     Plaintiffs' allegations against Centerbridge satisfy Rule 12(b)(6). ..........5

     A.    Georgia law permits holding a parent liable for its subsidiary's torts. ...........................................................................................5

     B.    The Complaint alleges that CB Partners and Centerbridge Fund are—like KIK and BioLab—alter egos of one another. ..................7

     C.    Plaintiffs have alleged that KIK is Centerbridge's alter ego. .........8

          1.    "Centerbridge is not a passive investor in KIK." .................9

          2.    Plaintiffs have alleged that Centerbridge forced KIK to act contrary to KIK's own interest. ...........................................10

          3.    Centerbridge faults Plaintiff for not pleading facts unavailable at the pleading stage. ..........................................13

          4.    KIK's alleged insolvency also supports an inference that it is Centerbridge's alter ego. ......................................................15

     D.    Plaintiffs sufficiently allege Centerbridge is directly liable. .........17

II.    Plaintiffs have alleged the Court's personal jurisdiction over the Centerbridge Defendants. ...............................................................18

     A.    Plaintiffs' allegations satisfy Georgia's long-arm statute. .............19

          1.    Centerbridge has transacted business in Georgia. ..............19

          2.    Centerbridge committed torts within Georgia....................21

          3.    Centerbridge caused tortious injury within Georgia. .........22

**B.**    **Plaintiffs' allegations comport with due process.** ...........................**22**

**C.**    **Were the Court to find Plaintiffs' allegations insufficient, it should order jurisdictional discovery rather than dismissal.** ....................**24**

**CONCLUSION**...................................................................................................**25**

# TABLE OF AUTHORITIES

## Case Law

*Aero Toy Store, LLC v. Grieves,*
    279 Ga. App. 515 (2006) ...............................................................................19, 21

*Amin v. Mercedes-Benz USA, LLC,*
    349 F. Supp. 3d 1338 (N.D. Ga. 2018) ...................................................................8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................5

*Bolling v. Mercedes-Benz USA, LLC,*
    No. 1:23-CV-671-TWT,
    2024 WL 3972987 (N.D. Ga. Aug. 27, 2024) .......................................................8

*BP Exploration & Oil, Inc. v. Jones,*
    252 Ga. App. 824 (2001) .....................................................................................17

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)..............................................................................................24

*Chudasama v. Mazda Motor Corp.,*
    123 F.3d 1353 (11th Cir. 1997)............................................................................25

*City of Winder v. Girone,*
    265 Ga. 723 (1995) ..............................................................................................17

*Cobra 4 Enters. v. Powell-Newman,*
    336 Ga.App. 609 (2016) ......................................................................................15

*Consol. Dev. Corp. v. Sherritt, Inc.,*
    216 F.3d 1286 (11th Cir. 2000)............................................................................19

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,*
    593 F.3d 1249 (11th Cir. 2010)..............................................................20, 23–24

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
    592 U.S. 351 (2021) ................................................................................24

*Harvey v. Merchan*,
    311 Ga. 811 (2021) ..........................................................................21–22

*Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*,
    43 F.4th 1303 (11th Cir. 2022) ................................................12, 14, 23

*Hickman v. Hyzer*,
    261 Ga. 38 (1991) ......................................................................14, 16

*Hyde v. Schlotzsky's, Inc.*,
    254 Ga.App. 192 (2002) ..................................................................17–18

*In re First Reserve Mgmt.*,
    671 S.W. 3d 653 (Tex. 2023) ..............................................................18

*In re Generac Solar Power Sys.*,
    735 F. Supp. 3d 1047 (E.D. Wis. 2024) ..............................................15

*In re Heritage Org., L.L.C.*,
    413 B.R. 438 (Bankr. N.D. Tex. 2009) ................................................14

*Innotex Precision Ltd. v. Horei Image Prods.*,
    679 F. Supp. 2d 1356 (N.D. Ga. 2009) ................................................14

*J-Mart Jewelry Outlets, Inc. v. Std. Design*,
    218 Ga.App. 459 (1995) ......................................................................13

*Kipperman v. Onex Corp.*,
    No. 1:05-cv-01242-JOF,
    2010 WL 11505688 (N.D. Ga. Sept. 29, 2010) ............................14, 16

*Kissun v. Humana, Inc.*,
    267 Ga. 419 (1997) ..............................................................................6

*Knieper v. Forest Group USA, Inc.*,
No. 4:15-CV-0222-HLM,
2016 WL 9450454 (N.D. Ga. Mar. 3, 2016)......................................................20

*Kyle K. v. Chapman*,
208 F.3d 940 (11th Cir. 2000) ...............................................................................7

*Lima Delta Co. v. Global Aerospace, Inc.*,
325 Ga.App. 76 (2013) .........................................................................................21

*Louis Vuitton Malletier, S.A. v. Mosseri*,
736 F.3d 1339 (11th Cir. 2013) ...........................................................................23

*Lowery v. Noodle Life, Inc.*,
363 Ga.App. 1 (2022) ...........................................................................................11

*McCommons v. White*,
371 Ga.App. 93 (2024) .........................................................................................15

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
288 F.3d 1264 (11th Cir. 2002) ...........................................................................24

*Melia v. LexisNexis Risk Sols., Inc.*,
No. 1:23-CV-904-CAP-JEM,
2023 WL 7493534 (N.D. Ga. Oct. 10, 2023) ......................................................15

*Morris v. SSE, Inc.*,
843 F.2d 489 (11th Cir. 1988)..............................................................................18

*Naga Hanuman Fish Packers v. Sivani Int'l LLC*,
No. 1:23-CV-2019-SEG,
2023 WL 8505750 (N.D. Ga. Oct. 20, 2023) ...........................................5, 14, 16

*Patel v. Diplomat 1419VA Hotels, LLC*,
No. 1:13-cv-01588-SCJ,
2014 WL 11462722 (N.D. Ga. Feb. 4, 2014).. .....................................................14

