UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE: BIO-LAB CLASS ACTIONS

CIVIL ACTION NO.
1:24-CV-4407-SEG

# **O R D E R**

This matter is before the Court on Defendants Bio-Lab, Inc. ("Bio-Lab"),
KIK International LLC, KIK U.S. Holdings LLC, and KIK Custom Products
Inc.'s (collectively, the "KIK Defendants") partial motion to dismiss.  (Doc.
176.)[1]  Defendants move to dismiss Plaintiffs' claim for strict liability and their
request for medical monitoring.  After careful consideration, the Court enters
the following order.

---

[1] The Court will address Defendants Centerbridge Partners, L.P. and
Centerbridge Capital Partners III, L.P.'s (together, the "Centerbridge
Defendants") motion to dismiss (Doc. 177) in a separate order.

## I.    Background[2]

This is a putative class action stemming from a fire that engulfed a chemical plant in Conyers, Georgia last year.  The plant is owned by Bio-Lab, a company that manufactures swimming pool chemicals.  (Consolidated Class Action Complaint ("CAC"), Doc. 138 ¶¶ 40-42.)

### A. The Fire

On September 29, 2024, a fire erupted at Bio-Lab's Conyers plant, producing a "toxic chemical plume" that was visible as far as 30 miles away. (*Id.* ¶ 1.)



---

[2] The following facts are derived from Plaintiffs' Consolidated Class Action Complaint ("CAC").  (Doc. 138.)  For purposes of resolving the pending motion to dismiss, the Court accepts the well-pled allegations as true and construes them in the light most favorable to Plaintiffs.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

(*Id.*)  As a result of the fire, authorities in Rockdale County where the plant is located issued an alert directing over 17,000 residents near the facility to evacuate.  (*Id.* ¶¶ 309-310.)  Rockdale County also closed an eight-mile stretch of Interstate 20 until the next morning.  (*Id.* ¶¶ 311-312.)  At 7:45pm on the evening of the fire, the County issued a shelter-in-place order for all residents, affecting more than 90,000 people.  (*Id.* ¶ 314.)  The shelter-in-place order remained in effect for over a week and was extended even further for residents within two miles of the plant.  (*Id.* ¶¶ 320-22.)  Piedmont Rockdale Hospital evacuated patients and diverted others, delaying care for people seeking emergency medical treatment.  (*Id.* ¶ 323.)  In addition, Rockdale County schools cancelled in-person classes until October 21, forcing over 15,000 students to attend school virtually.  (*Id.* ¶ 324.)

According to Plaintiffs, "Plant 12" (or "Building 12") was the source of the September 2024 fire at the Conyers facility.  (*Id.* ¶ 293.)  Plaintiffs allege that Plant 12 stored large quantities of chemicals that were highly combustible and prone to causing fires.  Citing a November 2024 U.S. Chemical Safety Board ("CSB") report, Plaintiffs indicate that the primary chemicals stored at Plant 12 were TCCA and DCCA.[3]  (*Id.* ¶ 267.)  TCCA, or "trichloroisocyanuric

_____

[3] The CAC does not identify the full chemical name for DCCA.

acid," is an "algaecide, bactericide, and swimming pool disinfectant that is also an active ingredient in household bleaches." (*Id.* ¶¶ 2, 270.) Per Plaintiffs, "[w]hen TCCA comes into contact with water, it causes an exothermic reaction that gives off a significant amount of heat and decomposes the TCCA into chlorine gas and nitrogen trichloride." (*Id.* ¶ 3.) As such, TCCA's exposure to small amounts of water can cause "a runaway reaction" that generates fire and explosions. (*Id.* ¶¶ 3, 271.) Similarly, wet DCCA produces explosion hazards like nitrogen trichloride. (*Id.* ¶ 269.)

Plaintiffs assert, moreover, that TCCA and DCCA are harmful to human health, particularly when they combust and decompose during a fire. For instance, TCCA is "severely irritating to eyes and can cause serious and irreversible eye damage and burns[,]" as well as respiratory distress. (*Id.* ¶ 270.) DCCA is a "corrosive chemical" that can cause similar respiratory problems, skin corrosion, and eye damage. (*Id.* ¶ 268.) As TCCA and DCCA decompose, they "can release toxic and corrosive products such as chlorine gas and hydrogen chloride" which are also hazardous to human health. (*Id.* ¶ 267.)

In the hours and days following the fire, the U.S. Environmental Protection Agency and Georgia Environmental Protection Division detected chlorine, chlorine compounds, chloramine, carbon monoxide, hydrogen chloride, and phosgene in the air over Rockdale County. (*Id.* ¶¶ 352-53.)

Plaintiffs cite an atmospheric measurement system, which allegedly detected a 1,400-times increase in chlorine-containing particles and a 170-times increase in bromine-containing particles in Decatur on the day after the fire. (*Id.* ¶ 354.)  While Plaintiffs say they have yet to identify all the chemicals released by the Bio-Lab fire, they assert that the toxic plume contained "chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide, and phosgene, among other chemicals known only to Defendants." (*Id.* ¶ 426.)

These chemicals, Plaintiffs allege, "are incredibly caustic, and even short-term exposures can cause severe, life-changing injuries." (*Id.* ¶ 427.) According to Plaintiffs, hundreds of residents of Rockdale County have "visited emergency rooms and clinics complaining of symptoms associated with an exposure to the BioLab smoke[.]" (*Id.* ¶ 355.)  Moreover, Plaintiffs claim that due to the release of toxic chemicals and debris from the fire, residents in communities surrounding Bio-Lab's facility have been unable to fully use their property. (*Id.* ¶ 356.)