*Peeples v. Caroline Container, LLC*,
No. 4:19-cv-00021-HLM,
2019 WL 12338070 (N.D. Ga. Apr. 3, 2019) ......................................................23

v

*Posner v. Essex Ins. Co.*,
    178 F.3d 1209 (11th Cir. 1999) ............................................................19

*Purvis v. Aveanna Healthcare, LLC*,
    563 F. Supp. 3d 1360 (N.D. Ga. 2021) ..............................................17

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249, 1275 (11th Cir. 2019) ..................................................7

*Quashie v. Olympus Am., Inc.*,
    315 F. Supp. 3d 1329 (N.D. Ga. 2018) ..............................................20

*Ralls Corp. v. Huerfano River Wind, LLC*,
    27 F. Supp. 3d 1303 (N.D. Ga. 2014) ................................................20

*Ramirez v. Paradies Shops, LLC*,
    69 F.4th 1213 (11th Cir. 2023) ..........................................................17

*RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*,
    579 F. App'x 779 (11th Cir. 2014) ....................................................25

*S. Ent. T.V., Inc. v. Comcast Corp.*,
    270 F. App'x 747 (11th Cir. 2008) ......................................................5

*Sun Nurseries, Inc. v. Lake Erma, LLC*,
    316 Ga.App. 832 (2012) ....................................................................14

*TMX Fin., LLC v. Goldsmith*,
    352 Ga.App. 190 (2019) ..............................................................6, 15

*United States v. Fidelity Capital Corp.*,
    920 F.2d 827 (11th Cir. 1991) ............................................................14

*Vogt v. Greenmarine Holding, LLC*,
    No. 1:01-CV-0311-JOF,
    2002 WL 534542 (N.D. Ga. Feb. 20, 2002) ......................................23

*Williams v. Booker*,
    310 Ga.App. 209 (2011) ....................................................................18

*Wooten v. La Salle Corr.,*
    748 F. Supp. 3d 1363 (M.D. Ga. 2024) ............................................................. 25

*W.P. Prods., Inc. v. Tramontina U.S.A., Inc.,*
    101 F.4th 787 (11th Cir. 2024) ..........................................................................13

## **Statutory Authority**

Fed. R. Civ. P. 12……………………………………………………………….24

O.C.G.A. § 9-10-91………………………………………………………...19–22

### **Other Authority**

*1 Fletcher Cyc. Corp.* § 43…………………………………………...………….6

# INTRODUCTION

Contrary to Centerbridge's arguments, Plaintiffs' allegations are not based on Centerbridge's position as a passive private equity funder of BioLab and KIK.[1] Instead, the allegations rely on much more than the typical private equity arrangement—conduct that both led to the Conyers fire and that demonstrates an unusual level of domination and control over KIK and BioLab's decisions. This level of control was so unusual that Standard & Poor noted in 2022 that the evidence "points to corporate decision-making that prioritizes the interests of the controlling owners." Doc. 138 ¶ 169. KIK and BioLab's controlling owner is Centerbridge.

The Complaint alleges Centerbridge drained resources from KIK and BioLab to such an extreme degree that Centerbridge precluded BioLab and KIK from exercising reasonable care in the face of a known catastrophic risk. Among other things, the Complaint alleges Centerbridge forced KIK to take out approximately $1.2 billion in low-quality, high-risk loans to finance its own acquisition. *Id.* ¶ 173–85. Centerbridge continued to burden KIK with debt, despite credit rating agencies' conclusion that KIK's "capital structure/debt burden" was "unsustainable." *Id.* ¶¶ 186–90. Then, instead of investing in safety improvements after multiple fires

---

[1] Unless otherwise noted, this brief uses capitalized terms as defined in the Consolidated Class Action Complaint ("the Complaint"). Doc. 138. Page numbers in citations to the Complaint and other documents in the record refer to page numbers found in the header affixed by the Court's electronic filing system.

1

and hazardous chlorine releases at KIK's facilities—including the Conyers Plant—Centerbridge forced KIK to distribute roughly $484 million in dividends, despite having never demanded a significant dividend before. *Id.* ¶¶ 191–98.

These facts more than sufficiently allege that Centerbridge's conduct renders it liable for its role in the devastating Conyers fire.

## BACKGROUND

The 2024 Conyers fire was neither unprecedented nor unexpected—it was the inevitable result of years of neglect, excessive profit extraction, and failure to address known, repeated dangers. By 2024, the Conyers Plant had a long, well-documented history of fires and chemical releases. In 2004, a warehouse fire injured 28 people and forced nearby residents to evacuate. *Id*. ¶ 229. In 2016, another fire triggered yet another evacuation. *Id.* ¶¶ 233–37. In September 2020, two separate incidents sent toxic plumes into the community: the first hospitalized nine firefighters and caused $1 million in damage, *id.* ¶¶ 238–43; the second, just days later, ignited a trailer filled with TCCA. *Id.* ¶ 244. The 2016 and 2020 fires, like the catastrophic 2024 fire, arose from the same well-understood risk: when small amounts of water come into contact with TCCA, a dangerous chemical reaction occurs, emitting heat and toxic, combustible gases, and "initiat[ing] a fire and caus[ing] explosions." *Id.* ¶ 3.

BioLab and KIK have operated the Conyers Plant since 2013. *Id*. ¶¶ 42, 56–

58, 93–96, 102–48. No one—neither KIK, BioLab, nor Centerbridge—challenges the allegation that KIK and BioLab are corporate alter egos. KIK and BioLab learned—repeatedly—that the Conyers Plant's safety systems and processes were inadequate. Beyond earlier fires, Georgia state regulators found as recently as 2024 that multiple areas in the Conyers Plant had been neglected "to the point of creating potential safety hazards." *Id*. ¶ 252. Still, KIK and BioLab failed to use reasonable care to prevent another massive fire and toxic release. *Id*. ¶¶ 193–94, 229–56, 283, 284–91, 306–08, 444. But KIK and BioLab did not operate in a vacuum.