### B. Previous Fires and Regulatory Issues

Plaintiffs allege that Bio-Lab's Conyers plant has experienced several large fires over the past two decades.  For instance, in 2004, a warehouse at the facility caught fire after an explosion involving 250,000 pounds of dry chlorine pellets. (*Id.* ¶¶ 229-30.)  That fire allegedly injured 28 people and

emitted a toxic chlorine plume that forced the evacuation of residents within a 1.5-mile radius of the plant.  (*Id.* ¶¶ 229-32.)  Again, in 2016, a storage shed containing chlorine pellets caught fire leading to the evacuation of residents within a mile of the plant.  (*Id.* ¶¶ 233-37.)  Approximately four years before the incident at issue here, in September 2020, the Bio-Lab facility ignited from a chemical reaction caused by unpackaged TCCA coming into contact with water.  (*Id.* ¶¶ 238-39.)  The 2020 incident again led to evacuations and nine responding firefighters were hospitalized from exposure to toxic fumes.  (*Id.* ¶¶ 240, 243.)  Following the fire, chlorine levels at a nearby business property were measured at 12 times the applicable federal exposure limit.  (*Id.* ¶ 241.) The fire also caused over a million dollars in property damage.  (*Id.* ¶ 242.)

In the years leading up to the 2024 fire, Plaintiffs state, environmental regulators discovered several violations at the Bio-Lab facility.  (*Id.* ¶¶ 245-56.)  For example, in February 2024, Georgia environmental regulators cited Bio-Lab for violating the Resource Conservation and Recovery Act ("RCRA"). (*Id.* ¶ 252.)  Specifically, "regulators found multiple improperly sealed and unlabeled hazardous waste containers on site" and noted that "multiple areas . . . showed a neglect of maintenance to the point of creating potential safety hazards."  (*Id.*)  Plaintiffs also claim that in the past five years, Bio-Lab has

faced several formal and informal enforcement actions for noncompliance with the Clean Air Act and Clean Water Act. (*Id.* ¶¶ 245-49.)

### C. Plaintiffs

The named Plaintiffs in this case are several residents and businesses located in the vicinity of Bio-Lab's Conyers facility who were impacted by the September 2024 fire. (*Id.* ¶¶ 357-88.) To take one example of many, Plaintiff Teresa Boyd, a teacher in Rockdale County, was attending church near Bio-Lab's plant at the time of the fire. (*Id.* ¶ 362.) She alleges that she soon began to suffer symptoms including "skin irritation, a headache, coughing, shortness of breath, and aching of the eyes, nose, throat, and ears." (*Id.*) When she returned home, she discovered that her dog had gotten sick and her husband and son were also feeling ill. (*Id.* ¶ 363.) The Boyd family then decided to evacuate their home for four days. (*Id.*) Upon returning, however, Ms. Boyd's family was still under a shelter-in-place order that advised them to avoid running any air conditioning. (*Id.* ¶ 364.) According to Ms. Boyd, her health and that of her family continued to deteriorate and each of them received medical treatment. (*Id.*) Ms. Boyd also has been unable to fully use and enjoy her home due to the presence of smoke, debris, and harmful pollutants that have been deposited on her property from the fire. (*Id.* ¶ 365.)

Among the several named business Plaintiffs, Pittman Construction operates a business within the area covered by the evacuation alert issued by Rockdale County in the wake of the fire. (*Id.* ¶ 377.) As a result of the fire, Pittman Construction was forced to send over 125 employees home for three days. (*Id.*) Moreover, Pittman Construction stores equipment and machinery needed by its independent contractors for construction jobs. (*Id.* ¶ 378.) Because Pittman Construction was unable to operate, and its independent contractors could not access any equipment at its facility, the company lost revenue. (*Id.* ¶¶ 377-78.)

The CAC defines the putative class in this case as "[a]ll persons who resided, owned property, worked or operated businesses within a 25-mile radius the Conyers Plant on September 29, 2024." (*Id.* ¶ 395.) The class definition, however, excludes any personal injury claims. (*Id.* ¶ 398 ("Also excluded from the Class are any personal injury claims.").)

### D. Defendants

In addition to Bio-Lab, the owner of the Conyers chemical plant, the CAC names several defendants that can be categorized into two groups. The KIK Defendants—KIK International LLC, KIK Custom Products Inc., and KIK U.S. Holdings LLC—are various entities that are alleged to be parent companies of Bio-Lab and alleged to have directly operated the Conyers

facility.  (*Id.* ¶¶ 47-59, 78-79.)  According to Plaintiffs, Bio-Lab is a wholly owned subsidiary of KIK International LLC.  (*Id.* ¶ 93.)  The sole member of KIK International LLC is KIK U.S. Holdings LLC, and in turn, KIK Custom Products Inc. is the sole member of KIK U.S. Holdings LLC.  (*Id.* ¶¶ 94-95.)

The second group—the Centerbridge Defendants—is comprised of Centerbridge Capital Partners III, LP and Centerbridge Partners, LP.  (*Id.* ¶¶ 60-66.)  Plaintiffs allege that Centerbridge Capital Partners III, LP is a controlling shareholder of the KIK Defendants, and that Centerbridge Partners, LP controls Centerbridge Capital Partners III, LP.  (*Id.* ¶¶ 97-100.) The relationship between the Centerbridge Defendants and Bio-Lab, or lack thereof, will be addressed in greater detail in the Court's forthcoming order on the Centerbridge Defendants' motion to dismiss.  (*See* Doc. 177.)

### E. Procedural History

Between September 30, 2024, and November 5, 2024, over twenty putative class actions were filed in this Court bringing various claims related to the Bio-Lab fire. (Doc. 59, 97.)  On November 5, 2024, the Court consolidated the related cases into the present action.  (*Id.*)  Soon after, the Court appointed interim class counsel to represent Plaintiffs through the pre-class certification phase of the proceedings.  (Doc. 112.)

On January 10, 2025, Plaintiffs filed a Consolidated Class Action Complaint ("CAC") against the Bio-Lab, KIK, and Centerbridge Defendants. (Doc. 138.)  The CAC asserts four claims against Defendants: (1) Negligence; (2) Trespass to Land; (3) Public Nuisance; and (4) Ultrahazardous Activity/Strict Liability.  (*Id.* ¶¶ 440-91.)  In addition to monetary damages, Plaintiffs "seek equitable relief in the form of a medical monitoring program, and establishment of a medical monitoring fund, to compensate them for ongoing screening for early detection and treatment of illnesses, diseases, or disease processes necessitated by their exposure to toxic chemicals . . . and debris arising from" the Bio-Lab fire.  (*Id.* ¶ 422.)  Plaintiffs contend that they face increased risks of disease from exposure to hazardous substances emitted by the fire, and that "[t]hese increased risks are such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic testing and necessary examinations for early detection and treatment of these illnesses, diseases, and disease processes."  (*Id.* ¶ 428.)