Centerbridge acquired KIK in June 2015 via a leveraged buyout. *Id*. ¶¶ 65, 66, 173. Centerbridge put up only $413 million of the $1.653 billion purchase price. *Id*. ¶¶ 174–76. KIK financed the remaining $1.24 billion. *Id*. That means KIK assumed more than $1 billion in debt to *sell*—not buy—itself. Centerbridge then saddled KIK with even more debt, *id*. ¶¶ 186–89, and installed its personnel into KIK's corporate leadership, *see id*. ¶¶ 162–67, ensuring Centerbridge's continued dominance.

Centerbridge's control had predictable—and devastating—consequences. Rather than addressing the known risk of fire, Centerbridge repeatedly drained KIK's resources to service debt and enrich itself. After the two 2020 fires at the Conyers Plant—and after the same failure to protect TCCA from water destroyed KIK's Lake Charles, Louisiana plant in 2020, *id*. ¶¶ 191–92—Centerbridge forced KIK to issue $484 million in dividends in December 2020. *Id*. ¶ 195. Any company

3

with a truly separate corporate personality would have prioritized safety and reconstruction. KIK could not, because it was an instrument of Centerbridge's financial strategy.

Months *before* the Conyers fire, Centerbridge had another opportunity to invest in safety to protect KIK and BioLab employees and the communities hosting their facilities. Specifically, in June 2024, KIK sold off a company that it had purchased in 2016, receiving roughly $850 million. *Id.* ¶¶ 208–09. Though that sale presented a prime opportunity to strengthen KIK's financial position, KIK instead refinanced most of its existing debt and paid Centerbridge as much as $550 million in forced dividends. *Id.* ¶ 210. In all, KIK has paid Centerbridge roughly $1 billion in dividends since the multiple fires at the Conyers Plant and the destruction of the Lake Charles Plant in 2020. *Id.* ¶ 211.

Contrary to Centerbridge's suggestion, Plaintiffs' case against Centerbridge is not about run-of-the-mill private equity transactions in the abstract. Rather, Centerbridge ignored clear, repeated warnings and funneled resources away from safety. Those decisions establish that Centerbridge exerted *de facto* control over safety at BioLab/KIK's facilities. Specifically, Centerbridge had actual knowledge of the specific, recurring hazards at its TCCA-storing facilities and, in particular, the Conyers Plant. Still, it systematically prioritized its own profits over safety.

4

## ARGUMENT AND CITATION TO AUTHORITY

Plaintiffs have alleged specific facts that—when assumed true and all reasonable inferences from them are construed in Plaintiffs' favor—plausibly support Centerbridge's liability and this Court's ability to exercise its jurisdiction.

## I.    Plaintiffs' allegations against Centerbridge satisfy Rule 12(b)(6).

Rule 12(b)(6) requires only that a complaint "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[2] A complaint is facially plausible when it includes facts permitting "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he issue is not whether plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support its claims." *S. Ent. T.V., Inc. v. Comcast Corp.*, 270 F. App'x 747, 748 (11th Cir. 2008) (per curiam). In fact, "[a] complaint may proceed even if it strikes the judge that proof of the facts alleged is 'improbable' or that recovery is 'remote and unlikely.'" *Naga Hanuman Fish Packers v. Sivani Int'l LLC*, No. 1:23-CV-2019-SEG, 2023 WL 8505750, at *2 (N.D. Ga. Oct. 20, 2023) (quoting *Twombly*, 550 U.S. at 556).

### A.    Georgia law permits holding a parent liable for its subsidiary's torts.

A parent corporation can, "under appropriate circumstances," use a subsidiary

---

[2] Unless otherwise noted, quotations, citations, and alterations original to legal citations are omitted, and alterations and emphasis within this brief are added.

"to promote the parent's purposes yet maintain a separate identity from the subsidiary and avoid liability for the subsidiary's actions." *Kissun v. Humana, Inc.*, 267 Ga. 419, 421 (1997). But Georgia law *also* permits holding defendants jointly liable despite ostensible corporate separateness when one is the alter ego of another.

The alter ego doctrine applies equitable principles "to disregard" corporations' "separate and distinct legal existence" if one "corporation served as a mere alter ego or business conduit of" another. *Id.* at 419–20. Sometimes called the "instrumentality" doctrine, Georgia law permits an alter ego finding where one corporation controls another "in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation." *Id.* at 420. Thus, "disregard[ing] the separateness of legal entities" or "confus[ing]" their "otherwise separate" "control" will support alter ego liability. *TMX Fin., LLC v. Goldsmith*, 352 Ga.App. 190, 210 (2019).

Georgia law tracks that of other jurisdictions on this point. As summarized by the Fletcher Cyclopedia of Corporations, a court may disregard ostensible separation when one corporation "is merely an instrumentality, agency, conduit, or adjunct of another." *1 Fletcher Cyc. Corp.* § 43. This doctrine's "gist" "is misuse of the corporate form by turning the subsidiary into the [parent's] self-sacrificing lackey." *Id.* Plaintiffs have alleged that Centerbridge made KIK its self-sacrificing lackey.

None of the Defendants argues that the Complaint fails to plead that KIK and

BioLab are alter egos of one another. But Plaintiffs have also pled that the Centerbridge Defendants are alter egos of one another *and* of KIK.

### B. The Complaint alleges that CB Partners and Centerbridge Fund are—like KIK and BioLab—alter egos of one another.

The Complaint alleges that "Centerbridge Capital Partners III, LP," defined as "Centerbridge Fund," Doc. 138 ¶ 62, "is controlled and promoted by Centerbridge Partners, L.P.," defined as "CB Partners," *id.* ¶¶ 60, 100. Plaintiffs allege that "CB Partners operates through a number of subsidiary entities," *id* ¶ 151, Centerbridge Fund being one. The Centerbridge Defendants also share common founders, *id.* ¶¶ 155–56, and a common registered agent. *Id.* ¶¶ 61, 63.