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the

light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## III.   Discussion

The Bio-Lab and KIK Defendants move to dismiss Plaintiffs' claim for strict liability and their request for medical monitoring.[4]  (Doc. 176.)  Before turning to the merits of Defendants' motion, the Court addresses the substantive law to be applied to Plaintiffs' claims.

### A. Application of Georgia Law

The parties appear to agree that Georgia law applies to Plaintiffs' claims. This Court has jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").  (*See* Doc. 54-1, 58.)  Because "CAFA broadens diversity jurisdiction for certain qualifying class actions[,]" *Braud v. Transp. Serv. Co.*, 445 F.3d 801, 803 (5th Cir. 2006), the Court must apply Georgia's choice-of-law rules to determine what body of law governs Plaintiffs' claims.  *See Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998) ("Federal courts sitting in diversity apply the forum state's choice-of-law rules.").

Georgia follows the choice-of-law rule of *lex loci delicti*, which holds that "tort cases are governed by the substantive law of the state where the tort was committed."  *Federated Rural Elec. Ins. Exchange v. R.D. Moody & Associates,*

---

[4] The Centerbridge Defendants also join the Bio-Lab and KIK Defendants' partial motion to dismiss.  (Doc. 177-1 at 3 n.1.)

*Inc.*, 468 F.3d 1322, 1325 (11th Cir. 2006) (citing *Fed. Ins. Co. v. Nat'l Distrib. Co., Inc.*, 417 S.E.2d 671, 673 (Ga. Ct. App. 1992)).  "A tort is committed where the last event occurred necessary to make an actor liable for the alleged tort." *Erler v. Hasbro, Inc.*, 506 F. Supp. 3d 1275, 1291 (N.D. Ga. 2020) (cleaned up). And "the last event necessary to make an actor liable for a tort is usually an injury."  *Id.* (cleaned up); *see McCarthy v. Yamaha Motor Mfg. Corp.*, 994 F. Supp. 2d 1329, 1332 (N.D. Ga. 2014) ("[T]he place of wrong, the *locus delicti*, is the place where the injury sustained was suffered rather than the place where the act was committed, . . . ." (quoting *Risdon Enters., Inc. v. Colemill Enters., Inc.*, 324 S.E.2d 738, 740 (Ga. Ct. App. 1984)).  Here, Plaintiffs have alleged that they sustained their injuries in Georgia.  (*See* Doc. 138 ¶¶ 9-39; 357-88.) Accordingly, the Court will evaluate Plaintiffs' claims pursuant to Georgia law.

The Eleventh Circuit has instructed that when "a state's highest appellate court (in this case the Georgia Supreme Court) has addressed an issue of state law, [courts must] simply apply its holding."  *CSX Transportation, Inc. v. Gen. Mills, Inc.*, 82 F.4th 1315, 1326 n.6 (11th Cir. 2023).  However, when a court is "confronted with a state-law issue of first impression, [it] must attempt to predict how the state's highest court would decide the issue."  *Id.*  "Absent certainty from the state's highest court," a district court must "apply the decisions of the state's intermediate court—here,

the Georgia Court of Appeals—unless there is persuasive indication that the Georgia Supreme Court would rule otherwise." *Id.* (cleaned up); *see Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004). With these principles in mind, the Court turns to consideration of Plaintiffs' claim for strict liability and request for the remedy of medical monitoring.

### B. Strict Liability Claim

There is "no general rule of strict liability in Georgia[.]" *McEntyre v. Sam's E., Inc.*, 870 S.E.2d 385, 389 (Ga. 2022) (quoting *Reeves v. Bridges*, 284 S.E.2d 416, 418 (Ga. 1981)). Rather, strict liability is only available (1) where a statute imposes strict liability, or (2) in "certain circumstances involving abnormally dangerous activities . . . ." *Id.*

Plaintiffs do not identify a statute imposing strict liability for injuries caused by the manufacture or storage of chemicals. Instead, they assert a claim for strict liability on the ground that "Defendants are engaged in an ultrahazardous activity in the manufacture, processing, and storage of chlorine and other hazardous chemicals." (Doc. 138 ¶ 142.) Plaintiffs allege that "[t]he manufacture, processing, and storage of highly toxic and combustible chemicals is abnormally dangerous and cannot be made safe by the exercise of the utmost care." (*Id.* ¶ 143.) Defendants argue that Plaintiffs have failed to sufficiently allege that manufacturing and handling pool chemicals is an

abnormally dangerous activity within the meaning of Georgia law. (Doc. 176 at 5-11.) As a result, Defendants contend, Plaintiffs cannot state a claim for strict liability. (*Id.*)

Georgia courts have provided little guidance on the circumstances under which an activity should be considered "abnormally dangerous" for purposes of imposing strict liability. *See Gullock v. Spectrum Scis. & Software, Inc.*, 146 F. Supp. 2d 1364, 1374 (M.D. Ga. 2001) ("Georgia courts have provided little guidance as to what constitutes an abnormally dangerous activity."). The Supreme Court of Georgia has noted that "[h]istorically," the abnormally dangerous label has been applied to "activities like owning vicious animals or explosive blasting[.]" *McEntyre*, 870 S.E.2d 385, 389 n.2 (Ga. 2022). Almost fifty years ago, in 1977, the Court also determined, in connection with a mining operation, that "the piling of dirt on [one's] own property in carrying out a legitimate business activity" was "not abnormally dangerous when supervised under the authority of the law of [the] state[.]" *Gen. Refractories Co. v. Rogers*, 239 S.E.2d 795, 798 (Ga. 1977).