But even if the Centerbridge Defendants weren't alter egos of one another, the Complaint alleges that they, together, controlled KIK. *Id.* ¶¶ 195, 197–98, 216, 218–19. "The fact that defendants are accused collectively does not render the complaint deficient." *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000). In fact, the Eleventh Circuit has reversed dismissal based on alleged "group pleading" because the complaint at issue defined "Defendants" to "mean each and every Defendant named in the caption above." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.,* 917 F.3d 1249, 1275 (11th Cir. 2019). Plaintiffs, meanwhile, define "Centerbridge Partners, LP and Centerbridge Capital Partners III, LP," collectively, "as 'Centerbridge.'" Doc. 138 ¶ 64.

Other authority confirms that Plaintiffs' allegations are not infirm because

they group the two Centerbridge Defendants. In *Amin v. Mercedes-Benz USA, LLC*, plaintiffs' complaint grouped two defendants, "Daimler and MBUSA[,] into a non-entity named 'Mercedes.'" 349 F. Supp. 3d 1338, 1353 (N.D. Ga. 2018). Judge Totenberg ruled that this grouping could "be fairly read to allege that both Defendants, collectively, are, in Plaintiffs' view, responsible for the conduct alleged." *Id.* The grouping did not, therefore, render the complaint "procedurally deficient." *Id*. Again, Plaintiffs defined "Centerbridge" similarly. Doc. 138 ¶ 64.

Moreover, as Judge Thrash observed in *Bolling v. Mercedes-Benz USA, LLC*, much of the information required to plead more specific allegations remains unavailable to Plaintiffs without discovery. No. 1:23-CV-671-TWT, 2024 WL 3972987, at *7 (N.D. Ga. Aug. 27, 2024). "Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery." *Id.* And this stage, Plaintiffs have sufficiently alleged that the Centerbridge Defendants are alter egos of one another, just as they have sufficiently alleged that KIK is an alter ego of the Centerbridge Defendants.

### C.    Plaintiffs have alleged that KIK is Centerbridge's alter ego.

Plaintiffs allege that "the Centerbridge Defendants have taken action, either alone or in concert with other Centerbridge entities, to influence, control and direct the operations of KIK." Doc. 138 ¶ 80. And despite Centerbridge's contrary insistence, Plaintiffs' allegations are not mere conclusions.

8

### 1.    "Centerbridge is not a passive investor in KIK."[3]

Centerbridge's treatment of KIK reflected its hands-on investment approach, and others took notice. The Complaint quotes public-facing Centerbridge documents touting its "integrated approach," *id.* ¶ 161, and the degree to which it "effectuate[s] operational improvements" and deploys "other value-creating strategies" for its portfolio companies. *Id.* ¶ 160.

KIK and Centerbridge also share key officers and directors. Namely, Elliott Weinstein, who serves as KIK's Vice President, Secretary, and among its Directors, is a CB Partners Managing Director. *Id.* ¶¶ 162–63. Steven Silver is both a CB Partners Managing Director and a Director of KIK. *Id.* ¶¶ 164–65. Susanne Clark serves CB Partners as a Managing Director General Counsel, Chief Sustainability Officer, Secretary, and as a KIK Director. *Id.* ¶¶ 166–67.

Common leadership alone may not be sufficient to support an inference of control, but these allegations do not stand alone. Plaintiffs have alleged not just common leadership, but also that Centerbridge took an active role in governing KIK. "S&P has rated KIK's governance structure as a negative consideration in its credit rating analysis." *Id.* ¶ 168. Standard & Poor also noted the degree to which Centerbridge drove KIK's decision-making. *Id.* ¶ 171. This supports an inference that "Centerbridge's dominance of KIK went beyond what is considered typical

---

[3] *Id.* Doc. 138 ¶ 159.

among majority owners," *id*. ¶ 172, and is not a benign fact.

### 2. Plaintiffs have alleged that Centerbridge forced KIK to act contrary to KIK's own interest.

Centerbridge forced decisions on KIK that Centerbridge knew would restrict KIK's ability to deploy necessary environmental, health, and safety measures. Contrary to Centerbridge's central thesis, Plaintiffs do not allege that "lawful and routine" transactions, Doc. 177-1 at 16, are—standing alone—a basis for tort liability. Rather, Plaintiffs' allegations regarding the debt Centerbridge required KIK to assume and maintain *against KIK's own interest* are evidence of Centerbridge's control over KIK.[4] These allegations are especially important for two reasons.

*First*, the degree to which Centerbridge loaded KIK with debt confirms Centerbridge's unfettered control over KIK. No truly separate corporation would have assumed the position KIK did. To start, when Centerbridge acquired KIK in 2015, it required *KIK* to take on more than $1 billion in debt to *sell* itself. *Id.* ¶¶ 174–76. Then, Centerbridge continued to saddle KIK with debt. In 2016, Centerbridge financed its acquisition of a chemical manufacturer "by loading" hundreds of millions in "debt onto KIK." *Id.* ¶ 188. The 2018 acquisition of another pool chemical maker "burdened KIK with an additional $175 million in debt." *Id.* ¶ 189.

While perhaps lawful, these transactions were *not* routine. The Complaint

---

[4] They are also, as discussed in Part I.D., below, evidence that Centerbridge created or exacerbated a dangerous condition posing a reasonably foreseeable risk of harm.

establishes Centerbridge's extraordinary treatment of KIK by alleging that ratings agencies repeatedly commented on Centerbridge's dominance over KIK. *Id.* ¶¶ 169–70, 185, 201–04, 207, 215. After the December 2018 acquisition of another pool chemical company, Standard & Poor predicted that KIK's "credit measures" would "deteriorate," and described KIK's "capital structure/debt burden" as "unsustainable in the long term*." Id.* ¶ 190. Years later, Moody's observed that KIK's "high leverage [and] private equity ownership" "could lead to financial policies … more favorable to shareholders" and "constrained" KIK's credit rating. *Id.* ¶¶ 203–04. In 2022, recognizing that the level of control Centerbridge exerted over KIK was so unusual, Standard & Poor noted that evidence "points to corporate decision-making that prioritizes the interests of the controlling owners." *Id.* ¶ 169.