The Georgia Court of Appeals has more recently evaluated whether certain enterprises were engaged in abnormally dangerous activities in two cases. *Lowry v. Cochran* considered a suit brought by a spectator who was struck by a skydiver whose parachute collapsed during a skydiving

demonstration.  699 S.E.2d 325, 327-29 (Ga. Ct. App. 2010), *overruled on other grounds by Dep't of Lab. v. McConnell*, 828 S.E.2d 352 (Ga. 2019).  The *Lowry* Court noted that "[w]hile Georgia courts have, on rare occasions, applied strict liability to activities deemed 'inherently dangerous,' that label has been applied only to activities such as mining or blasting."  *Id.* at 329.  Although the plaintiff had pointed to evidence demonstrating that skydiving was dangerous, none of the cited evidence "show[ed] that skydiving is inherently dangerous to *persons on the ground* or that such risk cannot be eliminated by the exercise of reasonable care."  *Id.* at 329.  On that basis, along with the fact that "Georgia courts have never applied strict liability to participants in aviation or recreational activities . . . ," the Court declined to apply strict liability on a theory of abnormal dangerousness.  *Id.* at 329-30.

Another case, *Combustion Chemicals, Inc. v. Spires*, involved "the emission of highly acidic water which . . . destroys a creek's ability to sustain normal aquatic life" in connection with a mining operation.  433 S.E.2d 60, 62 (Ga. Ct. App. 1993).  The Georgia Court of Appeals reasoned that it could not "hold as a matter of law that the activity of holding highly acidic water in ponds which may pollute streams running through the property of adjoining landowners is not a dangerous activity."  *Id.*  Conversely, the Court also declined to conclude, based on the evidence, "that the activity *is* dangerous as

16

a matter of law." *Id.* Instead, the Court suggested that the question of whether the activity was abnormally dangerous should have been submitted to the jury. *Id.* at 63 ("An appropriate charge to the jury in this case would simply have instructed the jury that if they found defendant conducted an abnormally dangerous activity which proximately caused plaintiffs' injuries, then defendant should be held liable for those injuries.").

The Restatement (Second) of Torts § 520 sets forth a six-part test to determine whether an activity is abnormally dangerous. At least one federal district court in Georgia has found that "[i]n the absence of any other state guidance, . . . the Supreme Court of Georgia would apply the Restatement test to determine whether [certain] activities were abnormally dangerous." *Gullock*, 146 F. Supp. 2d at 1375. In deciding whether an activity is abnormally dangerous, the Restatement considers the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977). While the comments to Section 520 of the Restatement suggest that all factors are to be considered, *id.* cmt. f.,

17

courts appear to place heightened emphasis on the third factor—whether the risk posed by an activity can be eliminated through the exercise of reasonable care. *See, e.g.*, *Lowry*, 699 S.E.2d at 329 ("[N]one of the evidence cited by Lowry shows that skydiving is inherently dangerous to persons on the ground or that such risk cannot be eliminated by the exercise of reasonable care."); *St. Cyr v. Flying J Inc.*, No. 3:06CV13 J33TEM, 2006 WL 2175662, at *4 (M.D. Fla. July 31, 2006) ("[T]he Court finds that the danger involved in the sale of propane can easily be eliminated by the exercise of reasonable care by use of proper handling and dispensing procedures . . . ."); *Gullock*, 146 F. Supp. 2d at 1375 ("More importantly, these risks are all eliminated with the exercise of reasonable care.").

Turning to the facts of this case, Plaintiffs contend that Bio-Lab's manufacture and storage of pool chemicals constitutes an abnormally dangerous activity. Specifically, Plaintiffs allege that Bio-Lab handles pool chemicals such as TCCA and DCCA that pose health hazards and are "known to be explosive or combustible." (Doc. 138 ¶¶ 265, 267.) Plaintiffs highlight that some of these pool chemicals can ignite from being wetted by a small quantity of water, thereby posing a high risk of fire and explosion. (*Id.* ¶¶ 271-72, 280.) TCCA, in particular, "is a strong oxidizer [that] can intensify existing fires" and "wet TCCA can generate nitrogen trichloride, which creates an

explosion hazard." (*Id.* ¶ 271.)  Further, Plaintiffs assert that when chemicals like TCCA and DCCA combust or decompose during a fire, they can release toxic and corrosive substances that are harmful to human health such as chlorine gas and hydrogen chloride.  (*Id.* ¶¶ 267-71.)

Plaintiffs also emphasize that Bio-Lab has had eight fires in its various facilities since 2004, and that at least eleven fires involving pool chemicals occurred nationwide between 1996 and 2000.  (*Id.* ¶¶ 229-44, 257-63.) According to Plaintiffs, "the fact that these fires keep happening is additional evidence that—if they are not caused by Defendants' negligence—then the storage and manufacturing of these chemicals is inherently dangerous."  (Doc. 190 at 26; *see also* Doc. 138 ¶ 486 ("The ultrahazardous nature of Defendants' conduct is evident in the history of repeated chemical fires at the Conyers Plant, and other BioLab facilities around the country, caused when water-reactive chemicals came into contact with water.").)

Although this issue presents a close call, at this early motion-to-dismiss stage, the Court finds that Plaintiffs have plausibly alleged that Bio-Lab's manufacture, use, and storage of water-reactive chemicals was abnormally dangerous.  In reaching this conclusion, the Court considers that while "Georgia courts have deemed certain activities to be abnormally dangerous as a matter of law, and others not, . . . nothing in [the] applicable precedent either

19

expressly or implicitly limit[s] the doctrine of strict liability for abnormally dangerous activities to those activities" historically recognized as such. *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1303 (N.D. Ga. 2005), *aff'd*, 230 F. App'x 878 (11th Cir. 2007); *see also Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1544 (10th Cir. 1992) (rejecting the proposition "that the law regarding ultrahazardous activities is static in Colorado"). Moreover, the Georgia Court of Appeals' holding in *Combustion Chemicals*—that "the activity of holding highly acidic water in ponds which may pollute streams running through the property of adjoining landowners" could not be ruled out as a dangerous activity "as a matter of law"—has certain parallels to this case. 433 S.E.2d at 62. There, too, the defendant was handling chemicals that were alleged to pose a high degree of risk of environmental harm to the surrounding area. *See id.* ("In this case, the activity complained of is not siltation but the emission of highly acidic water which . . . destroys a creek's ability to sustain normal aquatic life.").