In fact, KIK's practices *have* prioritized Centerbridge. Forced dividends alone, without management or other fees, "have given Centerbridge a profit of 142% on its initial equity investment," *id.* ¶ 213, while KIK remains responsible for billions in debt it did not carry before Centerbridge acquired it. Because Centerbridge has already extracted so much profit without responsibility for KIK's debt, it can continue to force KIK to act against KIK's own interest, including potentially an opportunistic bankruptcy filing. In any event, these facts all establish that Centerbridge has operated KIK to "evade statutory, contractual, or tort liability," supporting "alter ego liability." *Lowery v. Noodle Life, Inc.*, 363 Ga.App. 1, 4 (2022).

Moreover, when Centerbridge describes these as "standard" and "routine" transactions, *see* Doc. 177-1 at 7, 16, Centerbridge asks the Court to ignore Plaintiffs' allegations about those transactions' context. Courts "must look to the totality of circumstances [when resolving] the alter ego issue." *Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1312 (11th Cir. 2022). It is a matter of both law and common sense that, under certain circumstances, even lawful and routine transactions can signal malfeasance. For example, spouses routinely take out life insurance policies on one another. But when a husband takes out a policy on his wife one month *after* he takes a mistress and one month *before* his wife disappears, he can hardly complain when he becomes a suspect in his wife's disappearance. Here, too, Plaintiffs allege that these "standard transactions" amount to malfeasance against future involuntary creditors like Plaintiffs.

*Second*, Plaintiffs connect the transactions Centerbridge forced on KIK to KIK's history of disastrous fires. The transactions are *how* Centerbridge rendered KIK unable to act reasonably in response to the known fire risk. As the Complaint alleges, "[t]he Centerbridge Defendants' diversion of KIK's assets, revenue, and free cash flow was a material factor in KIK's inability to invest in adequate safety measures at KIK and BioLab facilities." Doc. 138 ¶ 81. The need for these safety measures was well known. There were two fires at the Conyers Plant in 2020, and that same year, a fire destroyed KIK's Lake Charles, Louisiana plant.

Instead of investing in safety or infrastructure, Centerbridge drained KIK of cash when it needed it most. Centerbridge "wanted to secure a profit through asset stripping before any other major incidents could occur." *Id.* ¶ 198. In late 2020 alone, after notice of deficient safety measures and KIK's pressing capital needs, Centerbridge extracted $484 million in dividends from KIK. *Id.* ¶ 191–95. "Any genuinely independent corporate entity in KIK's situation would have recognized the risk that additional incidents would pose to both the sustainability of KIK's business operations and the communities that host KIK facilities." *Id.* ¶ 194. KIK was *not*, however, independent of or separate from Centerbridge, and what happened following the Lake Charles fire compels this conclusion.

Four years later—and just months before the Conyers fire—Centerbridge forced another round of debt-financed dividends "between $450 million and $550 million." *Id.* ¶ 210. These transactions "divert[ed] all of KIK's free cash flow," *id.* ¶ 219, and "affirmatively prevented KIK and BioLab[] from undertaking necessary safety expenditures." *Id.* ¶ 291.

### 3.    Centerbridge faults Plaintiff for not pleading facts unavailable at the pleading stage.

Whether one defendant is another's alter ego is a "fact intensive" inquiry. *W.P. Prods., Inc. v. Tramontina U.S.A., Inc.*, 101 F.4th 787, 792 (11th Cir. 2024). For this reason, the question is typically reserved for a jury. *J-Mart Jewelry Outlets, Inc. v. Std. Design*, 218 Ga.App. 459, 460 (1995).

Yet, Centerbridge relies mostly on cases from the proof—rather than pleading—stage.[5] And even the pleading-stage cases Centerbridge cites involve fewer and far-less-specific allegations than Plaintiffs'. In *Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Limited*, plaintiffs alleged only some overlap between corporate leadership and consolidated financial statements. 43 F.4th at 1312 & n.4.[6] Other cases involved only "threadbare recitations of factors." *E.g., Innotex Precision Ltd. v. Horei Image Prods.*, 679 F. Supp. 2d 1356, 1360 (N.D. Ga. 2009); *Patel v. Diplomat 1419VA Hotels, LLC*, No. 1:13-cv-01588-SCJ, 2014 WL 11462722, at *4 (N.D. Ga. Feb. 4, 2014), *rev'd* 605 F. App'x 965, 966 (11th Cir. 2015) (error not to grant leave to amend). And unlike in *Naga Hanuman*, Plaintiffs are not relying on an unadorned assertion that Centerbridge used KIK for its "own purposes." 2023 WL 8505750, at *3. Instead, Plaintiffs have specifically pled that Centerbridge stripped assets from KIK when any independent corporation with a truly separate identity would have retained those assets, either to prevent additional industrial disasters or help communities recover from them. *See* Doc. 138 ¶ 194.

Centerbridge also faults Plaintiffs for omitting precise details about the cost

---

[5] *E.g., United States v. Fidelity Capital Corp.*, 920 F.2d 827, 837–40 (11th Cir. 1991); *Kipperman v. Onex Corp.*, No. 1:05-cv-01242, 2010 WL 11505688, at *36 (N.D. Ga. Sept. 29, 2010); *In re Heritage Org., L.L.C.*, 413 B.R. 438, 517 (Bankr. N.D. Tex. 2009); *Sun Nurseries, Inc. v. Lake Erma, LLC*, 316 Ga.App. 832, 841–42 (2012); *Hickman v. Hyzer*, 261 Ga. 38, 40 (1991).