Several of the Restatement factors also weigh in favor of permitting Plaintiffs' strict liability claim to move forward. With respect to the first and second factors, Plaintiffs have plausibly pled that there is an elevated risk of fire from handling large quantities of chemicals like TCCA and DCCA that are highly combustible. Further, they have pled that the harm which results from

20

fires involving such chemicals is likely to be great. Plaintiffs have explained various properties of these chemicals that make them unusually dangerous. (Doc. 138 ¶¶ 265-75, 280.) They have also alleged that several large fires at Bio-Lab's Conyers and Lake Charles plants caused property damage, injured people, and released toxic chemicals which prompted evacuation and shelter-in-place orders affecting thousands of people. (*Id.* ¶¶ 229-44, 257-63.) The September 2024 fire at issue here is alleged to have caused the evacuation of 17,000 people, prompted the sheltering-in-place of 90,000 residents, and disrupted approximately 2,200 businesses. (*Id.* ¶¶ 310-24.) According to the CAC, moreover, hundreds of residents near the Conyers Plant "visited emergency rooms and clinics complaining of symptoms associated with an exposure to the BioLab smoke[.]" (*Id.* ¶¶ 355 (internal quotation marks omitted).)

The parties vigorously dispute how the Court should weigh the critical third factor—whether the risk posed by an activity can be eliminated through the exercise of reasonable care. Plaintiffs argue that the combustible nature of chemicals like TCCA and DCCA, together with the history of frequent fires involving pool chemicals at Bio-Lab's plants and elsewhere, raise a plausible inference that the risks of handling such chemicals cannot be eliminated through reasonable care. For their part, Defendants emphasize that the CAC

is replete with factual allegations suggesting that the risks of storing pool chemicals *can* be eliminated through the exercise of due care.  (*See* Doc. 176-1 at 9-11.)   Plaintiffs allege, for example, that the Environmental Protection Agency ("EPA") issued a notice in 2001 concerning the "Safe Storage and Handling of Swimming Pool Chemicals" recognizing that "[h]azardous substances *are capable of being safely handled day-after-day* through a management system that ensures that good, written procedures are prepared, posted, and followed by trained employees."  (Doc. 138 ¶¶ 280-82 (emphasis added); *see also id.* ¶¶ 87, 193, 228, 284, 286-87, 306.)  Defendants contend that these allegations are inconsistent with the theory that Bio-Lab engaged in an abnormally dangerous activity and thus preclude Plaintiffs from asserting a strict liability claim.  (Doc. 176-1 at 9-10.)

Plaintiffs have the better argument at this early stage of the proceedings. Whether the risks of manufacturing and storing chemicals like TCCA and DCCA in large quantities can be eliminated through the exercise of reasonable care is a question more apt for resolution following evidentiary development in this case.  *See, e.g.*, *Henderson v. United States*, 965 F.2d 1488, 1495 (8th Cir. 1992) ("Whether reasonable care could have eliminated the risk of harm here is not so easily determined."); *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 842 F. Supp. 475, 479 (D.N.M. 1993) ("Whether strict liability

should actually be imposed in this case is an issue awaiting further development of the record, requiring an evaluation of the six factors of section 520 of the Restatement."). At the pleading stage, Plaintiffs' allegations regarding the combustible nature of TCCA and DCCA and the history of frequent fires involving such chemicals are sufficient to raise an inference that the risks of handling large quantities of them cannot be eliminated through reasonable care. *C.f. Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1308 (5th Cir. 1982) (holding that the disposal of toxic waste was an abnormally dangerous activity under Louisiana law and Section 520 of the Restatement); *Schwartzman, Inc.*, 842 F. Supp. at 479 ("[C]ourts in other jurisdictions have recognized the abnormally dangerous potential for hazardous waste generation, treatment, storage and disposal."); *Effkay Enters. v. J.H. Cleaners, Inc.*, No. CIV A 07CV-02521-LTB, 2008 WL 2357698, at *5 (D. Colo. June 5, 2008) (finding, at the motion-to-dismiss stage, that the handling, storage, and disposal of cleaning chemicals was plausibly an abnormally dangerous activity).

In addition, Plaintiffs are permitted to plead alternative and inconsistent theories of liability. *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014) ("It is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability.");

*United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009) ("Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims."). As such, Plaintiffs' allegations suggesting that the risks at issue can be eliminated through the implementation of safety measures do not count against them for purposes of a motion to dismiss. Indeed, two things may be true simultaneously. Defendants may have been negligent in managing certain safety risks at the Conyers Plant *and* the manufacture and storage of certain pool chemicals in large quantities may be an abnormally dangerous activity.[5]

In short, viewing the allegations in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have plausibly alleged that Bio-Lab was

---

[5] The remaining factors articulated by the Restatement—the commonality of the activity, the appropriateness of the activity to the place it is carried out, and the extent to which its value to the community is outweighed by its danger—are difficult to weigh without the aid of an evidentiary record. In any event, for an activity to be considered abnormally dangerous, "it is not necessary that each [factor] be present, especially if others weigh heavily." Restatement (Second) of Torts § 520, cmt. f (1977); *see also Effkay Enters.*, 2008 WL 2357698, at *5 ("Although these allegations do not address considerations d through f of the RESTATEMENT, the RESTATEMENT makes clear that all six inquiries need not be met.").

engaged in an abnormally dangerous activity. Accordingly, Defendants'
motion to dismiss is denied with respect to Plaintiffs' strict liability claim.[6]

### C. Medical Monitoring Fund

Among the remedies requested in the CAC, Plaintiffs seek the
establishment of a medical monitoring fund as a form of equitable relief "to
compensate them for ongoing screening for early detection and treatment of
illnesses, diseases, or disease processes necessitated by their exposure to toxic
chemicals, fumes, smoke, and debris arising from Defendant[s]' wrongful
conduct." (Doc. 138 ¶ 422.) Plaintiffs allege that such medical monitoring is
reasonably necessary due to the increased risk of illness associated with
exposure to hazardous substances released during the fire at the Bio-Lab
facility. (*Id.* ¶ 428.)