[6] The *Herederos* Plaintiffs also failed to promptly seek jurisdictional discovery, something Plaintiffs *do* seek, as discussed more fully below.

of additional safety measures. *See* Doc. 177-1 at 8. But Rule 8—which governs initial pleading, prior to any discovery—does not require such detail, and for good reason. Such information is often within defendants' sole control. This argument, too, conflates the pleading and proof standards. A complaint need not include "all of the prima facie elements required to ultimately prevail on a claim." *Melia v. LexisNexis Risk Sols., Inc.*, No. 1:23-CV-904-CAP-JEM, 2023 WL 7493534, at *4 (N.D. Ga. Oct. 10, 2023) (collecting cases), *rep. and rec. adopted*, 2023 WL 7492186 (N.D. Ga. Nov. 3, 2023). Thus, "a court may not reject a legal theory at the pleading stage simply because the plaintiff did not plead a fact that he must prove to prevail on that theory at trial." *In re Generac Solar Power Sys.*, 735 F. Supp. 3d 1047, 1053 (E.D. Wis. 2024).

### 4. KIK's alleged insolvency also supports an inference that it is Centerbridge's alter ego.

To begin, insolvency equivalent to that required for bankruptcy is not—as Centerbridge would have the Court believe—necessary to establish that one entity is an alter ego of another for the purpose of tort liability. Georgia courts routinely affirm imposing alter ego liability without any discussion of insolvency specifically or the ability to pay debts generally. *E.g.*, *McCommons v. White*, 371 Ga.App. 93, 101–02 (2024); *Cobra 4 Enters. v. Powell-Newman*, 336 Ga.App. 609, 613 (2016); *TMX Fin., LLC*, 352 Ga.App. at 210. If anything, what is required is insolvency "in the sense that there are insufficient corporate assets to satisfy the plaintiff[s']

claim[s]." *Naga Hanuman*, 2023 WL 8505750, at *3.

Still, Plaintiffs have pled KIK's insolvency, even under the authority on which Centerbridge relies. Centerbridge twice cites *Kipperman v. Onex Corp.*, No. 1:05-cv-01242-JOF, 2010 WL 11505688 (N.D. Ga. Sept. 29, 2010). Centerbridge should know, then, that "equitable insolvency" applies to a debtor that "is operating with inadequate capital," a standard that examines "the debtor's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." *Id.* at *12. Plaintiffs allege Centerbridge's years-long strategy to "'ble[ed]' KIK of assets and cash flow" and "undercapitaliz[e]" the KIK entities "to improperly avoid [their] future debts." Doc. 138 ¶¶ 216–17. The Complaint also alleges that KIK has unusually high debt, *id.* ¶¶ 183–84, 190, and an insufficient capital cushion, relative to its capital needs. *Id.* ¶¶ 194–99, 205–207, 212, 219.

Similarly, Centerbridge cites *Hickman v. Hyzer*, 261 Ga. 38 (1991), three times. That case also supports Plaintiffs' position. In *Hickman*, the Georgia Supreme Court held that undercapitalization could justify piercing the corporate veil when "coupled with evidence of an intent at the time of the capitalization to improperly avoid future debts of the corporation." *Id.* at 40. Plaintiffs have alleged that KIK's forced dividends in 2020 and 2024—in the wake of fires at KIK's facilities—represent an effort by Centerbridge to deplete assets, in part, to avoid the liability for future claims like the ones brought by Plaintiffs.

**D.    Plaintiffs sufficiently allege Centerbridge is directly liable.**

Even assuming KIK were not Centerbridge's alter ego, Plaintiffs have stated direct liability claims against Centerbridge, whose sole argument against direct liability is that Plaintiffs have not pled a cognizable duty. However, Plaintiffs' Complaint alleges Centerbridge is liable under the well-established tort law principle that a party who creates or exacerbates a dangerous condition owes a duty to prevent reasonably foreseeable harm. *Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1219 (11th Cir. 2023). As *Ramirez*'s reliance on *City of Winder v. Girone*, 265 Ga. 723 (1995), confirms, Georgia has adopted this principle.

Plaintiffs plead that Centerbridge exacerbated known safety risks at the Conyers Plant by diverting critical financial resources from KIK and BioLab for its own benefit. Doc. 138 ¶¶ 8, 169–221. Centerbridge prioritized extracting value—stripping assets and directing substantial dividends to itself—while depriving the Conyers Plant of needed capital investments. *Id.* This increased the probability of foreseeable risk and aggravated the resulting harm. *Id.* These allegations suffice to plead a duty, imposed under Georgia law, based on Centerbridge's "alleged knowledge of [a] foreseeable risk." *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1368 (N.D. Ga. 2021).

Centerbridge is wrong to rely on *BP Exploration & Oil, Inc. v. Jones*, 252 Ga.App. 824 (2001), and *Hyde v. Schlotzsky's, Inc.*, 254 Ga.App. 192 (2002). Those

17

cases involved *passive* parents with no direct involvement in their subsidiaries' negligent conduct. *Jones*, 252 Ga.App. at 825–26; *Hyde*, 254 Ga.App. at 193. By contrast, Plaintiffs allege that Centerbridge is directly liable for its own affirmative actions as a joint tortfeasor. Doc. 138 ¶¶ 195–198, 209–10, 212, 217–220.

The same flaw undercuts Centerbridge's reliance on *Williams v. Booker*, 310 Ga.App. 209 (2011). There, the court rejected a "duty to inform" theory based on nonfeasance. *Id.* at 213. Here, Plaintiffs are not seeking to impose liability for inaction, but for Centerbridge's deliberate misconduct. Moreover, *Booker* was resolved on summary judgment after discovery, whereas Plaintiffs' burden at this stage is only to plead plausible claims. *Id.*

Nor can the Texas Supreme Court's decision in *In re First Reserve Management*, 671 S.W.3d 653 (Tex. 2023), salvage Centerbridge's argument. In *First Reserve*, the defendant's involvement was limited to board representation and investor advisory activities. *Id.* at 662. Plaintiffs' allegations go well beyond that, detailing Centerbridge's abnormal financial and managerial control over KIK and BioLab, its acquisition of KIK to extract value, and its close coordination with KIK in decisions perpetuating the hazardous conditions. *See* Doc. 138 ¶¶ 159–227.