Plaintiffs, however, have explicitly excluded any "damages claims for any
current physical manifestation of personal or bodily injury" from their

---

[6] Although the Court will not prejudge the merits of any future motion for
summary judgment, it notes that Plaintiffs will have a heavy evidentiary
burden to demonstrate that the handling of the chemicals at issue constitutes
an abnormally dangerous activity. As the Restatement explains, for an activity
to be considered abnormally dangerous, it must create a risk "so unusual,
either because of its magnitude or because of the circumstances surrounding
it, as to justify the imposition of strict liability for the harm that results from
it, even though it is carried on with all reasonable care." Restatement (Second)
of Torts § 520, cmt. f (1977).

definition of the putative class in this case. (*Id.* ¶¶ 398, 421.) Defendants contend that Georgia law only permits medical monitoring as a remedy when a party alleges a present physical injury. (Doc. 176-1 at 11-17.) Because Plaintiffs have not alleged that they have suffered a present physical injury, Defendants argue that the Court should dismiss, or in the alternative, strike Plaintiffs' request for the establishment of a medical monitoring fund. (*Id.*)

After assessing the relevant cases presented by the parties, the Court is left with considerable uncertainty as to whether Georgia law permits medical monitoring as a tort remedy absent a current physical injury. In *Boyd v. Orkin Exterminating Co.*, the Georgia Court of Appeals considered an action brought by a family seeking to recover for injuries allegedly caused by a pest control company's negligent application of toxic insecticide inside their home. 381 S.E.2d 295, 296 (1989). The Boyds presented expert medical testimony that their children had significantly elevated levels of heptachlor, a toxic chemical that the insecticide contained, in their bloodstreams. *Id.* at 297. They contended that their children had "suffered an injury" and would require periodic medical monitoring in the future to ascertain whether they were developing any health problems due to their exposure to the toxic pesticide. *Id.* The trial court granted partial summary judgment for the pest control company, Orkin, to the extent the Boyds sought damages for an "increased risk

of cancer" and later entered a directed verdict in favor of Orkin on liability for any damages stemming from a current injury.  *Id.* at 296.

The Court of Appeals affirmed.  First, the Court determined that the directed verdict was proper because the Boyds could not recover actual damages against Orkin "based on expert testimony that the presence of elevated levels of the heptachlor metabolite in the children's blood itself constituted 'injury.'"  *Id.* at 298.  Instead, the Court held that "absent any indication that the presence of these metabolites had caused or would eventually cause *actual disease, pain, or impairment of some kind*, this testimony must be considered insufficient to support an award of actual damages in any amount."  *Id.* (emphasis added).

Second, the Court decided that partial summary judgment in favor of Orkin was warranted on the issue of whether the Boyds could recover for an alleged "increased risk of cancer" from exposure to the insecticides.  *Id.*  Citing an American Law Reports survey,[7] the Court stated that "[i]n those jurisdictions which have allowed recovery for an enhanced future risk of developing a new complication, the claimant has been required to establish to

---

[7] Admissibility of Expert Medical Testimony as to Future Consequences of Injury as Affected by Expression in Terms of Probability or Possibility, 75 A.L.R.3d 9 (1977).

a 'reasonable medical certainty' that such consequences will occur." *Id.* The Court concluded, however, that the evidence presented by the Boyds "f[ell] far short of that standard" and faulted them for "merely produc[ing] medical testimony that the children would require monitoring in the future to determine whether they developed health problems due to their exposure to the chemicals." *Id.*

The Eleventh Circuit, in an unpublished opinion, has read *Boyd* to preclude recovery of medical monitoring costs where a plaintiff fails to state a current physical injury. *Parker v. Wellman*, 230 F. App'x 878, 883 (11th Cir. 2007). The *Parker* plaintiffs sought damages for injuries allegedly caused by exposure to a hazardous substance, beryllium, during their employment. *Id.* at 879-80. They alleged, in part, that they "ha[d] suffered and w[ould] suffer in the future personal injuries in the form of sub-clinical, cellular, and sub-cellular damage" and had been "placed at substantially increased risk" of several diseases. *Id.* at 880. Affirming the district court's dismissal of the plaintiffs' request for medical monitoring, the *Parker* Court found that "because Plaintiffs' allegations of subclinical damage are insufficient to state a current physical injury, Plaintiffs are not entitled to recover the 'quantifiable costs of periodic medical examinations' as future medical expenses." *Id.* at 883 (citing *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1504 (11th Cir.

1985)).  The plaintiffs, the Eleventh Circuit reasoned, had "failed to point us to any Georgia authority that allows recovery of medical monitoring costs in the absence of a current physical injury, and *Boyd* suggests that Georgia would not recognize such a claim."  *Id.*

Following the *Parker* decision, however, the Supreme Court of Georgia addressed *Boyd* in the context of a data breach case.  In *Collins v. Athens Orthopedic Clinic, P.A.*, the Supreme Court of Georgia asked the question, "[w]hen a criminal steals consumers' sensitive personal data, what do those consumers have to plead against the allegedly negligent business from whom the data was stolen to show a legally cognizable injury under Georgia tort law?" 837 S.E.2d 310, 311 (Ga. 2019).  The plaintiffs in *Collins* alleged that "an anonymous hacker stole the personally identifiable information, including Social Security numbers, addresses, birth dates, and health insurance details, of at least 200,000 current and former patients of Athens Orthopedic Clinic ('the Clinic') from the Clinic's computer databases."  *Id.* at 311.  In their suit, the plaintiffs sought costs related to credit monitoring and identity theft protection.  *Id.* at 312.  The Clinic moved to dismiss the case.  *Id.*