## II. Plaintiffs have alleged the Court's personal jurisdiction over the Centerbridge Defendants.

A Rule 12(b)(2) motion to dismiss requires that the plaintiff establish a prima facie case of jurisdiction over the movant. *Morris v. SSE, Inc.*, 843 F.2d 489, 492

(11th Cir. 1988). In determining whether the plaintiff has satisfied that burden, the court must accept the complaint's allegations "as true, to the extent that they are uncontroverted[,] … and must construe all reasonable inferences in favor of the Plaintiff." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).

Georgia courts exercise personal jurisdiction over a defendant "if two requirements are met: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999). Plaintiffs' allegations meet both.

### A.    Plaintiffs' allegations satisfy Georgia's long-arm statute.

Plaintiffs plead three bases for jurisdiction under Georgia's long-arm statute: (1) transacting business in the state; (2) committing a tortious act within the state; or (3) causing in-state injury while deriving substantial revenue from in-state goods or services. O.C.G.A. § 9-10-91.

### 1.    Centerbridge has transacted business in Georgia.

Georgia courts apply a three-part test for whether a nonresident defendant has transacted business here within the meaning of O.C.G.A. § 9-10-91(1). (1) The defendant must have "purposefully" engaged in business activities in Georgia; (2) the claims must "arise out of or connect[] with" those activities; and (3) exercising jurisdiction must align with traditional notions of fairness and substantial justice. *Aero Toy Store, LLC v. Grieves*, 279 Ga.App. 515, 517–18 (2006).

*First*, Centerbridge engaged in business activities in Georgia when it acquired 100% of KIK and its core business BioLab, a Georgia company, [7] Doc. 138 ¶¶ 44, 66, and required them to pay management and transaction fees, *id.* ¶ 214. These transactions satisfy § 9-10-91(1)'s literal language. "There is no requirement that a plaintiff plead more than the bare minimum required by the long-arm statute." *Quashie v. Olympus Am., Inc.*, 315 F. Supp. 3d 1329, 1336 (N.D. Ga. 2018). *Knieper v. Forest Group USA, Inc.* is not to the contrary. No. 4:15-CV-0222-HLM, 2016 WL 9450454 (N.D. Ga. Mar. 3, 2016). Unlike here, the *Knieper* plaintiff failed to allege that the management and consulting fees were actually paid to the nonresident defendant and instead acknowledged that the payments may have been made to "a related third party" or "an affiliate." *Id.* at *2–3.

*Second*, Plaintiffs' claims arise directly from these transactions, as they enabled Centerbridge to wield absolute financial, strategic, and operational control over KIK and BioLab's safety infrastructure. Doc. 138 ¶¶ 159, 172, 214, 218. Centerbridge drained KIK and BioLab of critical resources to protect its profits at

---

[7] It doesn't matter that Centerbridge is based in Delaware and New York: "transacting business" within the state "*does not require* physical presence in Georgia." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1312 (N.D. Ga. 2014). Courts consider "tangible *and* intangible conduct," including "mail, telephone calls, and other 'intangible' acts, though occurring while the defendant is physically outside of Georgia," and then "ask whether it can fairly be said that the nonresident has transacted any business within Georgia." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1264 (11th Cir. 2010).

the expense of safety improvements, blocking essential upgrades and exacerbating the hazardous conditions leading to the Conyers fire. *Id.* ¶¶ 169–194, 216–19.

*Third*, exercising personal jurisdiction over Centerbridge also aligns with traditional fairness and substantial justice. When determining whether exercising jurisdiction passes this test, courts consider "the burden on defendant, the forum state's interest in adjudicating the dispute, plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution to controversies, and the shared interest of the states in furthering substantive social policies." *Aero Toy Store,* 279 Ga.App. at 518.

Those factors, too, support this Court's exercise of jurisdiction. Centerbridge has "identified no logistical or financial difficulties in defending a case in Georgia that would unduly burden" it. *Lima Delta Co. v. Global Aerospace, Inc.*, 325 Ga.App. 76, 82 (2013). In addition, the majority of the evidence is likely located in Georgia, making this jurisdiction the most convenient. *Id.* at 84. Finally, Georgia has an obvious interest in this dispute due to the fire's impact on Georgia citizens.

### 2.    Centerbridge committed torts within Georgia.

Centerbridge is also subject to jurisdiction because it committed tortious conduct within Georgia as required by O.C.G.A. § 9-10-91(2). Under Georgia law, a tort is committed "where the injury [was] sustained." *Harvey v. Merchan*, 311 Ga. 811, 814 (2021). Again, Centerbridge's draining of funds essential for safety

improvements, despite a history of violations and incidents, Doc. 138 ¶¶ 245–56, resulted in the fire causing Plaintiffs' injuries. Because the fire and injuries occurred in Georgia, Georgia is where "the injury sustained was suffered," *Harvey*, 311 Ga. at 814, and Georgia is thus where the tort occurred.

### 3.    Centerbridge caused tortious injury within Georgia.

For this same reason, Centerbridge is subject to jurisdiction under the long-arm statute's third prong, as Centerbridge's actions caused tortious injury within Georgia. O.C.G.A. § 9-10-91(3). Because Centerbridge regularly conducts business in Georgia and "derives substantial revenue" from its activities here, its conduct also satisfies § 9-10-91(3)'s second element. *Id*. Centerbridge, after all, extracted a 142% profit from its investment in KIK, whose core business is Georgia-based BioLab, forcing KIK to issue massive dividends in 2020 and 2024. Doc. 138 ¶ 90, 213. In sum, the Complaint details *how* Centerbridge blocked critical safety infrastructure upgrades by extracting assets precisely when a responsible (and truly independent) company would have reinforced safety measures. Doc. 138 ¶¶ 169–227.