Before reaching the Supreme Court of Georgia, a divided panel of the Court of Appeals "concluded that although the credit monitoring and other precautionary measures alleged by the plaintiffs were 'undoubtedly prudent,'

29

they were 'designed to ward off exposure to future, speculative harm' and thus 'insufficient to state a cognizable claim under Georgia law.'" *Id.* (quoting *Collins v. Athens Orthopedic Clinic*, 815 S.E.2d 639 (Ga. Ct. App. 2018)). The Court of Appeals analogized the case to *Boyd*, noting that both suits presented a scenario where "the defendant's alleged negligence exposed the Plaintiffs to a risk of harm which may or may not occur." *Id.* at 314 (quoting *Collins*, 815 S.E.2d 639). In addition, the Court of Appeals cited the Eleventh Circuit's unpublished opinion in *Parker* in support of its reliance on *Boyd*. *Id.* at 314 n.2.

The Supreme Court of Georgia rejected the Court of Appeals' reasoning based on *Boyd*. As an initial matter, the Supreme Court noted that *Boyd* and two other precedents cited by the Court of Appeals were issued at the summary judgment or class certification stage, where evidence was required to prevail, rather than on a motion to dismiss, where a plaintiff's allegations must be accepted as true. *Id.* at 314-315. The Supreme Court also distinguished the *Collins* plaintiffs' allegations from previous data breach cases which had presented a more speculative risk of harm. Specifically, the Court explained that while previous cases presented no "reason to believe that the data in question had in fact fallen into a criminal's hands; here, plaintiffs allege that their data was stolen by a criminal whose alleged purpose was to sell the data

to other criminals." *Id.* at 315.  As such, the Court concluded that the plaintiffs'

allegations that they faced an "imminent and substantial" risk of identity theft

was sufficient to state a cognizable injury with respect to their negligence claim

at the motion to dismiss stage.  *Id.* at 315-16.

In a footnote, the Supreme Court of Georgia acknowledged the Eleventh

Circuit's conclusion in *Parker* that *Boyd* precludes recovery of medical

monitoring costs where a plaintiff fails to state a current physical injury.

Specifically, the Supreme Court noted that the Court of Appeals had "cited an

unpublished Eleventh Circuit opinion surmising that *Boyd* 'suggests that

Georgia would not recognize' a claim for 'recovery of medical monitoring costs

in the absence of a current physical injury.'" *Id.* at 314 n.2 (quoting *Parker v.*

*Brush Wellman, Inc.*, 230 F. App'x 878, 883 (11th Cir. 2007)).  The Supreme

Court further stated that "[this] type of claim is not before us, and we express

no opinion on the viability of such a claim." *Id.* at 314 n.2.  A draft of the

Restatement (Third) of Torts has interpreted this footnote as "cast[ing] doubt"

on *Parker's* holding.  *See* Restatement (Third) of Torts: Miscellaneous

Provisions § 1_0, Tentative Draft No. 3 (2024) ("In 2019, however, the Georgia

Supreme Court cast doubt on *Parker*'s prediction in a footnote.").

The legal developments described above leave this Court with

uncertainty as to whether Georgia law permits a remedy of medical monitoring

where a plaintiff fails to allege a current physical injury.  While the Eleventh
Circuit's unpublished decision in *Parker* takes the clear position that such a
recovery is impermissible, the Eleventh Circuit has repeatedly cautioned lower
courts and litigants not to rely on unpublished opinions as precedential.  *See
Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016)
("In this Court, unpublished decisions, with or without opinion, are not
precedential and they bind no one."); *United States v. Irey*, 612 F.3d 1160, 1215
n.34 (11th Cir. 2010) ("Unpublished opinions are not precedential . . . ."); 11th
Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent . . .
.").

    Moreover, neither *Boyd* nor *Collins* provides a clear answer on the
availability of medical monitoring as a tort remedy.  One might fairly read
*Boyd* as expressing skepticism that Plaintiffs can recover for the costs of
medical monitoring based on an increased risk of future medical conditions.
*See Boyd*, 381 S.E.2d at 298 ("The appellants merely produced medical
testimony that the children would require monitoring in the future to
determine whether they developed health problems due to their exposure to
the chemicals.").  On the other hand, *Boyd* appears to have ultimately rested
its conclusion that the Boyds could not recover damages related to an increased
risk of cancer on a finding that the evidence presented on summary judgment

32

fell short of the "reasonable medical certainty" standard. *Id.* at 298 (explaining that other jurisdictions have only allowed recovery for a future risk of developing medical complications where the claimant has established such consequences will occur to "reasonable medical certainty" and finding that "[t]he evidence in the present case falls far short of that standard").

Adding to this Court's doubts as to the proper interpretation of *Boyd*, the decision did not clearly distinguish between a claim seeking compensation for the increased risk of future disease and a claim seeking medical monitoring. As some courts have explained, "an action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 850 (3d Cir. 1990); *see Redland Soccer Club, Inc. v. Dep't of the Army & Dep't of Def. of the U.S.*, 696 A.2d 137, 144 (Pa. 1997); *Petito v. A.H. Robins Co.*, 750 So. 2d 103, 106 (Fla. Dist. Ct. App. 1999). The Third Circuit, for instance, has reasoned that an injury based on enhanced risk "is inherently speculative because courts are forced to anticipate the probability of future injury[,]" while the remedy of medical monitoring "is much less speculative because the issue

for the jury is the less conjectural question of whether the plaintiff needs medical surveillance." *In re Paoli*, 916 F.2d at 850-51.

This Court expresses no view on whether medical monitoring ought to be a cognizable remedy under Georgia law. However, because *Boyd's* analysis did not clearly distinguish between compensation for the increased risk of disease and medical monitoring as a form of equitable relief, it is difficult to discern whether the Georgia Court of Appeals intended to entirely foreclose the availability of medical monitoring in the absence of a current physical injury. Further, the Supreme Court of Georgia in *Collins* "express[ed] no opinion on the viability of such a claim[,]" and as far as this Court is aware, has not considered the question since. 837 S.E.2d at 314 n.2.