### B.    Plaintiffs' allegations comport with due process.

The exercise of specific jurisdiction over a nonresident defendant satisfies federal due process requirements if: (1) "the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum;" (2) the defendant "purposefully availed [itself] of the privilege of conducting activities within the

forum state, thus invoking the benefit of the forum state's laws;" and (3) "the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). This test is satisfied where the defendant "purposefully directed" its activities at the forum and the litigation arises from those activities and boils down to whether the defendant had "fair warning" that it could be subject to suit in the forum. *Diamond Crystal Brands*, 593 F.3d at 1267.

To begin, Centerbridge concedes, as it must, that the Court can attribute KIK's contacts to it if the companies are alter egos. Doc. 177-1 at 14. Indeed, "a subsidiary's contacts can justify jurisdiction over the parent when the subsidiary is a mere 'alter ego' of the parent company." *Herederos*, 43 F.4th at 1312. As shown above, Plaintiffs allege alter ego liability, and they allege far more than overlap between corporate leadership, unlike in *Drumm Corp. v. Wright*, 326 Ga.App. 41 (2014), and *Vogt v. Greenmarine Holding, LLC*. No. 1:01-CV-0311-JOF, 2002 WL 534542, at *6 (N.D. Ga. Feb. 20, 2002).

But even if KIK and BioLab's actions (and contacts) were not attributable to it, Centerbridge would remain subject to jurisdiction. This was the case in *Peeples v. Caroline Container, LLC*, where Judge Murphy found that a foreign parent was subject to jurisdiction based on its "own efforts." No. 4:19-cv-00021-HLM, 2019 WL 12338070, at *5 (N.D. Ga. Apr. 3, 2019). Plaintiffs' claims, too, arise directly

23

out of Centerbridge's own efforts directed at Georgia. Centerbridge stripped BioLab and KIK of assets when it should have been investing in safety. Doc. 138 ¶¶ 194, 229, 245–256. These are not "random, fortuitous, or attenuated" acts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73, 475 (1985). And though personal jurisdiction has no causation requirement, *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 362 (2021), Plaintiffs have alleged Centerbridge rendered BioLab and KIK unable to protect the Conyers community. Accordingly, Plaintiffs have more than met their pleading burden.

In sum, Centerbridge has failed to make a "compelling case" that "the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal*, 593 F.3d at 1267. And a compelling case is what the law requires. *Id.* As a multi-billion-dollar firm, Doc. 138 ¶ 157, Centerbridge faces minimal burden litigating in Georgia, especially given its in-state activities and financial resources. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1276 (11th Cir. 2002). Moreover, Georgia has a strong interest in this dispute, as the harm occurred within the state and affected its residents. *Id.* Exercising jurisdiction over Centerbridge therefore comports with due process.

### C.    Were the Court to find Plaintiffs' allegations insufficient, it should order jurisdictional discovery rather than dismissal.

"Resolution of a pretrial motion that turns on findings of fact—for example, a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P.

12(b)(2)—may require some limited discovery before a meaningful ruling can be made." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). In the Eleventh Circuit, "courts should order limited jurisdictional discovery where the information the plaintiff seeks, if it exists, would give rise to jurisdiction." *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 F. App'x 779, 790 (11th Cir. 2014).

Given that Centerbridge, KIK, and BioLab are all privately held companies "with little publicly available information," there is a "significant evidentiary asymmetry." *Wooten v. La Salle Corr.,* 748 F.Supp.3d 1363, 1369 (M.D. Ga. 2024). This asymmetry can be ameliorated, as in *Wooten*, by permitting Plaintiffs to conduct discovery about, among other things:

1) The dividends Centerbridge extracted in 2020 and 2024, including any discussions about the impact thereof and communications among Centerbridge, KIK, and BioLab;

2) General Ledgers of Centerbridge, KIK, and BioLab from 2019–present;

3) BioLab/KIK's full balance sheets from 2019 (the year before the 2020 dividends) through the present;

4) Records of contacts by the Centerbridge Defendants with Georgia, including the Conyers Plant; and

5) Centerbridge's knowledge of safety issues at the KIK/BioLab facilities, including prior fires and/or releases.

## CONCLUSION

For the reasons set out above, the Court should deny Centerbridge's motion.

Respectfully submitted this 24th day of March, 2025.[8]

|  | /s/ Jason J. Carter |
|---|---|
| Daniel R. Flynn | Jason J. Carter |
| Admitted *Pro Hac Vice* | Ga. Bar No. 141669 |
| DICELLO LEVITT LLP | BONDURANT MIXSON & ELMORE, LLP |
| Ten North Dearborn Street, Sixth Floor | 1201 West Peachtree Street, Suite 3900 |
| Chicago, Illinois 60602 | Atlanta, Georgia 30309 |
| (312) 214-7900 | (404) 881-4100 |
| dflynn@dicellolevitt.com | carter@bmelaw.com |

Daniel R. Flynn
Admitted *Pro Hac Vice*
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth
Floor
Chicago, Illinois 60602
(312) 214-7900
dflynn@dicellolevitt.com

Jean Sutton Martin
Admitted *Pro Hac Vice*
MORGAN & MORGAN
201 N. Franklin St., 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com

Jason J. Carter
Ga. Bar No. 141669
BONDURANT MIXSON & ELMORE, LLP
1201 West Peachtree Street, Suite 3900
Atlanta, Georgia 30309
(404) 881-4100
carter@bmelaw.com

L. Chris Stewart
Ga. Bar No. 142289
STEWART MILLER SIMMONS TRIAL ATTORNEYS
55 Ivan Allen Jr. Boulevard, Suite 700
Atlanta, Georgia 30308
(404) 529-3476
cstewart@smstrial.com

*Counsel for Plaintiffs*

---

[8] Pursuant to Local Rule 7.1D, Plaintiffs' counsel certifies that this brief was prepared with a font and point selection approved by Local Rule 5.1C.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing **RESPONSE TO CENTERBRIDGE DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This 24th day of March, 2025.

*/s/ Jason J. Carter*