Furthermore, there does not appear to be a nationwide consensus on the availability of medical monitoring as a remedy when no physical injury is present. To the contrary, "of the jurisdictions in which state courts or federal courts (predicting state law) have expressly considered . . . the issue, roughly half have authorized medical monitoring absent present injury . . . , while approximately half of courts reject such claims." Restatement (Third) of Torts: Miscellaneous Provisions § 1_0, Tentative Draft No. 3 (2024); *see also Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 440 (1997) (noting "that federal courts, interpreting state law, have come to different conclusions about"

34

whether medical monitoring costs provide "a sufficient basis for a tort recovery"); *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 438 (2d Cir.) ("Courts in other states considering whether claims for medical monitoring are cognizable under their respective state laws have reached varying results.").

Finally, the Court would be remiss if it did not acknowledge the high stakes involved in this action. The September 2024 Bio-Lab fire is alleged to have caused 17,000 people to evacuate, prompted another 90,000 to shelter-in-place for several days, and disrupted approximately 2,200 businesses. (Doc. 138 ¶¶ 310-24.) According to Plaintiffs, in the wake of the fire, hundreds of residents of Conyers, Georgia "visited emergency rooms and clinics complaining of symptoms associated with an exposure to the BioLab smoke[.]" (*Id.* ¶ 355 (internal quotation marks omitted).) Plaintiffs further contend that putative class members experienced "significant exposure to hazardous substances, which are known to cause serious illnesses, diseases, and disease processes." (*Id.* ¶ 428.) Given the uncertainty with respect to the availability of medical monitoring as a remedy under Georgia law, as well as the alleged far-reaching impacts of the Bio-Lab fire on Georgia residents, the Court finds it appropriate and prudent to certify this issue to the Supreme Court of Georgia.

## IV.    Certification of Questions to the Supreme Court of Georgia

Federal courts have discretion to certify "novel, unsettled questions of state law" to the state's highest court for resolution. *Pittman v. Cole*, 267 F.3d 1269, 1289 (11th Cir. 2001) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)); *see* O.C.G.A. § 15-2-9(a) (providing that, by rule of the Supreme Court of Georgia, federal courts may certify questions of law when the proceeding involves "questions of the laws of this state which are determinative of the case and there are no clear controlling precedents in the decisions of the Supreme Court of this state . . . ."); Ga. Sup. Ct. Rule 46.  The Eleventh Circuit has instructed that "[w]hen substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." *Mississippi Valley Title Ins. Co. v. Thompson*, 754 F.3d 1330, 1334 (11th Cir. 2014) (quoting *Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 761 (11th Cir. 1996)); *see id.* ("Only a state supreme court can provide what we can be assured are 'correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law.").  In determining whether certification is appropriate, federal courts consider factors such as "the closeness of the question"; "the

existence of sufficient sources of state law to allow a principled rather than conjectural conclusion"; "considerations of comity"; and the "practical limitations of the certification process." *Royal Cap. Dev., LLC v. Maryland Cas. Co.*, 659 F.3d 1050, 1055 (11th Cir. 2011).

As the Court has explained above, it has "substantial doubt" as to the availability of medical monitoring as a remedy under Georgia law where a plaintiff does not seek to recover for a present physical injury.[8]  The Supreme Court of Georgia has never squarely addressed the question.  Because of the importance of this issue, and its dispositive impact on Plaintiffs' request for medical monitoring, principles of federalism and comity weigh in favor of certification to the Supreme Court of Georgia.  *See Steele v. Comm'r of Soc. Sec.*, 51 F.4th 1059, 1065 (11th Cir. 2022) ("As a matter of federalism and comity, it is often appropriate to certify dispositive issues of [state] law to [the

---

[8] The Court also considers that federal courts in other jurisdictions have certified similar questions to their respective states' highest courts. *See, e.g.*, *Caronia*, 715 F.3d at 450 (certifying to the New York Court of Appeals the question of whether a smoker who had not been diagnosed with a smoking-related disease could "pursue an independent equitable cause of action for medical monitoring for such a disease?"); *Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 894 (Mass. 2009) (answering the certified question, "does the plaintiffs' suit for medical monitoring, based on subclinical effects of exposure to cigarette smoke and increased risk of lung cancer, state a cognizable claim and/or permit a remedy under Massachusetts state law?").

state's] highest court for decision."). Accordingly, the Court respectfully certifies the following questions to the Supreme Court of Georgia:

1. Under Georgia law, may plaintiffs who have been exposed to toxic substances which may cause future disease, but who do not claim a present physical injury, obtain medical monitoring as a form of equitable relief in a tort action?

2. If the answer is yes, what is the legal standard for obtaining such a remedy?

The Court's phrasing of these questions "is intended only as a guide." *United States v. Clarke*, 780 F.3d 1131, 1133 (11th Cir. 2015). The Court does not intend to restrict the Supreme Court of Georgia's consideration of the issues or the scope of its inquiry. If the Court has "overlooked or mischaracterized any state law issues or inartfully stated any of the questions . . . posed, [the Court] hope[s] the [Georgia] Supreme Court will feel free to make the necessary corrections." *Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1312 (11th Cir. 2000). To assist its consideration of these issues, the entire record of this case, including the parties' briefing, shall be transmitted to the Supreme Court of Georgia.

## V.    Conclusion

For the foregoing reasons, Defendants' partial motion to dismiss (Doc. 176) is **DENIED IN PART** and **DEFERRED and STAYED IN PART**.  The motion is denied with respect to Plaintiffs' strict liability claim.  The Court defers consideration of the motion as to Plaintiffs' request for a medical monitoring fund pending the Supreme Court of Georgia's response to the certified questions posed above.

The Clerk of Court is **DIRECTED** to transmit the full record of this case, including the parties' briefing, to the Supreme Court of Georgia.

**SO ORDERED**, this 15th day of September, 2025.

SARAH E. GERAGHTY
United States District Judge